**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | Case No. |
| v. | _____ |
| VITAS HOSPICE SERVICES, L.L.C., VITAS HEALTHCARE CORPORATION, VITAS CARE SOLUTIONS, INC., VITAS HEALTHCARE CORPORATION OF CALIFORNIA, VITAS HEALTHCARE CORPORATION OF ILLINOIS, VITAS HEALTHCARE CORPORATION OF FLORIDA, VITAS HEALTHCARE CORPORATION OF OHIO, VITAS HEALTHCARE CORPORATION OF ATLANTIC, VITAS HEALTHCARE OF TEXAS, L.P., VITAS HEALTHCARE CORPORATION MIDWEST, VITAS HEALTHCARE CORPORATION OF GEORGIA, VITAS HME SOLUTIONS, INC., VITAS OF NORTH FLORIDA, VITAS HOLDINGS CORPORATION, VITAS RT, INC., VITAS SOLUTIONS, INC., HOSPICE CARE INC., CHEMED CORPORATION, AND COMFORT CARE HOLDINGS CO., | |
| Defendants. | |

## UNITED STATES' COMPLAINT

The United States of America, by and through its undersigned counsel, alleges as follows:

**I.       Introduction**

1.       The United States brings this False Claims Act action against the publicly-traded company Chemed Corporation ("Chemed") and its subsidiaries named above (collectively referred to in this Complaint as "Vitas"), to recover losses sustained by the Medicare Program.

2. Medicare is a federally-funded program that provides medical insurance for certain items and services to qualified people. In addition to paying for doctor visits, nursing home care, and hospital stays, Medicare offers a hospice benefit for eligible Medicare beneficiaries. Hospice care services include palliative care, or care to relieve the pain, symptoms, and stress for Medicare beneficiaries who are expected to die within six months. Hospice care services are intended to include a comprehensive set of medical, social, psychological, emotional, and spiritual services.

3. Hospice companies like Vitas are entitled to receive Medicare dollars only for hospice services provided to patients who are "terminally ill." An individual is "terminally ill" if he or she has a medical prognosis of six months or less if the individual's illness runs its normal course. 42 C.F.R. § 418.3. Electing the Medicare hospice benefit is a critical decision for an individual because he or she is electing to cease further curative care for his or her illness.

4. Hospices are paid a per diem rate based on the number of days and level of care provided to the patient. Medicare recognizes and provides reimbursement for four levels of hospice care: routine home care, continuous home care, inpatient respite care, and general inpatient care. The payment rates are based on which level of care the hospice provider furnishes to a patient on a particular day. 42 C.F.R. § 418.302; Medicare Benefit Policy Manual, Chapter 9, § 40.

5. Most hospice care is and should be billed as routine home care. Hospice providers receive the highest daily rate of reimbursement for continuous home care services (also called "crisis care"). Crisis care is available only for patients who are experiencing an acute crisis that requires the immediate and short-term provision of skilled nursing services. In fiscal

year 2013, Medicare's daily reimbursement rate for crisis care was $742 more per patient than the daily reimbursement rate for routine home care.

6.     Chemed has historically owned and operated Roto-Rooter Group, Inc., a national drain cleaning and plumbing service.  Chemed expanded into the hospice business in 2004 when it acquired the Vitas-affiliated companies, which had been in operation since 1978.  Vitas is now the largest for-profit hospice chain in the United States and, according to its website, provides hospice services to patients residing in their own homes, assisted living facilities, skilled nursing facilities, hospitals unaffiliated with Vitas, and 36 inpatient units.  Chemed finances its hospice operations largely through receipt of Medicare dollars.  Historically, approximately 90 percent of Vitas's revenue is derived from the Medicare program.  According to Chemed's 2012 Annual Report to Shareholders, Vitas received over one billion dollars in revenue in 2012.

7.     The United States alleges in this action that Vitas focused on maximizing Medicare reimbursement for as many patients as possible while disregarding patients' medical needs and Medicare guidelines.  Vitas regularly ignored concerns expressed by its own physicians and nurses regarding whether its hospice patients were receiving appropriate care.

8.     Vitas's business and marketing practices led to increased Medicare billings for costly crisis care services, even though its patients often did not need such medical care or were not eligible for this type of medical care.  Chemed's internal auditors and Vitas's employees were aware of these problems, yet the problems continued to persist, even to this day.

9.     Specifically, the United States alleges that, since at least 2002, Vitas, and since at least 2004 Chemed (after acquiring Vitas), submitted or caused the submission of false claims to the Medicare program by both: (a) billing Medicare for more costly crisis care services when certain patients did not need crisis care services or when Vitas, in fact, did not provide such

3

services, or Vitas provided inappropriate medical care, and (b) admitting certain patients who were not eligible to receive hospice services (instead of curative care), because the patients did not have a life expectancy of six months or less if their illnesses ran their normal course. Chemed and Vitas also submitted or caused to be submitted fraudulent records and statements in support of their false claims for payment to the Medicare Program.

10. As a result of this conduct, Chemed and Vitas are liable under the False Claims Act, 31 U.S.C. § 3729, *et seq.*

**II. Jurisdiction and Venue**

11. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1345, and supplemental jurisdiction to entertain common law or equitable claims pursuant to 28 U.S.C. § 1367(a).

12. This Court has personal jurisdiction over Vitas and Chemed pursuant to 31 U.S.C. § 3732(a). Jurisdiction is proper over Vitas and Chemed because they can be found in, reside in, and/or have transacted business within this Court's jurisdiction, and acts that they committed, in violation of 31 U.S.C. § 3729, occurred within this district.

13. Venue is proper in this district under 28 U.S.C. §§ 1391(b)-(c), and 31 U.S.C. § 3732(a) because Vitas and Chemed reside in or transact business in this district.

**III. The Parties**

14. Plaintiff in this action is the United States of America, suing on behalf of the United States Department of Health & Human Services ("HHS") and, specifically, its operating division, the Centers for Medicare & Medicaid Services ("CMS"). At all times relevant to this Complaint, CMS was an operating division of HHS that administered and supervised the Medicare Program.

4

15.     Defendant Chemed, a Delaware Corporation, shares of which are listed on the New York Stock Exchange, is headquartered in Cincinnati, Ohio.

16.     Defendant Chemed also wholly owns Chemed RT, Inc., and Comfort Care Holdings Co.

17.     Defendant Comfort Care Holdings Co. wholly owns subsidiaries that operate Vitas's for-profit hospices nationwide, including Defendants Vitas Hospice Services, L.L.C., Vitas Healthcare Corporation, Vitas Care Solutions, Inc., Vitas Healthcare Corporation of California, Vitas Healthcare Corporation of Illinois, Vitas Healthcare Corporation of Florida, Vitas Healthcare Corporation of Ohio, Vitas Healthcare Corporation of Atlantic, Vitas Healthcare of Texas, L.P., Vitas Healthcare Corporation Midwest, Vitas Healthcare Corporation of Georgia, Vitas HME Solutions, Inc., Vitas of North Florida, Vitas Holdings Corporation, Vitas RT, Inc., Vitas Solutions Inc., and Hospice Care Inc.

18.     Vitas's operations are based in Miami, Florida.  Vitas operates 51 for-profit hospice programs in 18 states (Alabama, California, Colorado, Connecticut, Delaware, Florida, Georgia, Illinois, Indiana, Kansas, Michigan, Missouri, New Jersey, Ohio, Pennsylvania, Texas, Virginia and Wisconsin) and the District of Columbia.  At all times relevant to this Complaint, Vitas was engaged in the business of providing hospice care to individuals who were Medicare beneficiaries.

## IV.     The False Claims Act

19.     The False Claims Act provides, in part, that any entity that (1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; or (2) knowingly makes, uses, or causes to be made or used, a false record or statement material to a

5

false or fraudulent claim, is liable to the United States for damages and penalties. 31 U.S.C. §§ 3729(a)(1)-(2), amended by, 31 U.S.C. §§ 3729(a)(1)(A)-(B).

20. To show that an entity acted "knowingly" under the False Claims Act, the United States must prove that the entity, with respect to the information: (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information. The United States does not have to prove that the entity had the specific intent to defraud the United States. 31 U.S.C. § 3729(b), amended by 31 U.S.C. § 3729(b)(1).

## V. The Medicare Hospice Program

### A. Hospice Services Covered

21. Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, *et seq*., establishes the Health Insurance for the Aged and Disabled Program, commonly referred to as the Medicare Program (or "Medicare").

22. The Medicare Program is comprised of four parts. Medicare Part A is a 100 percent federally-funded health insurance program for qualified individuals aged 65 and older, younger people with qualifying disabilities, and people with End Stage Renal Disease (permanent kidney failure requiring dialysis or transplant). The majority of Medicare Part A's costs are paid by United States citizens through their payroll taxes. The benefits covered by Medicare Part A include hospice care under 42 U.S.C. § 1395x(dd).

23. Hospice is a program designed to provide patients with palliative care (i.e., care designed to relieve pain, symptoms or stress of terminal illness) instead of curative care (i.e., care designed to cure an illness or condition). Hospice palliative care includes a comprehensive set of medical, social, psychological, emotional, and spiritual services for terminally ill individuals. To be covered, hospice services must be reasonable and necessary for the palliation

6

and management of a patient's terminal illness as well as related conditions. Medicare outlines the admission criteria for various illnesses.

24. Hospice is available to terminally ill individuals for two initial 90-day periods, and then an unlimited number of 60-day periods, as long as certain conditions are met, as described later. Medicare Benefit Policy Manual, Chapter 9, §§ 10, 20.1.

25. Crisis care is for a patient who elects to receive hospice care at home, or in a long-term care facility such as a nursing home. Crisis care is provided when the (at-home or nursing home) hospice patient is experiencing a "brief period[] of crisis," and only as necessary to allow the patient to remain at their residence. 42 C.F.R. § 418.302(b)(2). Medicare defines a brief "period of crisis" as "a period in which the individual requires continuous care to achieve palliation and management of acute medical symptoms." *Id*. at § 418.204(a).

26. To bill Medicare for crisis care, a hospice must provide care that is: (1) designed to palliate the patient's acute medical symptoms, (2) provided to the patient for at least eight hours in a 24-hour period, counted from midnight to midnight, and (3) predominantly nursing care, meaning care provided by a registered nurse (RN), licensed practical nurse (LPN), or nurse practitioner (NP). *See* 42 C.F.R. §§ 418.302, 418.204. If the care lasts less than eight hours in a 24-hour period, the hospice may only bill Medicare for routine home care for that day of hospice services. Similarly, if the care provided does not consist of predominantly nursing care, the hospice may not bill Medicare for crisis care and must instead bill for routine home care. *See id.*

## B.     Eligibility For Hospice Services

27. In order to be eligible to elect hospice care under Medicare, an individual must be (a) entitled to Part A of Medicare; and (b) certified as terminally ill in accordance with 42 C.F.R. § 418.22. *See* 42 U.S.C. § 1395f(7)(A); 42 C.F.R. § 418.20. According to 42 C.F.R. § 418.3,

7

"terminally ill" means that a person "has a medical prognosis that his or her life expectancy is 6 months or less if the illness runs its normal course."

28.     Medicare beneficiaries must elect hospice care (i.e., it is *voluntary*) and in doing so agree to forego curative treatment of their terminal illnesses.  Patients who receive the Medicare hospice benefit no longer receive care that seeks to cure their illnesses.  For this reason, electing hospice care is a critical medical decision for a patient who has been informed that his or her death is imminent.

### C.     Obligations of the Hospice Provider

29.     All Medicare providers are expected to deal honestly with the Government and with patients.

30.     In addition, all healthcare providers like Vitas are obligated to comply with applicable statutes, regulations, and guidelines in order to be reimbursed by Medicare under what is known as "Part A," as described above.  When participating in Medicare, a provider has a duty to be knowledgeable of the statutes, regulations, and guidelines for coverage of Medicare services, and, in the case of hospice care, to know that Medicare only reimburses for services that are reasonable and necessary for the palliation or management of terminal illness.  42 U.S.C. § 1395y(a)(1)(C).

31.     Vitas, a Medicare provider that received close to a billion dollars last year from hospice revenue, the overwhelming majority of which was paid by Medicare, has a duty to have a thorough knowledge of the Medicare hospice program, and to properly train and inform its employees regarding the requirements for Medicare coverage of hospice services.

32.     One of the purposes of the Medicare hospice requirements is to ensure that limited Medicare funds are properly spent on patients who are dying and need end of life care.

8

33.     To bill for hospice care, the hospice provider must ensure that a patient is terminally ill before the individual is faced with the decision to stop receiving medical care that could cure his or her illness.  The hospice provider must have a written certification of terminal illness that, among other things, includes:  (1) a statement that the individual's medical prognosis is that his or her life expectancy is six months or less if the terminal illness runs its normal course; (2) specific clinical findings and other documentation that support a determination that the patient has a life expectancy of six months or less; and (3) the signature(s) of the physician(s) attesting to these medical conclusions.  42 C.F.R. § 418.22.

34.     In addition to the Medicare regulations, these important requirements are also contained in the Medicare Benefit Policy Manual, Chapter 9, § 20.1, along with additional descriptions and guidance for hospice providers.

35.     Recognizing the gravity of a patient's decision to forgo curative care for a terminal illness, Medicare instructs that "a hospice needs to be certain that the physicians' clinical judgment can be supported by clinical information and other documentation that provide a basis for the certification of six months or less if the illness runs its normal course.  A signed certification, absent a medically sound basis that supports the clinical judgment, is not sufficient for application of the hospice benefit under Medicare."  170 Fed. Reg. 70534-35.

36.     Medicare requires that at least eight hours of primarily nursing care are needed to manage an acute medical crisis.  Furthermore, "[w]hen a hospice determines that a beneficiary meets the requirements for [crisis care], appropriate documentation must be available to support the requirement that the services provided were reasonable and necessary and were in compliance with an established plan of care in order to meet a particular crisis situation. This

9

would include the appropriate documentation of the situation and the need for continuous care services consistent with the plan of care." Medicare Benefit Policy Manual, Chapter 9, § 40.2.1.

37.     The clinical record for each hospice patient must contain "correct clinical information." 42 C.F.R. § 418.104.  All entries in the clinical record must be "legible, clear, complete, and appropriately authenticated and dated…." 42 C.F.R. § 418.104(b).

38.     For the initial 90-day period, the hospice provider must obtain a certification of terminal illness for the patient from both (a) the medical director of the hospice or a physician-member of the hospice interdisciplinary group, and (b) the individual's attending physician, if the individual has an attending physician.  For subsequent periods, the hospice provider must obtain the certification of terminal illness from either the medical director of the hospice or a physician who is a member of the hospice's interdisciplinary group for the patient.  42 U.S.C. § 1395f(7)(A); 42 C.F.R. § 418.22.

39.     As specified by 42 C.F.R. § 418.56, the interdisciplinary group should consist of, at a minimum, a physician, a registered nurse, a social worker, and a pastor or other counselor. The interdisciplinary group is responsible for coordination of each patient's care, to ensure continuous assessment of each patient's and family's needs, and the implementation of the interdisciplinary plan of care.

**D.     The Medicare Hospice Payment Process**

40.     The United States reimburses Medicare providers with payments from the Medicare Trust Fund, through CMS, as supported by American taxpayers.  CMS, in turn, contracts with Medicare Administrative Contractors ("Medicare claims processors," also known as "MACs"), to review, approve, and pay Medicare bills, called "claims," received from health care providers like Vitas.  In this capacity, the Medicare claims processors act on behalf of CMS.

10

41.     Payments are typically made by Medicare directly to health care providers like Vitas rather than to the patient.  The Medicare beneficiary usually assigns his or her right to Medicare payment to the provider.

42.     The Medicare provider either submits its bill directly to Medicare for payment, or it contracts with an independent billing company to submit a bill to the Medicare claims processor, on the provider's behalf.

43.     Since 2002, Palmetto GBA (Palmetto) has been the Medicare claims processor that is responsible for processing the claims that Vitas submitted to obtain Medicare payments for hospice services.

44.     Palmetto provides guidance to hospice providers on the medical criteria for determining whether individuals with certain diagnoses have a prognosis of six months or less, and such guidance is publicly available.

45.     Palmetto also provides publicly available guidance to help hospice providers determine when crisis care is appropriate.

46.     In addition, Palmetto offers training and assistance to hospice providers on the Medicare requirements.

47.     Because it is not feasible for the Medicare program, or its contractors, to review the patient files for the millions of claims for payments it receives from hospice providers, the Medicare program relies upon the hospice providers to comply with the Medicare requirements, and trusts the providers to submit truthful and accurate claims.  Hospice providers are reimbursed based upon their submission of a single electronic or hard-copy form called a "CMS-1450 form."

48.     All Medicare providers must have, in each of their patients' files, the medical documentation to establish that the Medicare items or services for which they have sought Medicare reimbursement are reasonable and medically necessary.

49.     The physician certifications and other documents that support the claim that hospice providers make to Medicare are submitted to Medicare only if the claim for hospice services is selected for medical review, which does not happen routinely. *See generally* Medicare Claims Processing Manual, Chap. 11, Processing Hospice Claims, and Medicare Program Integrity Manual, Chap. 3, *Verifying Potential Errors and Taking Corrective Actions*. Additionally, it is the hospice provider like Vitas and not the patient's primary care or treating physician, who is required to submit to Medicare the underlying documentation that supports the eligibility determination and the claim.

50.     Once the provider submits its CMS-1450 form to the Medicare claims processor, the claims are paid directly to the provider.

51.     On the CMS-1450 form, the hospice provider must state, among other things, the identity of the patient, the hospice's provider number, the patient's principal diagnosis, the date of the patient's certification or re-certification as "terminally ill," the location where hospice services were provided, and the level of hospice care provided (i.e., routine home care, crisis care, respite care, or general inpatient care).

52.     On the claim form, the provider also certifies that the claim "is correct and complete," that "[p]hysician's certifications and re-certifications, if required by contract or Federal regulations, are on file," and that "[r]ecords adequately disclosing services will be maintained and necessary information will be furnished to government agencies as required by applicable law."

12

53.     Federal law requires providers like Vitas that receive funds under the Medicare program, to report and return any overpayments within specified time periods.  42 U.S.C. § 1320a-7k(d).

## VI.  Chemed and Vitas Submitted or Caused to be Submitted False and Fraudulent Claims for Crisis Care.

54.     Chemed and Vitas knowingly submitted false or fraudulent claims, or caused the submission of false claims, for crisis care services that were not actually provided to patients, that were inappropriately provided to patients, or that were not medically necessary because the patients were not in crisis during the periods that Vitas claimed it provided crisis care.  Those false claims were paid by Medicare.  Such services were not reasonable and medically necessary under the Medicare requirements.

55.     Chemed and Vitas disregarded Medicare regulations in order to increase their reimbursement by Medicare for crisis care services, which they knew Medicare reimbursed at a higher level than other hospice services.

### A.  Chemed's and Vitas's Business Practices Led to the Submission of False or Fraudulent Claims for Crisis Care

56.     Chemed's and Vitas's business practices led to the submission of false or fraudulent claims to Medicare for hospice services that were not reasonable or necessary under the Medicare hospice requirements.

57.     Chemed and Vitas used aggressive marketing tactics and expected their employees to increase the number of crisis care claims submitted to Medicare, without regard to whether the crisis care services were appropriate for patients, or whether Vitas was actually providing the crisis care services to patients when it billed Medicare for those services.  In some instances discussed below, Vitas's care provided to patients was inappropriate.

13

58.     Vitas marketed crisis care services to patients and their families as "intensive comfort care" services, without mentioning that in order to bill Medicare for these services at the higher rates, a patient had to be experiencing a short-term crisis and have acute medical symptoms. One of Vitas's marketing brochures states that "intensive comfort care" is available for "symptoms causing distress to the patient or family."

59.     Vitas knowingly misled patients and their families to believe that the Medicare hospice benefit would routinely cover around-the-clock care for hospice patients, absent the requisite acute medical symptoms resulting in brief periods of crisis that must be present for crisis care to be covered by Medicare. Because of this marketing ploy, patients sometimes chose Vitas over other providers, although the Medicare benefit is the same for patients regardless of the hospice program they choose. Vitas used similarly misleading techniques when it marketed its hospice services to potential referral sources of future hospice patients, such as physicians, nursing homes, and hospitals.

60.     Vitas and Chemed management regularly corresponded with Vitas field offices about each office's crisis care utilization, particularly when the crisis care rates were lower than Defendants wanted. For example, on January 18, 2007, Vitas's Vice President of Operations sent an email to a marketing employee and General Manager in one of Vitas's Texas locations, stating: "Your program's CC [crisis care] margin dropped to [0.3 percentage] in December. Would you give me your thoughts on what caused this drop and what you will be doing to correct this in January? I will need this analysis by the end of the day today."

61.     Defendants did not ensure that Vitas's medical staff were properly trained on the Medicare requirements for crisis care.

62. Vitas distributed written materials to its own staff that incorrectly trained them on how and when to initiate crisis care. For example, one Vitas document called "Procedure for Starting Crisis Care" outlines a procedure inconsistent with Medicare regulations, because it instructs Vitas employees that crisis care may commence without a physician's order.

63. One former medical director of a Vitas facility incorrectly believed that Vitas could bill Medicare for crisis care if the patient was "actively dying," a term not used anywhere in the Medicare requirements for crisis care. All patients who receive hospice care and elect to forgo curative care should have a life expectancy of six months or less if their illnesses run their normal course, but not all hospice patients are expected to experience periods of crisis requiring crisis care.

64. One Vitas nurse stated that, on more than one occasion when Vitas sent her to the homes of patients whom she was told needed crisis care, she arrived ready to perform intensive nursing care only to find that the patients were at church, the beauty parlor, or playing bingo. Despite the fact that these patients did not require or receive crisis care services, Vitas billed Medicare for crisis care for these patients.

65. Chemed set goals for the number of crisis care days that it wanted Vitas to bill to Medicare, and was directly involved in making decisions about how Vitas would market its crisis care services.

66. As a result, Chemed and Vitas set aggressive goals for Vitas's salespeople and other staff to find beneficiaries for whom they could bill Medicare for crisis care, and Vitas billed Medicare excessively for crisis care.

67. There are even specific instances, one of which is described below, where Vitas's medical records suggest that Vitas's failure to medically address a patient's symptom resulted in

15

a patient suffering from acute medical symptoms for an extended period of time, allowing Vitas to bill Medicare for the "crisis care" services necessary to address the patient's crisis that Vitas itself had caused.

68.     Chemed and Vitas knew that they were submitting false billings for crisis care services to Medicare.

69.     Since at least 2007, Chemed and Vitas conducted regular internal audits or program reviews that included a review of Vitas's crisis care services.  Through these internal audits, Chemed and Vitas were made aware of patients (1) who were receiving crisis care services, but did not qualify for such services, (2) for whom services were billed to Medicare as "crisis care services", but the services were inconsistent with the patients' medical plans of care or with Medicare requirements, (3) for whom Vitas's own medical records showed were not in crisis.

70.     By way of example, a document dated September 2010, and entitled, "Patient Care Documentation and Compliance Internal Review" for the San Fernando, California Vitas hospice program, showed that Vitas reviewed crisis care medical records for this hospice program.  Only 50 percent of the records showed that Vitas was being consistent with Medicare's criteria for crisis care.  Only 10 percent of the crisis care claims comported with the patients' plans of care set forth by Vitas medical teams.  After reviewing multiple factors, the audit team gave the crisis care claims in this location a 69 percent score, indicating a significant deficiency in compliance with Medicare requirements.

71.     Chemed and Vitas were also aware that their Medicare billings for crisis care were excessive as compared to other hospices, yet their billings to Medicare did not decrease.

16

72.     The National Hospice and Palliative Care Organization (NHPCO) releases annual reports regarding hospice operations.  It is clear from their historical data that Vitas obtains Medicare reimbursement for crisis care far exceeding that of the rest of the hospice industry. The size of Vitas alone does not explain its high Medicare expenditures for crisis care.  Vitas bills Medicare for twice as many crisis care days as all other hospice providers combined.

73.     According to Chemed's financial reporting and data published by NHPCO, for the period 2004 through 2011, Vitas's percentage of days of service for crisis care ranged from 4.42 percent to 5.25 percent, while the national average ranged from 0.4 percent to 1.2 percent.

74.     According to Chemed's Annual Reports released between 2004 and 2012, Vitas received between $458.2 million and $1.067 billion in revenue, of which between $78.6 million and $172 million annually was for crisis care.

75.     Vitas's total revenue for crisis care between 2004 and 2011 was $999.654 million. Additionally, during the time period 2004 through 2011, Vitas's net revenue for crisis care as a percentage of total revenue averaged between 15.3 percent and 17.2 percent, while the net crisis care revenue as a percentage of total hospice revenues nationwide during the period 2003 through 2005 (the last years for which data could be obtained) ranged from 1.6 percent to 1.8 percent.

76.     Vitas's crisis care billings are almost six times what would be expected if its crisis care figures were in line with the national average.

77.     Despite internal auditing, publicly-available data showing excessive crisis care claims, and Chemed's and Vitas's knowledge that they were submitting or causing the submission of false claims for crisis care services, the companies continued to excessively bill Medicare and aggressively market these Medicare services.

### B. Examples of False Claims for Crisis Care Services [1]

78. Chemed and Vitas knowingly submitted or caused the submission of false or fraudulent claims to the Medicare program for the following patients, and Medicare paid these claims.

### i. Patient EF

79. Chemed and Vitas knowingly submitted or caused to be submitted false or fraudulent claims to Medicare for seven days of crisis care for patient EF who was diagnosed with dementia and receiving hospice care in Illinois. These claims were false or fraudulent because Vitas's medical records for patient EF show that EF was not in crisis and because Vitas administered what would be considered routine hospice care services, even though Vitas billed Medicare at the higher crisis care rate.

80. Vitas's medical records do not indicate that EF was in "crisis" that required nursing care to palliate acute symptoms. The following is shown by Vitas's medical records for EF.

81. Vitas's own assessments of EF's symptoms, documented in EF's medical files, showed that EF was not in crisis and did not need crisis care.

82. On the same date that Vitas began billing Medicare for crisis care for EF for what Vitas referred to as "pain and dyspnea," Vitas rated EF's pain level at zero, and a Vitas nurse wrote in EF's record that all care plans were "effective."

83. Vitas's records also indicated that EF's respiratory rate was normal. Even if EF had been experiencing symptoms of pain and dyspnea, these symptoms should have been

---

[1] To protect patient privacy, the United States has not identified by name the individuals who are provided as examples of patients whom Vitas knew were not eligible for crisis care though it continued to bill Medicare. The United States will serve Vitas with a list identifying each patient by name and patient identification number.

18

effectively managed with standard oral medications and billed at the lower rate of routine home care.

84.     Vitas administered small and occasional doses of morphine to patient EF, which Vitas should have billed to Medicare as routine home care.

85.     Chemed and Vitas knowingly submitted or caused the submission of false or fraudulent claims numbered 20710000791305 and 20711301007904 to Medicare for crisis care services for patient EF that were not necessary or not provided for the time period March 29, 2007 through April 4, 2007, in the amounts of $2005.47 and $2522.16; and Medicare paid the claims on April 16, 2007 and April 26, 2007.

### ii.     Patient MJ

86.     Chemed and Vitas knowingly submitted or caused to be submitted false or fraudulent claims to Medicare for two separate periods of crisis care for MJ, a patient in Virginia, in September and October 2009.  These claims were false or fraudulent because Vitas's medical records for patient MJ show that MJ was not in crisis and because Vitas administered what would be considered routine hospice care, even though Vitas billed Medicare at the higher crisis care rate on behalf of MJ.

### a)  Crisis Care Billing Period 1

87.     The first period of time for which Vitas billed Medicare for crisis care for MJ is for the time period from September 8, 2009 through September 11, 2009.

88.     Vitas's medical records for that time period do not indicate that MJ was in "crisis" that required nursing care to palliate acute symptoms.  The following is shown by Vitas's medical records for MJ.

19

89.     On September 8, 2009, the same date that Vitas began billing Medicare for crisis care for MJ for what Vitas referred to as "shortness of breath," the nursing assessment that Vitas completed shows that MJ's vital signs, including her respiratory rate, were normal, and there was no indication that she was suffering from shortness of breath. Vitas's nursing assessments completed on the following day, September 9, 2009, showed the same normal respiratory rate and no signs that MJ was experiencing shortness of breath.

90.     There is also nothing in Vitas's medical records for MJ to suggest that Vitas performed any intervention to manage shortness of breath symptoms during the same time period, except one brief episode, noted below.

91.     Even if MJ had been experiencing shortness of breath, these symptoms should have been effectively managed by Vitas and billed to Medicare as routine home care.

92.     For example, on September 10, 2009, the third day on which Vitas billed Medicare for crisis care for MJ, Vitas's medical records for MJ show that MJ had one episode of shortness of breath and that Vitas administered routine medications, and an additional dose of morphine and anti-anxiety medications. Administration of these medications did not qualify as crisis care and Vitas should have billed Medicare on behalf of MJ for routine home care.

93.     In addition, on September 10, 2009, the Vitas chaplain who visited MJ made a note in MJ's medical records that Vitas was billing Medicare for crisis care for MJ on the basis of what Vitas referred to as "transition." Other Vitas staff also made notes in MJ's file indicating that "transition" was the reason Vitas billed Medicare for crisis care for MJ.

94.     Vitas did not define the meaning of "transition," and transition does not have a recognized medical meaning or otherwise qualify as a basis for a hospice company to bill Medicare for crisis care. If "transition" is meant to refer to an event where a hospice patient is

20

transported from one care setting to another, that event should be billed to Medicare as routine services.

95.     Chemed and Vitas knowingly submitted or caused the submission of false or fraudulent claim numbered 20929500743405VAR to Medicare for crisis care services to patient MJ that were not necessary or not provided for the time period September 8, 2009 through September 11, 2009, in the amount of $2810.18; and Medicare paid the claims on October 26, 2009.

### b) Crisis Care Billing Period 2

96.     The second period of time for which Vitas billed Medicare for crisis care for MJ is for the time period from October 10, 2009 through October 12, 2009.

97.     Vitas billed Medicare for crisis care services for MJ again for the stated reason of shortness of breath. And again, MJ's medical records do not support Vitas's claim that MJ was experiencing shortness of breath. In fact, to the contrary, MJ's medical records during this time period state that she was agitated and screaming loudly.

98.     On October 10, 2009, MJ received a nebulizer treatment, which Vitas should have billed Medicare as routine home care.

99.     Rather than experiencing an acute crisis requiring crisis care, Vitas's medical records for October 10, 2009, show that MJ was playing bingo in the activity room.

100.    Vitas's medical records for MJ for October 11 and 12, 2009 contain various nursing notes with inconsistent information regarding MJ's condition, none of which indicate that MJ was experiencing acute symptoms or a medical crisis. One note states that MJ was screaming loudly, one states that that she was short of breath, another note states that MJ's respirations were unlabored, and yet another note indicates that she was "comfortable."

21

101.    MJ's agitation and screaming episodes should have been effectively treated as routine home care, and Vitas should have billed Medicare for routine home care.

102.    Chemed and Vitas knowingly submitted or caused the submission of false or fraudulent claims to Medicare for crisis care services to patient MJ that were not necessary or not provided for the time period October 10, 2009 through October 12, 2009, in the amount of approximately $2,000; and Medicare paid the claims.

### iii.    **Patient TS**

103.    Chemed and Vitas knowingly submitted or caused to be submitted claims to Medicare for crisis care for three separate time periods for patient TS, a patient in Florida, in March 2006, April 2006, and May to June 2006. These claims were false or fraudulent because Vitas's medical records for patient TS show that TS was not in crisis, and because Vitas administered what would be considered routine hospice care to TS, even though Vitas billed Medicare at the higher crisis care rate.

104.    Vitas's medical records do not indicate that TS was in "crisis" that required nursing care to palliate acute symptoms. The following is shown by Vitas's medical records.

### a)  **Crisis Care Billing Period 1**

105.    Vitas billed Medicare for crisis care for TS for the time period from March 19, 2006 through March 21, 2006.

106.    Vitas's medical records for TS state TS's increased weakness, increased anxiety, and pain necessitated crisis care. These are not acute symptoms requiring crisis care and do not support Vitas billing Medicare at the higher crisis care rate.

22

107.     Vitas's medical records also state that TS complained of back pain, and that Vitas staff used a heating pad to relieve the pain.  The medical record does not indicate that Vitas administered pain medication to TS.

108.     Vitas did administer an anti-anxiety drug to TS at a low dose every 4 hours, as needed, during the period that Vitas billed Medicare for crisis care.  However, Vitas should have billed Medicare at the routine home care rate for administering this medication.

109.     Chemed and Vitas knowingly submitted or caused the submission of a false or fraudulent claim numbered 20609702195205 to Medicare for crisis care services on behalf of patient TS that were not necessary or not provided for the time period March 19, 2006 through March 21, 2006, in the amount of $1037.24; and Medicare paid the claim on April 13, 2006.

### b)  Crisis Care Billing Period 2

110.     Vitas billed Medicare for crisis care for TS for the time period from April 3, 2006 through April 12, 2006.

111.     According to Vitas's medical records, beginning on April 3, 2006, Vitas billed Medicare for crisis care for TS's daily wound care, lower extremity edema, and poor nutrition. None of these conditions require crisis care and they should have been addressed through routine home care.

112.     A Vitas physician wrote a "crisis care note" on April 8, 2006, stating that crisis care was appropriate for TS at "this time" because she needed "daily dressing changes."  Daily dressing changes should be provided and billed as routine home care.

113.     Chemed and Vitas knowingly submitted or caused the submission of a false or fraudulent claim numbered 20612502442405 to Medicare for crisis care services on behalf of

patient TS that were not necessary or not provided for the time period April 3, 2006 through April 12, 2006, in the amount of $6839.28; and Medicare paid the claim on May 11, 2006.

### c) Crisis Care Billing Period 3

114. Vitas billed Medicare for crisis care for TS for the time period from May 13, 2006 through June 2, 2006.

115. According to Vitas's medical records, it billed Medicare for crisis care for TS for this third time period, beginning on May 13, 2006, for "decreased level of consciousness" after TS had suffered a fall. This did not require crisis care and the patient's condition should have been addressed through routine hospice care.

116. On May 18, 2006, five days after Vitas began billing Medicare for crisis care for TS, the Vitas doctor noted that TS was "nonresponsive," but also wrote that TS was walking.

117. On the following day, May 19, 2006, Vitas changed the reason for TS's crisis care to "safety, pain management, and weakness." "Safety" and "weakness" are not acute symptoms requiring crisis care. Both are chronic medical issues that do not necessitate continuous nursing care. As for the "pain management" that TS required, this should have been addressed through routine home care.

118. In addition, the medical records do not show that Vitas provided care to address TS's pain beyond what would be covered under the routine home care level of hospice care.

119. The care that Vitas did provide to TS to manage her pain, in fact, caused TS's symptoms to become worse. A Vitas nurse noted on May 25, 2006, that the nurse was crushing doses of long-acting morphine before administering them to TS, which prevented the morphine from properly palliating TS's pain. Although there are no indications in TS's medical records that her pain was uncontrolled (and, as stated above, no basis to support Vitas's billing for crisis

24

care for TS), the nurse's act of crushing long-acting morphine prior to giving it to TS hindered the morphine's effectiveness and caused TS to require additional doses of pain medication. If the reason for crushing the long-acting morphine was because TS had problems swallowing pills, there were several other pain management options (such as liquid methadone) that should have been administered as routine home care and would not have resulted in TS suffering additional pain. Furthermore, the additional doses of pain medication that Vitas administered to TS should have been billed to Medicare as routine home care.

120.     Chemed and Vitas knowingly submitted or caused the submission of false or fraudulent claims numbered 20617715080204 and 20621908453304 to Medicare for crisis care services for patient TS that were not necessary, not provided, or inappropriately provided for the time period May 13, 2006 through June 2, 2006, in the amounts of $777.84 and $14422.45; and Medicare paid the claims on June 29, 2006 and August 10, 2006.

### iv.     Patient DT

121.     Chemed and Vitas knowingly submitted or caused to be submitted false or fraudulent claims to Medicare for two separate periods of crisis care for Patient DT, a patient in Pennsylvania, in September and December 2006. These claims were false or fraudulent because Vitas's medical records for patient DT show that DT was not in crisis and because Vitas administered what would be considered routine hospice care, even though Vitas billed Medicare at the higher crisis care rate.

### a)  Crisis Care Billing Period 1

122.     The first period of time for which Vitas billed Medicare for crisis care for DT is for the time period from September 11, 2006 through September 20, 2006.

25

123.     Vitas's medical records do not indicate that DT was in "crisis" requiring nursing care to palliate acute symptoms.  The following is shown by Vitas's medical records for DT.

124.     The crisis care plan for DT states that DT was having symptoms of weakness, mental status changes, confusion and agitation.  Vitas nurses were visiting DT, but intensive nursing care to palliate acute medical symptoms was not necessary or provided.   The palliative medications being administered were low-dose and low-frequency, and should have been billed to Medicare as routine home care.

125.     Chemed and Vitas knowingly submitted or caused the submission of a false or fraudulent claim numbered 20628201663405 to Medicare for crisis care services for Patient DT that were not necessary or not provided for the time period September 11, 2006 through September 20, 2006, in the amount of $5758.84; and Medicare paid the claim on August 23, 2006.

### b)  Crisis Care Billing Period 2

126.     Vitas also billed Medicare for crisis care for DT for the time period from December 4, 2006 through December 5, 2006.  There is nothing in the medical record to show that DT was experiencing acute medical symptoms requiring crisis care during these two days, and again, Vitas did not provide any intensive palliative interventions to DT while it was billing Medicare for crisis care.  Vitas should have billed all care provided to DT during this time period as routine home care.

127.     Chemed and Vitas knowingly submitted or caused the submission of a false or fraudulent claim numbered 20700401484105 to Medicare for crisis care services for Patient DT that were not necessary or not provided for the time period December 4, 2006 through December 5, 2006, in the amount of $488.14; and Medicare paid the claim on January 18, 2007.

### v. **Patient RB**

128.     Chemed and Vitas knowingly submitted or caused to be submitted false or fraudulent claims for crisis care to Medicare for two separate time periods for patient RB in Florida in July 2007 and from June 2009 to July 2009.  These claims were false or fraudulent because Vitas's medical records for patient RB show that RB was not in crisis and because Vitas administered what would be considered routine hospice care, even though Vitas billed Medicare at the higher crisis care rate.

### a) **Crisis Care Billing Period 1**

129.     The first period of time for which Vitas billed Medicare for crisis care on behalf of RB is for the time period from July 5, 2007 through July 17, 2007.

130.     Vitas's medical records for that time period indicate that Vitas began billing Medicare for crisis care on July 5, 2007 in order to address RB's shortness of breath and respiratory distress symptoms.  However, on July 6, Vitas noted that RB's symptoms were controlled, she was comfortable, and she was no longer continuing to have labored respirations. Despite this, Vitas continued to bill Medicare for crisis care for RB for an additional eleven days, through July 17, 2007.

131.     During these eleven days, RB did not have symptoms that would constitute a crisis, and Vitas only provided RB with medications that should have been billed as routine home care.  Even as the medical records indicate that RB stated that she was feeling better and was walking, Vitas continued to bill Medicare for crisis care for RB until July 17, 2007.

132.     Chemed and Vitas knowingly submitted or caused the submission of a false or fraudulent claim numbered 20721501536705 to Medicare for crisis care services on behalf of

patient RB that were not necessary or not provided for the time period July 7, 2007 through July 17, 2007, in the approximate amount of $9000; and Medicare paid the claim on August 9, 2007.

### b) Crisis Care Billing Period 2

133.    Vitas billed Medicare for crisis care for patient RB for a second time period from June 18, 2009 through July 7, 2009.  Its medical records state the reasons for crisis care for RB as "change in level of consciousness."  However, the nursing notes indicate that RB's consciousness level was normal.

134.    During this time period, Vitas administered RB sedative medication, even though RB had a normal level of consciousness, and Vitas documented that RB was alert and verbally responsive, with "periods of forgetfulness," which is not a condition requiring crisis care.

135.    Medical records for RB on July 5, 2009, noted that RB was "pleasant and cooperative [and] [c]onsumes 100% meals," but Vitas continued to bill Medicare for crisis care for RB through July 7, 2009.

136.    During this entire second time period, totaling twenty days, that Vitas billed Medicare for crisis care for RB, the medical records show no symptoms that would require crisis care to be administered to RB.  In fact, RB's needs would have been effectively met by routine hospice care.

137.    Chemed and Vitas knowingly submitted or caused the submission of false or fraudulent claims numbered 20919600293705FLR and 20932801614304FLR to Medicare for crisis care services on behalf of patient RB that were not necessary or not provided for the time period June 18, 2009 through July 7, 2009, in the amounts of $10,893.33 and $5523.50; and Medicare paid the claims on July 20, 2009 and December 14, 2009.

### vi. **Patient MG**

138.    Chemed and Vitas knowingly submitted or caused to be submitted false or fraudulent claims to Medicare for crisis care for patient MG in California during three separate time periods, from November to December 2009, January to February 2010, and February to March 2010.  These claims were false or fraudulent because Vitas's medical records for patient MG show that MG was not in crisis or the care that Vitas provided to MG during this period of time was inappropriate, and Vitas should not have billed Medicare for crisis care.

### a) **Crisis Care Billing Period 1**

139.    The first period of time for which Vitas billed Medicare for crisis care for MG is for the time period from November 16, 2009 through December 1, 2009.

140.    Vitas's medical records for that time period do not indicate that MG was in "crisis" requiring nursing care to palliate acute medical symptoms.  The following is shown by Vitas's medical records.

141.    Beginning on November 16, 2009, Vitas's medical records state that the reasons for billing Medicare for crisis care were pain, complicated wound care, and caregiver breakdown.  MG's medical records do not indicate that MG's wound care was so complicated as to constitute a crisis requiring billing at the higher rate, and "caregiver breakdown" is not an appropriate basis to bill for crisis care.

142.    MG's pain symptoms should have been appropriately managed and billed as routine home care.

143.    Vitas did not provide appropriate care to manage MG's pain under any billing rate.  Vitas failed to recognize and address MG's symptoms, which caused MG's pain to increase and created additional medical complications for MG.  Vitas staff provided MG high intravenous

29

doses of morphine, which caused MG to suffer from opioid neurotoxicity and opioid hyperalgesia. These conditions, which should have been recognized immediately by Vitas's medical staff, caused MG to experience increasingly greater pain as Vitas administered higher and higher morphine doses.

144. Despite MG exhibiting clear signs and symptoms of opioid neurotoxicity, Vitas staff did not consult a doctor to evaluate MG or to address MG's increasing pain. Instead, Vitas continued to administer higher levels of morphine to MG, which further increased her pain symptoms and caused MG to begin having seizures.

145. Had Vitas staff consulted a doctor regarding MG's pain initially, through routine home care, MG's pain should have been managed effectively, and MG would not have experienced the painful and severe complications of opioid neurotoxicity.

146. Vitas billed Medicare for crisis care for sixteen days during this first period of time, despite the fact that MG's symptoms should have been effectively managed with routine home care, and despite the fact that the "care" provided by Vitas made MG's pain symptoms significantly worse.

147. Chemed and Vitas knowingly submitted or caused the submission of false or fraudulent claims to Medicare for crisis care services on behalf of Patient MG that were not necessary or not provided, or care that was inappropriate, for the time period from November 16, 2009 through December 1, 2009, in the amount of approximately $15,678.64; and Medicare paid the claims.

**b) Crisis Care Billing Period 2**

148. The second period of time for which Vitas billed Medicare for crisis care for MG is for the time period from January 23, 2010 through February 3, 2010.

30

149.    Vitas billed Medicare for crisis care for MG starting on January 23, 2010, and this time the medical records stated that seizures were the basis for crisis care. As discussed above, MG's earlier seizures were a direct result of Vitas administering high intravenous doses of morphine to MG and failing to adequately address MG's pain symptoms. During this time period, totaling eleven days, Vitas changed MG's medicine to dilaudid from morphine, and on January 31, 2010 noted that MG began to improve. Despite this improvement, Vitas continued to bill for crisis care for MG for an additional 3 days, until February 3, 2010, even though Vitas should have provided services to MG as routine home care.

150.    Chemed and Vitas knowingly submitted or caused the submission of false or fraudulent claims to Medicare for crisis care services to Patient MG that were not necessary or not provided, or care that was inappropriate, for the time period January 23, 2010 through February 3, 2010, in the amount of approximately $10,531.31; and Medicare paid the claims.

### c)  Crisis Care Billing Period 3

151.    The third period of time for which Vitas billed Medicare for crisis care is for the time period from February 19, 2010 through March 8, 2010.

152.    According to its medical records, Vitas billed Medicare for crisis care for MG beginning on February 25, 2010, and ending on March 8, 2010, for the stated reason of "seizures." However, Vitas's records do not indicate that MG suffered seizures during this time period. MG was not otherwise in "crisis" during this time period. Vitas should not have billed Medicare for crisis care when routine home care was appropriate.

153.    Chemed and Vitas knowingly submitted or caused the submission of false or fraudulent claims to Medicare for crisis care services to Patient MG that were not necessary or

not provided for the time period February 25, 2010 through March 8, 2010, in the amount of approximately $5,000; and Medicare paid the claims.

### vii. Patient FA

154.    Chemed and Vitas knowingly submitted or caused to be submitted false or fraudulent claims to Medicare for eight days of crisis care for patient FA, an Alzheimer's patient in Texas, in November 2007.  These claims were false or fraudulent because Vitas's medical records for patient FA show that FA was not in crisis and because Vitas administered what would be considered routine home care, even though Vitas billed Medicare at the higher crisis care rate.

155.    Vitas's medical records for FA do not indicate that FA was experiencing a medical "crisis" that required nursing care to palliate acute symptoms.

156.    On November 23, 2007, the same date that Vitas began billing Medicare for crisis care for what Vitas referred to as "decreased level of consciousness and tachypnea," Vitas's records show that Vitas actually offered crisis care to FA and his family because FA's family was considering aggressive curative therapy instead of continuing hospice care.  Thus, Vitas was using crisis care as a way to keep FA on hospice care so that it could continue to bill Medicare on behalf of FA, not to palliate any acute medical symptoms.

157.    During the billing period, all of FA's symptoms were managed through the administration of services that should have been provided under routine home care.

158.    Chemed and Vitas knowingly submitted or caused the submission of false or fraudulent claims to Medicare for crisis care services on behalf of Patient FA that were not necessary or not provided for the time period November 23, 2007 through November 30, 2007, in the amount of approximately $5257; and Medicare paid the claims.

**VII. Chemed and Vitas Submitted or Caused to be Submitted False and Fraudulent Claims for Patients Who Did Not Meet the Medical Criteria for End of Life Care.**

159. Chemed and Vitas knowingly submitted or caused to be submitted false or fraudulent claims to Medicare for patients who were not "terminally ill" with a prognosis of six months or less if their illness ran its normal course and, therefore, were not eligible to receive end of life care. Chemed and Vitas also created, submitted, or caused to be submitted documentation that falsely represented that certain Medicare patients were eligible for hospice when they were not.

**A. Chemed's and Vitas's Business Practices Led to the Submission of False or Fraudulent Claims for Ineligible Patients**

160. Vitas's business practices led to the submission of false claims for patients who did not need end of life care. Top-level managers at Vitas's corporate headquarters set aggressive hospice admissions goals for regional and mid-level corporate managers at local Vitas programs, resulting in the admission of ineligible patients.

161. Chemed management regularly corresponded with Vitas management about the average daily census and growth in admissions, making focused frequent inquiries if they believed the numbers reported were too low.

162. Vitas senior managers regularly corresponded with personnel in the field offices when their average daily census and admissions growth were lagging.

163. Chemed and Vitas falsely certified on electronic claim forms that they submitted (or caused to be submitted) to Medicare that Vitas's claims were "correct and complete" and that Vitas maintained patient medical records in compliance with the certification requirements of 42 C.F.R. § 418.22.

164. Vitas's corporate culture encouraged its marketing and clinical staff to admit as many patients as possible, regardless of whether they were eligible for hospice.

33

165.     The general manager of each Vitas program was directly evaluated on the profitability and the number of patients admitted at that program's facility.

166.     General managers, who were typically not nurses or doctors, expected their marketing departments and sales representatives to find referral sources and patients, and evaluated and promoted their employees based on meeting hospice admissions goals.  This often meant that the Vitas program managers disregarded concerns of nurses and doctors who expressed that they did not believe that certain Vitas hospice patients were terminally ill.

167.     Vitas paid bonuses to its non-clinical staff based on the number of patients enrolled into the program.

168.     Vitas took adverse employment actions against marketing representatives who did not meet monthly admissions goals.  One former general manager stated that Vitas paid him bonuses based on the number of patient admissions and the length of time he could get a patient to stay on hospice services.

169.     Vitas did not properly train its staff on hospice eligibility criteria.  One former Vitas medical director stated that he received no training at all from Vitas on Medicare eligibility requirements for hospice, and that Vitas expected him to certify patients as eligible for hospice without making actual determinations that the patient had a prognosis of six months or less if their illness ran its normal course.  In contrast, numerous Vitas marketing employees said that Vitas spent a significant amount of resources training its marketing employees on how to "sell hospice" to patients, patients' families, and referral sources for potential hospice patients.

170.     Vitas also employed field nurses to provide care to its hospice patients residing in skilled nursing facilities, assisted living facilities, and hospitals, but did not provide them adequate training on the eligibility requirements for the Medicare hospice benefit.

34

171.    Vitas directed these untrained field nurses, as part of their job duties, to identify elderly people who were eligible for the Medicare hospice benefit, and to encourage the referral of elderly people to Vitas for end of life care.

172.    According to one former hospice manager for Vitas, the company philosophy was to "sign everybody up" for Medicare hospice services.  A former Vitas nurse in Florida said that Vitas "wanted everyone enrolled in hospice care."  This philosophy is inconsistent with Medicare requirements, because, for example, a patient who elects hospice care under the Medicare program also chooses to stop receiving curative care for his or her illness.

173.    Medical staff reported that they felt pressured by Vitas to admit or readmit patients who were inappropriate for hospice services.  One former Vitas admissions nurse said that if he did not admit a patient he believed to be ineligible, he would be pressured to reconsider his decision until he finally determined the patient was eligible for the Medicare hospice benefit. The same nurse stated that he was pressured by Vitas to bend the Medicare rules to get patients onto hospice service.

174.    Another Vitas nurse stated that when she attended the weekly meetings to discuss discharging patients, the goal was to discharge as few patients as possible without regard to hospice appropriateness.  Discharging more than four patients per meeting was frowned upon by the Vitas business managers, and Vitas medical staff were told to stop discharging patients even if patients were not eligible.

175.    The same Vitas nurse stated that she was instructed by Vitas to falsely write that a patient experienced symptoms that the patient did not experience in order to support a determination of hospice eligibility.  For example, she was once told to write that a patient had

35

an unnatural color, or pallor, when the patient did not, and was instructed not to write that the patient's health was improving in the medical record.

176.     One Vitas team doctor stated that on several occasions, when he did not believe patients were eligible for hospice, and therefore did not certify the patients as eligible, the Vitas medical director overruled him and signed the certification even in the absence of justification.

177.     A former Vitas physician stated that he was under pressure from Vitas management to increase the number of patients admitted to hospice, and that he was often overruled when he determined that a patient should be discharged because the patient was not dying.  This physician informed Vitas managers that he was concerned that his medical decisions were being ignored, but Vitas did not address his concerns.

178.     At least beginning in 2007, Chemed and Vitas were aware that ineligible patients were regularly being admitted in their San Antonio, Texas location.

179.     The Medical Director in the San Antonio location, who was employed by Vitas from approximately 1998-2008, regularly admitted Medicare beneficiaries to hospice with little regard as to their eligibility for hospice under the Medicare regulations.

180.     In 2007, the San Antonio location was the focus of a medical review by its Medicare claims processor, Palmetto, to determine whether Vitas was submitting claims for ineligible patients.

181.     As a result of this medical review, several of Vitas's medical directors conducted their own internal limited review to determine whether certain patients they had admitted to hospice care were ineligible.  As a result of the review, Vitas discharged 75-80 patients because it determined they were not eligible for hospice services because they did not have a life expectancy of six months or less.

36

182.     Vitas did not repay the Medicare care program for these ineligible patients; and neither Vitas nor Chemed conducted a broader investigation.

183.     During the review, at least one hospice physician at the San Antonio location informed Vitas's Vice-President of Operations that the former medical director for the San Antonio facility, who was employed from 1998 to 2008, had knowingly admitted and recertified patients who did not meet Medicare's hospice eligibility requirements.

184.     Neither Vitas nor Chemed conducted a broader investigation in response to the disclosure made by this San Antonio physician.

185.     As shown in the below specific patient examples, Vitas's own patient medical records do not support a medical prognosis that the patient's life expectancy was six months or less if the illness ran its normal course.

**B.     Examples of False Claims for Ineligible Patients[2]**

186.     Chemed and Vitas knowingly submitted or caused to be submitted to Medicare numerous false or fraudulent claims for Medicare reimbursement for patients who did not need end of life care because they did not have a medical prognosis of six months or less if their illnesses ran the normal course.

**i.   Patient MP**

187.     Chemed and Vitas knowingly submitted or caused to be submitted false or fraudulent claims to Medicare for hospice care for Patient MP in Missouri from April 10, 2009 through February 3, 2010.  These claims were false or fraudulent because Vitas's medical

_____

[2] To protect patient privacy, the United States has not identified by name the individuals who are examples of patients whom Vitas knew were not eligible for hospice care though it continued to bill Medicare.  The United States will serve Vitas with a list identifying each patient by name and patient identification number.

records for MP show that MP did not have a terminal illness with a prognosis of six months or less if MP's disease ran its normal course.

188.    According to Vitas's medical records, Vitas admitted MP to hospice based upon a diagnosis of debility, but MP did not meet the medical criteria for this diagnosis.  In addition, on April 10, 2009, the day MP was admitted to hospice, there was no indication that MP's pre-existing condition had deteriorated.  The medical records state that MP was alert and "oriented to self, denied pain," and weighed 151 pounds, having only lost two pounds in the last one to two months.

189.    Throughout the period that Medicare paid Vitas's claims on behalf of MP, Vitas's medical records show that MP remained stable and even gained weight, and her body mass index remained consistently above the level required by hospice eligibility criteria.

190.    Chemed and Vitas knowingly submitted or caused the submission of false or fraudulent claims to Medicare for hospice care on behalf of patient MP from April 10, 2009 through February 3, 2010, in the amount of $42,763.82; and Medicare paid the claims.

### ii.  Patient WB

191.    Chemed and Vitas knowingly submitted or caused to be submitted false or fraudulent claims to Medicare for hospice care on behalf of Patient WB in California, covering the period from June 5, 2008 through March 18, 2011.  These claims were false or fraudulent because Vitas's medical records for WB show that WB did not have a terminal illness with a prognosis of six months or less if WB's illness ran its normal course.

192.    Vitas's medical records for WB also show that at each period of time when Vitas recertified that WB was eligible for hospice care, WB did not have a terminal illness with a prognosis of six months or less if WB's illness ran its normal course.

38

193. According to Vitas's medical records, Vitas admitted WB to hospice based upon a diagnosis of "cardiovascular disease," but there were no medical examination findings to support the conclusion that WB was in end-stage heart failure or had another end-stage cardiac condition, and Vitas did not accurately assess whether WB had a terminal illness with a prognosis of six months or less if WB's illness ran its normal course.

194. A patient with a cardiac disease can be terminal if the patient meets the criteria for "Class IV" on the New York Heart Association's system for classifying degrees of heart failure. To be "Class IV," a patient must be unable to carry out any physical activity without discomfort, have symptoms of cardiac insufficiency while at rest, and experience increased discomfort if the patient engages in any physical activity.

195. Vitas's records for WB show that he had no shortness of breath or other heart failure symptoms while at rest. Additionally, Vitas gradually decreased the heart medications that WB received while he was on hospice care, finally ceasing all of WB's heart medicines on December 20, 2009. Throughout his time on hospice, WB remained stable and was clearly not suffering from end-stage heart disease.

196. Vitas's medical records for WB contained inconsistent and contradictory information, including inconsistent descriptions of WB's symptoms written by different members of Vitas staff as well as inaccurate functional scores noted by Vitas staff but contradicted by WB's documented symptoms. For example, nursing notes in WB's medical files would state that WB had no shortness of breath, but a doctor who visited WB around the same time wrote that WB had intermittent shortness of breath. Additionally, Vitas staff noted in WB's records that he was experiencing "slow progressive decline" and "remain[ed] appropriate for hospice with prognosis of 6 [months] or less," Vitas's records for WB lack any

39

documentation of decline in WB's nutritional or functional status, or other factors that would indicate that WB had a prognosis of six months or less if his disease ran its normal course.

197.     After remaining stable while he received hospice care for almost three years, WB was ultimately discharged from hospice on March 2, 2011 for extended prognosis.

198.     Chemed and Vitas knowingly submitted or caused the submission of false or fraudulent claims to Medicare for hospice care on behalf of Patient WB from June 5, 2008 through March 18, 2011, in the amount of $170,666.02; and Medicare paid the claims.

### iii. **Patient MC**

199.     Chemed and Vitas knowingly submitted or caused to be submitted false and fraudulent claims for hospice care on behalf of Patient MC in California, covering the period from July 18, 2009 through February 16, 2012.  These claims were false or fraudulent because Vitas's medical records for MC show that MC did not have a terminal illness with a prognosis of six months or less if MP's disease ran its normal course.

200.     Vitas's medical records for MC also show that at each period of time when Vitas recertified that MC was eligible for hospice care, MC did not have a terminal illness with a prognosis of six months or less if MC's illness ran its normal course.

201.     According to Vitas's medical records, Vitas admitted MC to hospice after a hospital stay, based upon a diagnosis of "heart failure," but MC had no symptoms to indicate MC had any end-stage disease or condition, including heart disease.  At the time of MC's admission to the hospital, MC was living independently and performing daily activities without assistance.

202.     At around the time Vitas admitted MC to its hospice program, its medical notes for MC stated that MC was "very healthy given her age."   In fact, Vitas stopped administering MC heart medications during her time in hospice.

203.     During MC's hospice stay, the only medications that Vitas administered were for anxiety.  MC was walking and performing daily activities without assistance.

204.     In March 2010, a doctor noted that MC did not need oxygen, unless she became excited.  Any shortness of breath was related to MC's anxiety, not heart disease.

205.     In addition to improperly admitting MC for hospice care when she was not eligible, Chemed and Vitas also knowingly submitted or caused to be submitted false or fraudulent claims to Medicare on behalf of MC for crisis care.

206.     On January 20, 2012, Vitas began billing Medicare for crisis care for MC due to "caregiver teaching and breakdown," neither of which are bases to submit claims to Medicare for crisis care.

207.     During the time that Vitas billed Medicare for crisis care for MC, Vitas's nursing notes state that MC was doing her own laundry.  Vitas stopped billing Medicare for crisis care on January 24, 2012 for unspecified reasons.

208.     MC died on February 16, 2012, after being on hospice for approximately two and a half years.  Although MC died while receiving hospice, at no point during the time that Vitas billed Medicare for MC's hospice care did MC have a life expectancy of six months or less if a disease ran its normal course.

209.     Chemed and Vitas knowingly submitted or caused the submission of false or fraudulent claims to Medicare for hospice care on behalf of Patient MC from July 18, 2009 through February 16, 2012, in the amount of approximately $169,820.99 and Medicare paid the claims.

41

### iv. **Patient FA**

210.    Chemed and Vitas knowingly submitted or caused to be submitted false or fraudulent claims for hospice care on behalf of Patient FA in Texas covering the period from May 1, 2005 through April 26, 2006.  These claims were false or fraudulent because Vitas's medical records for patient FA show that FA did not have a terminal illness with a prognosis of six months or less if FA's disease ran its normal course.

211.    It is unclear from Vitas's medical records whether it admitted FA to hospice based upon a diagnosis of dementia, debility, or Alzheimer's disease.  Nonetheless, FA did not meet the hospice eligibility criteria for dementia, debility, or Alzheimer's disease at any point during FA's hospice stay.

212.    At the time of admission, FA's body mass index was 31.6, which did not meet the nutritional eligibility criteria for debility.  Additionally, Vitas's records state that FA was ambulatory and walking, and therefore FA did not meet the Palliative Performance Scale criteria for eligibility for hospice for a debility diagnosis.

213.    FA also did not meet the eligibility criteria for Alzheimer's disease.  Vitas's staff documented that FA was answering questions, and therefore did not have the functional impairment required to meet eligibility criteria for Alzheimer's disease.

214.    On February 14, 2006, a Vitas nurse wrote that she had asked a physician to evaluate FA's eligibility for hospice, and that she had already notified FA's family and facility staff of FA's potential discharge from hospice.  Despite this, the Vitas physician certified FA for hospice again, even while documenting that FA was answering simple questions and was walking.

215.    FA's family revoked the hospice benefit on February 24, 2006, and FA was discharged from hospice.

216.    Chemed and Vitas knowingly submitted or caused the submission of false or fraudulent claims to Medicare for hospice care on behalf of Patient FA from May 1, 2005 through April 26, 2006, in the amount of approximately $35,000; and Medicare paid the claims.

### v.   **Patient EC**

217.    Chemed and Vitas knowingly submitted or caused to be submitted false or fraudulent claims for hospice care on behalf of patient EC in Texas covering the period from April 28, 2006 through December 15, 2007.  These claims were false or fraudulent because Vitas's medical records for patient EC show that EC did not have a terminal illness with a prognosis of six months or less if EC's disease ran its normal course.

218.    Vitas admitted EC to hospice for end stage congestive heart failure, but Vitas's medical records did not support this diagnosis at any point during the period that EC received hospice services.

219.    When EC was admitted to hospice in April 2006, the admitting physician noted that EC showed no evidence of heart failure after a medical examination, and wrote in EC's medical records that he questioned whether EC had heart failure.

220.    A patient with a cardiac disease can be terminal if the patient meets the criteria for "Class IV" on the New York Heart Association's system for classifying degrees of heart failure. To be "Class IV," a patient must be unable to carry out any physical activity without discomfort, have symptoms of cardiac insufficiency while at rest, and experience increased discomfort if the patient engages in any physical activity.  EC was a Class II, which is not hospice eligible.

221.    In July 2006, when Vitas was providing EC hospice care, EC could perform daily activities without assistance.  Also, on May 2, 2007, EC was fishing when Vitas was billing Medicare.

222.    Chemed and Vitas knowingly submitted or caused the submission of false or fraudulent claims to Medicare for hospice care for Patient EC from April 28, 2006 through December 15, 2007, in the amount of approximately $111,378.00; and Medicare paid the claims.

### vi.  **Patient JD**

223.    Chemed and Vitas knowingly submitted or caused to be submitted false or fraudulent claims for hospice care on behalf of patient JD in Texas covering the period from February 21, 2006 through June 30, 2008.  These claims were false or fraudulent because Vitas's medical records for JD show that JD did not have a terminal illness with a prognosis of six months or less if JD's disease ran its normal course.

224.    JD suffered a significant heart attack, was hospitalized, and then was admitted to hospice in February 2006, even though when JD was discharged from the hospital his heart conditions were documented as being under control.  In fact, when JD began receiving hospice care at home, he was no longer taking heart medication, and Vitas staff had noted that his functional status was good.

225.    According to Vitas's medical records, Vitas admitted JD to hospice based upon a diagnosis of end stage heart failure.

226.    A patient with a cardiac disease can be terminal if the patient meets the criteria for "Class IV" on the New York Heart Association's system for classifying degrees of heart failure.  To be "Class IV," a patient must be unable to carry out any physical activity without discomfort, have symptoms of cardiac insufficiency while at rest, and experience increased discomfort if the

patient engages in any physical activity. JD did not meet the medical conditions for this classification.

227.    During the time when Vitas was billing Medicare on behalf of JD, Vitas's medical records show that JD did not experience shortness of breath while at rest. Additionally, on May 8, 2007, a Vitas physician wrote that JD was ambulating well and driving.

228.    On August 10, 2007, a physician noted that JD did not have chest pain, was not on heart medication and that his heart was well compensated and stable.

229.    In November 2007, JD voluntarily revoked hospice.

230.    Vitas readmitted JD to hospice two months later. Vitas's medical records show that JD was experiencing shortness of breath, but it was unrelated to heart disease.

231.    Vitas continued to submit claims to Medicare on behalf of JD until June 25, 2008 when he was discharged from hospice for having an extended prognosis.

232.    Chemed and Vitas knowingly submitted or caused the submission of false or fraudulent claims to Medicare for hospice care on behalf of Patient JD from February 21, 2006 through June 30, 2008, in the amount of approximately $80,000; and Medicare paid the claims.

### vii. **Patient LH**

233.    Chemed and Vitas knowingly submitted or caused to be submitted false or fraudulent claims for hospice care for patient LH in Texas covering the period from January 23, 2006 through August 10, 2007. These claims were false or fraudulent because Vitas's medical records for LH show that LH did not have a terminal illness with a prognosis of six months or less if LH's disease ran its normal course.

234. Vitas's medical records for LH also show that at each period of time when Vitas recertified that LH was eligible for hospice care, LH did not have a terminal illness with a prognosis of six months or less if LH's illness ran its normal course.

235. According to Vitas's medical records, Vitas admitted LH to hospice based upon a diagnosis of debility and organic brain syndrome (or dementia).

236. LH did not meet eligibility criteria for hospice for debility, dementia, or Alzheimer's during any period of time when Vitas billed Medicare for LH's hospice care. LH was engaging in daily living activities, speaking in full sentences, and showed nutritional improvement.

237. A dementia patient may be eligible for hospice if he or she has a Functional Assessment Staging Test score (also called "FAST score") of 7, meaning that the dementia is severe and end stage. Vitas's medical records for LH clearly indicate that she did not have a FAST score of 7. Additionally, LH was not eligible for hospice under any other diagnoses, including Alzheimer's or debility.

238. LH was speaking in full sentences at the time of admission and could perform all activities of daily living, including walking. Vitas's staff improperly identified LH as having a FAST score of 7(b), which was wrong. Vitas's records state that LH was stable and gaining weight, and that LH did not meet the nutritional or functional requirements for hospice eligibility at any point during her hospice stay.

239. In May 2007, a nurse wrote in the medical records that LH's weight was stable and that she was answering questions appropriately. At that time her body mass index was 23, which is higher than the eligibility criteria of 22 or lower.

240.    LH was discharged from hospice on August 10, 2007, for having an extended prognosis.

241.    Chemed and Vitas knowingly submitted or caused the submission of false or fraudulent claims to Medicare for hospice care for Patient LH from January 23, 2006 through August 10, 2007, in the amount of $69,418.60; and Medicare paid the claims.

**FIRST CAUSE OF ACTION**
**(False or Fraudulent Claims)**
**(False Claims Act-31 U.S.C. § 3729(a)(1)(A)),**
**formerly 31 U.S.C. § 3729(a)(1)).**

242.    The United States re-alleges and incorporates by reference the allegations of paragraphs 1 through 241.

243.    By virtue of the acts described above, Chemed and Vitas knowingly presented or caused to be presented to an officer or employee of the United States false or fraudulent Medicare claims for payment or approval, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1), amended by 31 U.S.C. § 3729(a)(1)(A); that is, Chemed and Vitas knowingly made or presented, or caused to be made or presented, to the United States claims for payment for hospice services for patients who were not eligible in whole or part for Medicare hospice benefits, and for medically unnecessary services or services that were not provided or were inappropriate.

244.    By reason of the foregoing, the United States suffered actual damages in an amount to be determined at trial; and therefore is entitled to treble damages under the False Claims Act, plus civil penalties of not less than $5,500 and not more than $11,000 per false claim. Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 (notes), and 64 Fed. Reg.

47099, 47103 (1999), civil penalties were adjusted to $5,500 to $11,000 for violations occurring on or after September 29, 1999.

## SECOND CAUSE OF ACTION
### (False Statements)
### (False Claims Act-31 U.S.C. § 3729(a)(1)(B), formerly 31 U.S.C. § 3729(a)(2))

245.    The United States re-alleges and incorporates by reference the allegations of paragraphs 1 through 241.

246.    By virtue of the acts described above, Chemed and Vitas knowingly made, used, or caused to be used a false record or statement material to a false or fraudulent Medicare claim, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(2), amended by 31 U.S.C. § 3729(a)(1)(B).

247.    By reason of the foregoing, the United States suffered actual damages in an amount to be determined at trial; and therefore is entitled to treble damages under the False Claims Act, plus civil penalties of not less than $5,500 and not more than $11,000 per false claim.  Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 (notes), and 64 Fed. Reg. 47099, 47103 (1999), the civil penalties were adjusted to $5,500 to $11,000 for violations occurring on or after September 29, 1999.

## THIRD CAUSE OF ACTION
### (Payment by Mistake)

248.    The United States re-alleges and incorporates by reference the allegations of paragraphs 1 through 241.

48

249.     This is a claim by the United States for the recovery of monies paid to Chemed and Vitas by mistake for ineligible Medicare beneficiaries and for Medicare services that were medically unnecessary, or not appropriate.

250.     As a consequence of the conduct and the acts set forth above, Chemed and Vitas were paid by mistake by the United States in an amount to be determined which, under the circumstances, in equity and good conscience, should be returned to the United States.

**FOURTH CAUSE OF ACTION**
**(Unjust Enrichment)**

251.     The United States re-alleges and incorporates by reference the allegations of paragraphs 1 through 241.

252.     This is a claim by the United States for recovery of monies by which Chemed and Vitas have been unjustly enriched.

253.     By virtue of the conduct and the acts described above, Chemed and Vitas were unjustly enriched at the expense of the United States in an amount to be determined, which, under the circumstances, in equity and good conscience, should be returned to the United States.

**PRAYER FOR RELIEF AND JURY DEMAND**

WHEREFORE, the United States respectfully prays for judgment in its favor as follows:

a.      As to First and Second Causes of Action (False Claims Act), against Chemed and Vitas for: (i) statutory damages in an amount to be established at trial, trebled as required by law, and such penalties as are required by law; (ii) the costs of this action, plus interest, as provided by law; and (iii) any other relief that this Court deems appropriate, to be determined at a trial by jury.

b.      As to the Third Cause of Action (Payment Under Mistake of Fact), for:  (i) an amount equal to the money paid by the United States through the Medicare

49

Program to Chemed or Vitas, and illegally retained by Chemed or Vitas, plus

interest; (ii) the costs of this action, plus interest, as provided by law; and (iii) any

other relief that this Court deems appropriate, to be determined at a trial by jury.

c.    As to the Fourth Cause of Action (Unjust Enrichment), for:  (i) an amount equal

to the money paid by the United States through the Medicare Program to Chemed

and Vitas, or the amount by which Chemed and Vitas were unjustly enriched, plus

interest; (ii) the costs of this action, plus interest, as provided by law; and (iii) any

other relief that this Court deems appropriate, to be determined at a trial by jury.

d.    And for all other and further relief as the Court may deem just and proper.

The United States hereby demands a jury trial on all claims alleged herein.

Respectfully submitted this the 2nd day of May, 2013.

        STUART F. DELERY
        ACTING ASSISTANT ATTORNEY GENERAL

        Tammy Dickinson
        United States Attorney

By:   */s/ **Lucinda S. Woolery***

        LUCINDA S. WOOLERY
        THOMAS M. LARSON
        Assistant United States Attorneys
        Charles E. Whittaker Courthouse
        400 E. 9th Street
        Kansas City, MO 64106
        Telephone:    (816) 426-3122
        Facsimile:    (816) 426-4210
        Cindi.Woolery@usdoj.gov
        Tom.Larson@usdoj.gov

MICHAEL D. GRANSTON
RENÉE BROOKER
CAROLYN B. TAPIE
JENELLE BEAVERS
Attorneys, Civil Division
United States Department of Justice
P.O. Box 261, Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 305-3669

SEAN MCKENNA
Assistant United States Attorney
1100 Commerce St. Suite 300
Dallas, TX 75242
Telephone: (214) 659-8792

SHANA MINTZ
Assistant United States Attorney
Courthouse 312 North Spring Street
Los Angeles, CA 90012
Telephone: (213) 894-4756
Counsel for the United States