# Medicare Benefit Policy Manual
## Chapter 9 - Coverage of Hospice Services Under Hospital Insurance

**Table of Contents**
*(Rev. 156, 06-01-12)*

**Transmittals for Chapter 9**

10 - Requirements - General

20 - Certification and Election Requirements

    20.1 - Timing and Content of Certification

    20.2 - Election, Revocation, and Change of Hospice

        20.2.1 - Hospice Discharge

    20.3 - Election by Skilled Nursing Facility (SNF) and Nursing Facilities (NFs) Residents and Dually Eligible Beneficiaries

    20.4 - Election by HMO Enrollees

30 - Coinsurance

    30.1 - Drugs and Biologicals Coinsurance

    30.2 - Respite Care Coinsurance

40 - Benefit Coverage

    40.1 - Covered Services

        40.1.1 - Nursing Care

        40.1.2 - Medical Social Services

        40.1.3 - Physicians' Services

            40.1.3.1 - Attending Physician Services

            40.1.3.2 - Nurse Practitioners as Attending Physicians

        40.1.4 - Counseling Services

        40.1.5 - Short-Term Inpatient Care

        40.1.6 - Medical Appliances and Supplies

        40.1.7 - Hospice Aide and Homemaker Services

        40.1.8 - Physical Therapy, Occupational Therapy, and Speech-Language Pathology

40.1.9 - Other Items and Services

40.2 - Special Services

    40.2.1 - Continuous Home Care (CHC)

    40.2.2 - Respite Care

    40.2.3 - Bereavement Counseling

    40.2.4 - Special Modalities

40.3 - Contracting With Physicians

40.4 - Core Services

    40.4.1 - Contracting for Core Services

    40.4.1.1 - Contracting for Highly Specialized Nursing Services

    40.4.2 - Waiver for Certain Core Staffing Requirements

        40.4.2.1 - Waiver for Certain Core Nursing Services

40.5 - Non-Core Services

50 - Limitation on Liability of Beneficiaries for Certain Hospice Coverage Denials

60 - Provision of Hospice Services to Medicare/Veteran's Eligible Beneficiaries

70 – Hospice Contracts with An Entity for Services not Considered Hospice Services

    70.1 - Instructions for the Contractual Arrangement

80 – Hospice Pre-Election Evaluation and Counseling Services

    80.1 – Documentation

    80.2 - Payment

*90 - Caps and Limitations on Hospice Payments*

    *90.1 - Limitation on Payments for Inpatient Care*

    *90.2 - Aggregate Cap on Overall Reimbursement to Medicare-certified Hospices*

        *90.2.1 - Actual Medicare Payments Counted*

        *90.2.2 - New Hospices*

        *90.2.3 - Counting Beneficiaries for Calculation*

        *90.2.4 - Changing Aggregate Cap Calculation Methods*

        *90.2.5 - Other Issues*

        *90.2.6 - Updates to the Cap Amount*

    *90.3 - Administrative Appeals*

## 10 - Requirements - General
**(Rev. 141, Issued: 03-02-11, Effective: 01-01-11: Implementation: 03-23-11)**

Hospice care is a benefit under the hospital insurance program. To be eligible to elect hospice care under Medicare, an individual must be entitled to Part A of Medicare and be certified as being terminally ill. An individual is considered to be terminally ill if the medical prognosis is that the individual's life expectancy is 6 months or less if the illness runs its normal course.

Section §1814(a)(7) of the Social Security Act (the Act) specifies that certification of terminal illness for hospice benefits shall be based on the clinical judgment of the hospice medical director or physician member of the interdisciplinary group (IDG) and the individual's attending physician, if he/she has one, regarding the normal course of the individual's illness. No one other than a medical doctor or doctor of osteopathy can certify or re-certify a terminal illness. Predicting of life expectancy is not always exact. The fact that a beneficiary lives longer than expected in itself is not cause to terminate benefits. "Attending physician" is further defined in section 20.1 and 40.1.3.1.

An individual (or his authorized representative) must elect hospice care to receive it. The first election is for a 90-day period. An individual may elect to receive Medicare coverage for an unlimited number of election periods of hospice care. The periods consist of two 90-day periods, and an unlimited number of 60-day periods. If the individual (or authorized representative) elects to receive hospice care, he or she must file an election statement with a particular hospice. Hospices obtain elections from the individual and forward them to the Medicare contractor, which transmits them to the Common Working File (CWF) in electronic format. Once the initial election is processed, CWF maintains the beneficiary in hospice status until death or until an election termination is received.

An individual must waive all rights to Medicare payments for the duration of the election/revocation of hospice care for the following services:

- Hospice care provided by a hospice other than the hospice designated by the individual (unless provided under arrangements made by the designated hospice); and

- Any Medicare services that are related to the treatment of the terminal condition for which hospice care was elected or a related condition or services that are equivalent to hospice care, except for services provided by:

  1. The designated hospice (either directly or under arrangement);

  2. Another hospice under arrangements made by the designated hospice; or

3. The individual's attending physician, who may be a nurse practitioner (NP) if that physician or nurse practitioner is not an employee of the designated hospice or receiving compensation from the hospice for those services.

Medicare services for a condition completely unrelated to the terminal condition for which hospice was elected remain available to the patient if he or she is eligible for such care.

## 20 - Certification and Election Requirements
**(Rev. 1, 10-01-03)**
**A3-3141, HO-204**

## 20.1 - Timing and Content of Certification
**(Rev. 141, Issued: 03-02-11, Effective: 01-01-11: Implementation: 03-23-11)**

For the first 90-day period of hospice coverage, the hospice must obtain, no later than 2 calendar days after hospice care is initiated, (that is, by the end of the third day), oral or written certification of the terminal illness by the medical director of the hospice or the physician member of the hospice IDG, and the individual's attending physician if the individual has an attending physician.

The attending physician is a doctor of medicine or osteopathy or a nurse practitioner and is identified by the individual, at the time he or she elects to receive hospice care, as having the most significant role in the determination and delivery of the individual's medical care. A nurse practitioner is defined as a registered nurse who performs such services as legally authorized to perform (in the state in which the services are performed) in accordance with State law (or State regulatory mechanism provided by State law) and who meets training, education, and experience requirements described in 42 CFR 410.75.

Note that a rural health clinic (RHC) or federally qualified healthcare clinic (FQHC) physician can be the patient's attending physician but may only bill for services as a physician under regular Part B rules. These services would not be considered RHC or FQHC services or claims (e.g., the physicians do not bill under the RHC provider number but they bill under their own provider number).

Written certification must be on file in the hospice patient's record prior to submission of a claim to the Medicare contractor.

Initial certifications may be completed up to 15 days before hospice care is elected. If these requirements are not met, no payment is made for the days prior to the certification. Instead, payment begins with the day of certification, i.e., the date verbal certification (or written certification if that is done first) is obtained. If the physician forgets to date the certification a notarized statement or some other acceptable documentation can be obtained to verify when the certification was obtained.

For the subsequent periods, recertifications may be completed up to 15 days before the next benefit period begins. For subsequent periods, the hospice must obtain, no later than 2 calendar days after the first day of each period, a written certification statement from the medical director of the hospice or the physician member of the hospice's IDG. If the hospice cannot obtain written certification within 2 calendar days, it must obtain oral certification within 2 calendar days. A written certification must be on file in the hospice patient's record prior to submission of a claim to the Medicare contractor.

The written certification must include:

1. The statement that the individual's medical prognosis is that their life expectancy is 6 months or less if the terminal illness runs its normal course;

2. Specific clinical findings and other documentation supporting a life expectancy of 6 months or less; and

3. The signature(s) of the physician(s), the date signed, and the benefit period dates that the certification or recertification covers.

4. As of October 1, 2009, the physician's brief narrative explanation of the clinical findings that supports a life expectancy of 6 months or less as part of the certification and recertification forms, or as an addendum to the certification and recertification forms.

- If the narrative is part of the certification or recertification form, then the narrative must be located immediately above the physician's signature.

- If the narrative exists as an addendum to the certification or recertification form, in addition to the physician's signature on the certification or recertification form, the physician must also sign immediately following the narrative in the addendum.

- The narrative shall include a statement directly above the physician signature attesting that by signing, the physician confirms that he/she composed the narrative based on his/her review of the patient's medical record or, if applicable, his or her examination of the patient.

- The narrative must reflect the patient's individual clinical circumstances and cannot contain check boxes or standard language used for all patients. The physician must synthesize the patient's comprehensive medical information in order to compose this brief clinical justification narrative.

- For recertifications on or after January 1, 2011, the narrative associated with the third benefit period recertification and every subsequent recertification must include an explanation of why the clinical findings of the face-to-face encounter support a life expectancy of 6 months or less.

5. Face-to-face encounter. For recertifications on or after January 1, 2011, a hospice physician or hospice nurse practitioner must have a face-to-face encounter with each hospice patient prior to the beginning of the patient's third benefit period, and prior to each subsequent benefit period. Failure to meet the face-to-face encounter requirements specified in this section results in a failure by the hospice to meet the patient's recertification of terminal illness eligibility requirement. The patient would cease to be eligible for the benefit.

The face to face encounter requirement is satisfied when the following criteria are met:

a. Timeframe of the encounter: The encounter must occur no more than 30 calendar days prior to the start of the third benefit period and no more than 30 calendar days prior to every subsequent benefit period thereafter (refer to section 20.1.5.d below for an exception to this timeframe).

b. Attestation requirements: A hospice physician or nurse practitioner who performs the encounter must attest in writing that he or she had a face-to-face encounter with the patient, including the date of the encounter. The attestation, its accompanying signature, and the date signed, must be a separate and distinct section of, or an addendum to, the recertification form, and must be clearly titled. Where a nurse practitioner performed the encounter, the attestation must state that the clinical findings of that visit were provided to the certifying physician, for use in determining whether the patient continues to have a life expectancy of 6 months or less, should the illness run its normal course.

c. Practitioners who can perform the encounter: A hospice physician or a hospice nurse practitioner can perform the encounter. A hospice physician is a physician who is employed by the hospice or working under contract with the hospice. A hospice nurse practitioner must be employed by the hospice. A hospice employee is one who receives a W-2 from the hospice or who volunteers for the hospice.

d. Timeframe exceptional circumstances for new hospice admissions in the third or later benefit period: In cases where a hospice newly admits a patient who is in the third or later benefit period, exceptional circumstances may prevent a face-to-face encounter prior to the start of the benefit period. For example, if the patient is an emergency weekend admission, it may be impossible for a hospice physician or NP o see the patient until the following Monday. Or, if CMS data systems are unavailable, the hospice may be unaware that the patient is in the third benefit period. In such documented cases, a face to face encounter which occurs within 2 days after admission will be considered to be timely. Additionally, for such documented exceptional cases, if the patient dies within 2 days of admission without a face to face encounter, a face to face encounter can be deemed as complete.

The hospice must retain the certification statements.

These requirements also apply to individuals who had been previously discharged during a benefit period and are being recertified for hospice care.

## 20.2 - Election, Revocation, and Change of Hospice
**(Rev. 141, Issued: 03-02-11, Effective: 01-01-11: Implementation: 03-23-11)**

Each hospice designs and prints its election statement. The election statement must include the following items of information:

- Identification of the particular hospice that will provide care to the individual;

- The individual's or representative's (as applicable) acknowledgment that the individual has been given a full understanding of hospice care, particularly the palliative rather than curative nature of treatment;

- The individual's or representative's (as applicable) acknowledgment that the individual understands that certain Medicare services are waived by the election;

- The effective date of the election; and

- The signature of the individual or representative.

An individual or representative may revoke the election of hospice care at any time in writing. To revoke the election of hospice care, the individual must file a document with the hospice that includes a signed statement that the individual revokes the election for Medicare coverage of hospice care for the remainder of that election period and the effective date of that revocation. Note that a verbal revocation of benefits is NOT acceptable. The individual forfeits hospice coverage for any remaining days in that election period. An individual may not designate an effective date earlier than the date that the revocation is made.

Upon revoking the election of Medicare coverage of hospice care for a particular election period, an individual resumes Medicare coverage of the benefits waived when hospice care was elected. An individual may at any time elect to receive hospice coverage.

An individual may change, once in each election period, the designation of the particular hospice from which he or she elects to receive hospice care. The change of the designated hospice is not considered a revocation of the election. To change the designation of hospice programs, the individual must file, with the hospice from which he or she has received care and with the newly designated hospice, a signed statement that includes the following information: the name of the hospice from which the individual has received care, the name of the hospice from which they plan to receive care and the date the change is to be effective. (A change of ownership of a hospice is not considered

a change in the patient's designation of a hospice and requires no action on the patient's part.)

Medicare beneficiaries enrolled in managed care plans may elect hospice benefits. Federal regulations require that the Medicare contractor assigned the hospice specialty workload maintain payment responsibility for hospice services and may pay for other claims if that contractor is the geographically assigned Medicare contractor for the managed care enrollees who elect hospice; for specifics, see regulations at 42 CFR 417, Subpart P, 417.585, Special Rules: Hospice Care (b), and 42 CFR 417.531 Hospice Care Services (b). Institutional claims for services not related to the terminal illness would otherwise be the responsibility of another geographically assigned Medicare contractor.

Managed care enrollees who have elected hospice may revoke hospice election at any time, but claims will continue to be paid by fee-for-service contractors as if the beneficiary were a fee-for-service beneficiary until the first day of the month following the month in which hospice was revoked. As specified above, by regulation, the duration of payment responsibility by fee-for-service contractors extends through the remainder of the month in which hospice is revoked by hospice beneficiaries.

See Pub. 100-04, Medicare Claims Processing Manual, Chapter 2, "Admission and Registration" and Chapter 11, "Processing Hospice Claims," for requirements for hospice reporting to the Medicare contractor.

## 20.2.1 - Hospice Discharge
**(Rev. 141, Issued: 03-02-11, Effective: 01-01-11: Implementation: 03-23-11)**

The hospice benefit is available only to individuals who are terminally ill; therefore, a hospice may discharge a patient if it discovers that the patient is not terminally ill. Discharge may also be necessary when the patient moves out of the service area of the hospice. The hospice notifies the Medicare contractor of the discharge so that hospice services and billings are terminated as of that date. In this situation, the patient loses the remaining days in the benefit period. However, there is no increase cost to the beneficiary. General coverage under Medicare is reinstated at the time the patient revokes the benefit or is discharged.

Once a hospice chooses to admit a Medicare beneficiary, it may not automatically or routinely discharge the beneficiary at its discretion, even if the care promises to be costly or inconvenient, or the State allows for discharge under State requirements. The election of the hospice benefit is the beneficiary's choice rather than the hospice's choice, and the hospice cannot revoke the beneficiary's election. Neither should the hospice request or demand that the patient revoke his/her election.

In most situations, discharge from a hospice will occur as a result of one the following:

- The beneficiary decides to revoke the hospice benefit;

- The beneficiary moves away from the geographic area that the hospice defines in its policies as its service area;

- The beneficiary transfers to another hospice;

- The beneficiary's condition improves and he/she is no longer considered terminally ill. In this situation, the hospice will be unable to recertify the patient; or

- The beneficiary dies.

There may be extraordinary circumstances in which a hospice would be unable to continue to provide hospice care to a patient. These situations would include issues where patient safety or hospice staff safety is compromised. The hospice must make every effort to resolve these problems satisfactorily before it considers discharge an option. All efforts by the hospice to resolve the problem(s) must be documented in detail in the patient's clinical record and the hospice must notify the Medicare contractor and State Survey Agency of the circumstances surrounding the impending discharge. The hospice may also need to make referrals to other relevant state/community agencies (i.e., Adult Protective Services) as appropriate.

## 20.3 - Election by Skilled Nursing Facility (SNF) and Nursing Facilities (NFs) Residents and Dually Eligible Beneficiaries
**(Rev. 1, 10-01-03)**
**HO-204.2**

A Medicare beneficiary who resides in an SNF or NF may elect the hospice benefit if:

- The residential care is paid for by the beneficiary; or

- The beneficiary is eligible for Medicaid and the facility is being reimbursed for the beneficiary's care by Medicaid, and

- The hospice and the facility have a written agreement under which the hospice takes full responsibility for the professional management of the individual's hospice care and the facility agrees to provide room and board to the individual.

A beneficiary could be in a SNF under the SNF benefit for a condition unrelated to the terminal condition and simultaneously be receiving hospice for the terminal condition.

The State Medicaid Agency pays the hospice the daily amount allowed by the State for room and board while the patient is receiving hospice care, and the hospice pays the facility. Room and board services include the performance of personal care services, assistance in activities of daily living, socializing activities, administration of medication, maintaining the cleanliness of a resident's room, and supervising and assisting in the use of durable medical equipment and prescribed therapies.

Whenever Medicaid is involved, the hospice sends a copy of the election form to the State Medicaid Agency at the time of election, and also notifies this agency when the patient is no longer receiving hospice care.

In States that offer the hospice benefit under the Medicaid program, dually eligible beneficiaries must elect the benefit under both programs at once.

## 20.4 - Election by HMO Enrollees
**(Rev. 22, Issued:  09-24-04, Effective:  12-08-03, Implementation:  06-28-04)**

An HMO enrollee may elect the hospice benefit.  After the hospice election, Medicare pays the hospice for hospice services and pays the HMO for services of the attending physician, who may be a nurse practitioner, (as defined in section 20.1 of this manual) and services not related to the patient's terminal illness.  (See 42 CFR 417.531 and 417.585.)

## 30 - Coinsurance
**(Rev. 1, 10-01-03)**
**A3-3142**

Hospices may charge individuals for the applicable coinsurance amounts.  An individual who has elected hospice care is liable for the following coinsurance payments.

## 30.1 - Drugs and Biologicals Coinsurance
**(Rev. 1, 10-01-03)**
**A3-3142.A**

An individual is liable for a coinsurance payment for each palliative drug and biological prescription furnished by the hospice while the individual is not an inpatient.  The amount of coinsurance for each prescription approximates five percent of the cost of the drug or biological to the hospice, determined in accordance with the drug copayment schedule established by the hospice, except that the amount of coinsurance for each prescription may not exceed $5.00.  The cost of the drug or biological may not exceed what a prudent buyer would pay in similar circumstances.  The drug copayment schedule must be periodically reviewed for reasonableness and approved by the intermediary before it is used.

## 30.2 - Respite Care Coinsurance
**(Rev. 1, 10-01-03)**
**A3-3142.B**

The amount of coinsurance for each respite care day is equal to five percent of the payment made by CMS for a respite care day.  The amount of the individual's coinsurance liability for respite care during a hospice coinsurance period may not exceed

the inpatient hospital deductible applicable for the year in which the hospice coinsurance period began.

The individual hospice coinsurance period begins on the first day an election is in effect for the beneficiary and ends with the close of the first period of 14 consecutive days on each of which an election is not in effect for the beneficiary.

Thus, if a beneficiary elects to use all three of his/her election periods consecutively (without a 2-week break), they are subject to a maximum coinsurance for respite care equal to the hospital inpatient deductible. Similarly, if a break between election periods exceeds 14 days, the maximum coinsurance for respite care doubles, triples, or quadruples (depending on the number of election periods used and the timing of subsequent elections).

**EXAMPLE:** Mr. Brown elected an initial 90-day period of hospice care. Five days after the initial period of hospice care ended, he began another period of hospice care under a subsequent election. Immediately after the period ended, he began a third period of hospice care. Mr. Brown received inpatient respite care during all three periods of hospice care. Since these election periods were not separated by 14 consecutive days, they constitute a single hospice coinsurance period. Therefore, a maximum coinsurance for respite care during all three periods of hospice care may not exceed the amount of the inpatient hospital deductible for the year in which the first period began.

## 40 - Benefit Coverage
**(Rev. 141, Issued: 03-02-11, Effective: 01-01-11: Implementation: 03-23-11)**

For an individual to receive covered hospice services, a certification of the individual's terminal illness must have been completed as set forth in §20.1, and a plan of care must be established before services are provided. Services must be consistent with the plan of care and reasonable and necessary for the palliation or management of the terminal illness and related conditions.

A nurse practitioner serving as an attending physician should participate as a member of the IDG that establishes and/or or updates the individual's plan of care. The nurse practitioner may not serve as or replace the medical director or physician designee.

Hospices are paid a per diem rate based on the number of days and level of care provided during the election period. Levels of care are defined as:

- Routine home care (refer to §40.2.1);

- Continuous home care (refer to §40.2.1);

- Inpatient respite care (refer to §40.1.5 and §40.2.2); and

- General inpatient care (refer to §40.1.5).

Hospices are expected to furnish the following services to the extent specified by the plan of care for the individual. The categories listed above are used in billing to describe the acuity of the services furnished. See Pub. 100-04, Medicare Claims Processing Manual, Chapter 11, "Processing Hospice Claims," for a description of billing procedures.

## 40.1 - Covered Services
**(Rev. 1, 10-01-03)**
**A3-3143.1, HO-230.1**

Appropriately qualified personnel must perform all services, but it is the nature of the service, rather than the qualification of the person who provides it, that determines the coverage category of the service. The following services are covered hospice services.

## 40.1.1 - Nursing Care
**(Rev. 141, Issued: 03-02-11, Effective: 01-01-11: Implementation: 03-23-11)**

To be covered as nursing services, the services must require the skills of a registered nurse, a licensed practical nurse (LPN) or a licensed vocational nurse (LVN) under the supervision of a registered nurse, and must be reasonable and necessary to the treatment of the patient's illness or injury.

Services provided by a nurse practitioner (NP) who is not the patient's attending physician, are included under nursing care. This means that, in the absence of an NP, a registered nurse (RN) would provide the service. Since the services are nursing, payment is encompassed in the hospice per diem rate and may not be billed separately regardless of whether the services are provided by an NP or an RN. The following are examples of some services that traditionally are provided by an RN, which could also be provided by an NP, for which separate payment is not made:

> a. A patient with a terminal diagnosis of lung cancer complains of leg pain. In the absence of an NP, an RN would assess the patient.

> b. Assessment of pain and or symptoms for the determination for the need of medications, other treatments, continuous home care, general inpatient care etc. In the absence of an NP, an RN would assess the patient.

> c. Administration of medications through intravenous (e.g., PICC, central, etc.), intrathecal or any other means. In the absence of an NP, an RN would administer the medication.

> d. Family counseling. In the absence of an NP, an RN, social worker or counselor would provide this service.

e. Providing a home visit for assessment or provision of care to a patient who is not his/her patient. In the absence of the NP, the service would be provided by an RN, LPN or LVN. Therefore the NP cannot bill separately for the service.

## 40.1.2 - Medical Social Services
**(Rev. 141, Issued: 03-02-11, Effective: 01-01-11: Implementation: 03-23-11)**

Medical social services must be provided by a person who meets the criteria given in the Conditions of Participation at 42CFR418.114(b)(3).

Services of these professionals which may be covered include, but are not limited to:

1. Assessment of the social and emotional factors related to the patient's illness, need for care, response to treatment and adjustment to care;

2. Assessment of the relationship of the patient's medical and nursing requirements to the patient's home situation, financial resources and availability of community resources;

3. Appropriate action to obtain available community resources to assist in resolving the patient's problem (**NOTE:** Medicare does not cover the services of a medical social worker to complete or assist in the completion of an application for Medicaid because Federal regulations require the State to provide assistance in completing the application to anyone who chooses to apply for Medicaid.);

4. Counseling services that are required by the patient; and

5. Medical social services furnished to the patient's family member or caregiver on a short-term basis when the hospice can demonstrate that a brief intervention (that is, two or three visits) by a medical social worker is necessary to remove a clear and direct impediment to the effective palliation and management of the patient's terminal illness and related conditions. To be considered "clear and direct," the behavior or actions of the family member or caregiver must plainly obstruct, contravene, or prevent the patient's medical treatment. Medical social services to address general problems that do not clearly and directly impede treatment, as well as long-term social services furnished to family members, such as ongoing alcohol counseling, are not covered.

## 40.1.3 - Physicians' Services
**(Rev. 141, Issued: 03-02-11, Effective: 01-01-11: Implementation: 03-23-11)**

A physician must perform physicians' services (as defined in 42 CFR 410.20(b)(1)(1)), except that the services of the hospice medical director or the physician member of the interdisciplinary group must be performed by a doctor of medicine or osteopathy. Nurse practitioners may not serve as a medical director or as the physician member of the

interdisciplinary group. Nurse practitioners may not bill for medical services other than those described in 40.1.3.2.

## 40.1.3.1 - Attending Physician Services

The attending physician is a doctor of medicine or osteopathy or a nurse practitioner and is identified by the individual, at the time he or she elects to receive hospice care, as having the most significant role in the determination and delivery of the individual's medical care.

## 40.1.3.2 - Nurse Practitioners as Attending Physicians
**(Rev. 141, Issued: 03-02-11, Effective: 01-01-11: Implementation: 03-23-11)**

A nurse practitioner is defined as a registered nurse who is permitted to perform such services as legally authorized to perform (in the state in which the services are performed) in accordance with State law (or State regulatory mechanism provided by State law) and who meets training, education and experience requirements described in 42 CFR 410.75.

If a beneficiary does not have an attending physician or a nurse practitioner who has provided primary care prior to or at the time of the terminal diagnosis, the beneficiary may choose to be served by either a physician or a nurse practitioner who is employed by the hospice. The beneficiary must be provided with a choice of a physician or a nurse practitioner.

Services provided by a nurse practitioner that are medical in nature must be reasonable and necessary, be included in the plan of care and must be services that, in the absence of a nurse practitioner, would be performed by a physician. If the services performed by a nurse practitioner are such that a registered nurse could perform them in the absence of a physician, they are not considered attending physician services and are not separately billable. Services that are duplicative of what the hospice nurse would provide are not separately billable.

Nurse practitioners cannot certify a terminal diagnosis or the prognosis of 6 months or less, if the illness or disease runs its normal course, or re-certify terminal diagnosis or prognosis. In the event that a beneficiary's attending physician is a nurse practitioner, the hospice medical director and/or physician designee may certify or re-certify the terminal illness.

Hospice nurse practitioners may conduct face-to-face encounters as described in §20.1(5) as part of the certification process, but are still prohibited by statute from certifying the terminal illness.

## 40.1.4 - Counseling Services
**(Rev. 141, Issued: 03-02-11, Effective: 01-01-11: Implementation: 03-23-11)**

Counseling services are provided to the terminally ill individual and the family members or other persons caring for the individual at home. Counseling, including dietary counseling, may be provided both for the purpose of training the individual's family or other caregiver to provide care, and for the purpose of helping the individual and those caring for the individual to adjust to the individual's approaching death. Bereavement counseling is available to the patient and his or her immediate family to provide emotional, psychosocial, and spiritual support and services before and after the death of the patient and to assist with issues related to grief, loss, and adjustment for up to 1 year after the patient's death. Also, see §40.5 regarding waivers under certain conditions for making dietary counseling available.

## 40.1.5 - Short-Term Inpatient Care
**(Rev. 22, Issued: 09-24-04, Effective: 12-08-03, Implementation: 06-28-04)**

Short-term inpatient care may be provided in a participating hospice inpatient unit, or a participating SNF or NF that additionally meets the special hospice standards regarding patient and staffing areas. Medicare payment cannot be made for inpatient hospice care provided in a VA facility to Medicare beneficiaries eligible to receive Veteran's health services. Services provided in an inpatient setting must conform to the written plan of care. However, dually eligible veterans residing at home in their community may elect the Medicare Hospice Benefit. See §60.

Medicare covers two levels of inpatient care: respite care for relief of the patient's caregivers, and general inpatient care which is for pain control and symptom management.

General inpatient care may be required for procedures necessary for pain control or acute or chronic symptom management that cannot feasibly be provided in other settings. Skilled nursing care may be needed by a patient whose home support has broken down if this breakdown makes it no longer feasible to furnish needed care in the home setting.

General inpatient care under the hospice benefit is not equivalent to a hospital level of care under the Medicare hospital benefit. For example, a brief period of general inpatient care may be needed in some cases when a patient elects the hospice benefit at the end of a covered hospital stay. If a patient in this circumstance continues to need pain control or symptom management, which cannot be feasibly provided in other settings while the patient prepares to receive hospice home care, general inpatient care is appropriate.

Other examples of appropriate general inpatient care include a patient in need of medication adjustment, observation, or other stabilizing treatment, such as psycho-social monitoring, or a patient whose family is unwilling to permit needed care to be furnished in the home.

Inpatient respite care may be furnished to provide respite for the individual's family or other persons caring for the individual at home.

Note that hospice inpatient care in an SNF or NF serves to prolong current benefit periods for general Medicare hospital and SNF benefits. This could potentially affect patients who revoke the hospice benefit.

If a hospice patient receives general inpatient care for 3 days or more, and elects to revoke hospice, then the 3 day stay (although not equivalent to a hospital level of care) would still qualify the beneficiary for covered SNF services.

## 40.1.6 - Medical Appliances and Supplies
**(Rev. 1, 10-01-03)**
**A3-3143.1.F, HO-230.1.F**

Medical appliances and supplies may be provided, including drugs and biologicals. Only drugs as defined in §1861(t) of the Act and which are used primarily for the relief of pain and symptom control related to the individual's terminal illness are covered. Appliances may include covered durable medical equipment as described in 42 CFR 410.38 as well as other self-help and personal comfort items related to the palliation or management of the patient's terminal illness. Equipment is provided by the hospice for use in the patient's home while the patient is under hospice care. Medical supplies include those that are part of the written plan of care.

## 40.1.7 - Hospice Aide and Homemaker Services
**(Rev. 141, Issued: 03-02-11, Effective: 01-01-11: Implementation: 03-23-11)**

A hospice aide is a person who meets the requirements described in the Conditions of Participation. Hospice aides may provide personal care services. Aides may also perform household services to maintain a safe and sanitary environment in areas of the home used by the patient, such as changing the bed or light cleaning and laundering essential to the comfort and cleanliness of the patient. Hospice aides are assigned to a specific patient by a registered nurse who is a member of the interdisciplinary group. Written patient care instructions for a hospice aide must be prepared by a registered nurse who is responsible for the supervision of a hospice aide.

CMS' Conditions of Participation define a qualified homemaker as an individual who meets the requirements described in 42CFR418.202(g) and who has successfully completed hospice orientation addressing the needs and concerns of patients and families coping with a terminal illness. Homemaker services may include assistance in maintenance of a safe and healthy environment and services to enable the individual to carry out the plan of care.

## 40.1.8 - Physical Therapy, Occupational Therapy, and Speech-Language Pathology
**(Rev. 141, Issued: 03-02-11, Effective: 01-01-11: Implementation: 03-23-11)**

Physical therapy, occupational therapy, and speech-language pathology services may be provided for purposes of symptom control or to enable the individual to maintain

activities of daily living and basic functional skills.  Also, see §40.5 regarding waivers available under certain conditions for provision of these services.

## 40.1.9 - Other Items and Services
**(Rev. 141, Issued: 03-02-11, Effective: 01-01-11: Implementation: 03-23-11)**

Any other item or service which is included in the plan of care and for which payment may otherwise be made under Medicare, in accordance with title XVIII of the Social Security Act, is a covered service under the Medicare hospice benefit.  The hospice is responsible for providing any and all services indicated in the plan of care as necessary for the palliation and management of the terminal illness and related conditions.

The hospice Interpretive Guidelines for 42 CFR 418.54(a), published via a Survey and Certification letter (S & C 09-19, Advance Copy-Hospice Program Interpretive Guidance Version 1.1), require that the initial assessment be conducted in the location where hospice services will be provided.  The plan of care is developed from that initial assessment and from the comprehensive assessment.  Ambulance transports to a patient's home which occur on the effective date of the hospice election (i.e., the date of admission), would occur prior to the initial assessment and therefore prior to the plan of care's development.  As such, these transports are not the responsibility of the hospice.  Medicare will pay for ambulance transports of hospice patients to their home, which occur on the effective date of hospice election, through the ambulance benefit rather than through the hospice benefit.  Ambulance transports of a hospice patient, which are related to the terminal diagnosis and which occur after the effective date of election, are the responsibility of the hospice.

**EXAMPLE:**

A hospice determines that an existing patient's condition has worsened and has become medically unstable.  An inpatient stay will be necessary for proper palliation and management of the condition.  The hospice adds this inpatient stay to the plan of care and decides that, due to the patient's fragile condition, the patient will need to be transported to the hospital by ambulance.  In this case, the ambulance service becomes a covered hospice service.

## 40.2 - Special Services
**(Rev. 1, 10-01-03)**
**A3-3143.2, HO-230.3**

## 40.2.1 - Continuous Home Care (CHC)
**(Rev. 141, Issued: 03-02-11, Effective: 01-01-11: Implementation: 03-23-11)**

Continuous home care may be provided only during a period of crisis.  A period of crisis is a period in which a patient requires continuous care which is primarily nursing care to achieve palliation or management of acute medical symptoms.  If a patient's caregiver has been providing a skilled level of care for the patient and the caregiver is unwilling or

unable to continue providing care, this may precipitate a period of crisis because the skills of a nurse may be needed to replace the services that had been provided by the caregiver. This type of care can also be given when a patient is in a long term care facility.

The hospice must provide a minimum of 8 hours of care during a 24-hour day, which begins and ends at midnight. This care need not be continuous, e.g., 4 hours could be provided in the morning and another 4 hours in the evening. But a need for an aggregate of 8 hours of primarily nursing care is required. The care must be predominately nursing care provided by either an RN, an LPN, or an LVN. Services provided by a nurse practitioner that, in the absence of a nurse practitioner, would be performed by an RN, LPN, or LVN, are nursing services and are paid at the same continuous home care rate. This means that at least half of the hours of care are provided by an RN, LPN, or LVN. Homemaker or hospice aide services may be provided to supplement the nursing care.

**NOTE:** When fewer than 8 hours of care are required, the services are covered as routine home care rather than continuous home care.

Nursing care in the hospice setting can include skilled observation and monitoring when necessary and skilled care is needed to control pain and other symptoms.

The development of the CHC rate included the daily costs of therapy visits, drugs, supplies and equipment, and the average daily cost of the hospice IDG. The computation of the required 8 hours for the CHC level of care applies only to direct patient care provided by a nurse, a homemaker, or a hospice aide and, in general, assumes that one hourly payment would be made per hour. While in the majority of situations, one individual would provide continuous care during any given hour, there may be circumstances where the patient's needs require direct interventions by more than one covered discipline resulting in an overlapping of hours between the nurse and hospice aide. In these circumstances, the overlapping hours would be counted separately. The hospice would need to ensure that these direct patient care services are clearly documented and are reasonable and necessary. Computation of hours of care should also reflect the total hours of direct care provided to an individual that support the care that is needed and required. This means that all nursing and aide hours should be included in the computation for CHC and when the aide hours exceed the nursing hours, CHC would be denied and routine payment will be made. The statutory definition of continuous home care is meant to include the full range of services needed to achieve palliation and management of acute medical situations. Deconstructing what is provided in order to meet payment rules is not allowed. In other words, hospices cannot discount any portion of the hours provided in order to qualify for a continuous home care day.

Documentation of care, modification of the plan of care and supervision of aides or homemakers would not qualify as direct care nor would it qualify as necessitating the services of more than one provider. In addition, the services provided by other disciplines such as medical social workers or pastoral counselors are an integral part of the care provided to a hospice patient**,** however, these services are not included in the

statutory definition of continuous care and are not counted towards total hours of continuous care. However, the services of social workers and pastoral counselors would be expected during these periods of crisis, if warranted as part of hospice care and are included in the provisions of routine hospice care.

The following are used to illustrate circumstances that may qualify as CHC. This list is not all-inclusive nor does it indicate that if a patient presents with similar situations, that it would constitute CHC.

1. **Frequent medication adjustment to control symptoms/collapse of family support system**

   **Situation A**: The patient has had a central venous catheter inserted to provide access for continuous Fentanyl drip for pain control and for the administration of antiemetic medication to control continuous nausea and vomiting. The nurse spends 2 hours teaching the family members how to administer IV medications. She returns in the evening for 1 hour. The hospice aide provides 3 hours of care. The nurse spends 2 hours phoning physicians, ordering medications, documenting and revising the plan of care.

   **Determination:** Despite 8 hours of service, this does not constitute CHC since 2 of the 8 hours were not activities related to direct patient care.

   **Situation B**: The patient experiences new onset seizures. He continues to have episodes of vomiting. The nurse remains with the patient for 4 hours (10 AM – 2 PM) until the seizures cease. During that time she provides skilled care and family teaching. The patient's wife states she is unable to provide any more care for her husband. A hospice aide is assigned to the patient for monitoring for 24 hours, beginning at 2:00 PM, with a total of 8 hours of direct care in the first day. The nurse returns intermittently for a total of an additional 5 hours to administer medications, assess the patient and to relieve the aide for breaks. The social worker provides 3 hours of services to work with the patient's wife in identifying alternative methods to care for the patient.

   **Determination**: This qualifies as a continuous home care day. This constitutes a medical crisis, including collapse of family structure. The caregiver has been providing skilled care and the change in the patient's condition requires the nurse's interventions. Since there is no overlap in nursing care, 17 hours of care (i.e., 9 hours of nursing care and 8 hours of aide care) would be computed as CHC. The social worker hours would not be incorporated. If the caregiver had been providing custodial care and his medical crisis resolved within a short time frame, this situation would not have qualified as CHC.

2. **Symptom management/rapid deterioration/imminent death**

**Situation A**:  77-year-old patient with lung cancer whose caregiver is 80 years old.  The caregiver has been caring for this patient for 4 months and is now exhausted and scared.  The care provided consists of assisting with bathing, assisting the patient to ambulate, preparing meals, housekeeping and administering oral medications.  Since the patient is dyspneic at rest, she requires assistance in all ADLs, which equates to 9 hours of assistance within a 24-hour period.

**Determination**:  This would not qualify as CHC since there is little nursing care that requires a nurse.  The patient would however be a candidate for an inpatient respite level of care.

**Situation B**:  The patient's condition deteriorates.  The patient now has circumoral cyanosis, respiratory rate of 44 and labored with intermittent episodes of apnea.  The nurse performs a complete assessment and teaches the caregiver on methods to make the patient comfortable.  The nurse returns twice within the 24 - hour period to assess the patient.  She revises the plan of care after conferring with the patient's attending physician and with the hospice physician.  The homemaker and hospice aide are sent to assist the caregiver.  Within the 24-hour period, the direct care provided by the nurse equates to 3 hours, homemaker with 2 hours, and hospice aide of 6 hours.

**Determination**:  Since only 3 of the 11 hours were skilled care requiring the services of a nurse, this would not constitute CHC.  In this situation, the care required is not predominantly nursing but are comprised of services provided by a hospice aide.  In addition, it would not be correct to discount any portion of the hospice aide's hours or to provide these services gratis in order to qualify for the CHC benefit.

**Situation C**:  The next day, the patient's condition deteriorates further.  She has increased periods of apnea and air hunger.  In addition she is experiencing continuous vomiting and increasing pain.  Her blood pressure is beginning to decrease and her respirations are increasing.  The nurse remains at the patient's bedside for 4 hours while attempting to control her pain and symptoms.  The hospice aide provides care during 1 hour of this period.  The nurse leaves and the hospice aide remains at the bedside for 3 hours.  The social worker comes and talks with the caregiver and remains for 1 hour.  The nurse returns while the aide leaves.  The nurse remains with the patient for 2 hours until she dies.  The social worker returns and stays with the caregiver for 1 hour until the mortuary arrives.

**Determination**:  The nurse provided 6 hours of direct skilled nursing care; the aide provided 4 hours of direct care resulting in a total of 10 hours of registered nurse and hospice aide care.  Since at least 6 of the 10 hours were direct nursing care, and since nursing care was the predominant service provided during the 10 hours, the care meets the criteria for CHC.  In addition, since the nurse and the aide provided direct care for the patient simultaneously, it would be appropriate to

bill for each resulting in total of 10 billable hours.  The patient received 12 hours of care.  The 2 hours for the social worker are not counted towards the CHC hours.

Medicare's requirements for coverage of CHC are that at least 8 hours of primarily nursing care are needed in order to manage an acute medical crisis as necessary to maintain the individual at home**.**  When a hospice determines that a beneficiary meets the requirements for CHC, appropriate documentation must be available to support the requirement that the services provided were reasonable and necessary and were in compliance with an established plan of care in order to meet a particular crisis situation. This would include the appropriate documentation of the situation and the need for continuous care services consistent with the plan of care.

Continuous home care is covered only as necessary to maintain the terminally ill individual at home.

## 40.2.2 - Respite Care
**(Rev. 1, 10-01-03)**
**A3-3143.2.B, HO-230.3.B**

Respite care is short-term inpatient care provided to the individual only when necessary to relieve the family members or other persons caring for the individual at home.  Respite care may be provided only on an occasional basis and may not be reimbursed for more than five consecutive days at a time.

## 40.2.3 - Bereavement Counseling
**(Rev. 141, Issued: 03-02-11, Effective: 01-01-11: Implementation: 03-23-11)**

Bereavement counseling consists of counseling services provided to the individual's family before and after the individual's death.  Bereavement counseling is a required hospice service, provided for a period up to 1 year following the patients' death.  It is not separately reimbursable.

Bereavement specifics are found in Pub. 100-07, State Operations Manual, Appendix M, 42CFR 418.64(d)(1), L596.

## 40.2.4 - Special Modalities
**(Rev. 1, 10-01-03)**
**Hospice 230.3.D**

A Hospice may use chemotherapy, radiation therapy, and other modalities for palliative purposes if it determines that these services are needed.  This determination is based on the patient's condition and the Hospice care giving philosophy.  No additional Medicare payment may be made regardless of the cost of the services.

## 40.3 - Contracting With Physicians
**(Rev. 141, Issued: 03-02-11, Effective: 01-01-11: Implementation: 03-23-11)**

Section 1861(dd)(2) of the Act allows hospices to contract for physician services. Medical directors and physician members of the IDG are not required to be employed by the hospice. These physicians can be "under contract" with the hospice. Although the Act does not specify what the terms of that contract must be, requirements at 42CFR 418.64(a), 418.100(e), and 418.102(a) are applicable to hospice, as well as all other responsibilities under the hospice conditions of participation. Hospices retain professional management responsibilities for these services and must ensure that qualified persons furnish them in a safe and effective manner. All physician employees and those under contract must function under the supervision of the hospice medical director. Since nurse practitioners are not included in the definition of a physician, this section does not apply to nurse practitioners.

## 40.4 - Core Services
**(Rev. 141, Issued: 03-02-11, Effective: 01-01-11: Implementation: 03-23-11)**

With the exception of physician services, substantially all core services must be provided directly by hospice employees on a routine basis. These services must be provided in a manner consistent with acceptable standards of practice. The following are hospice core services:

- Physician services.

- Nursing services, (routinely available and/or on call on a 24-hour basis, 7 days a week) provided by or under the supervision of an RN functioning within a plan of care developed by the hospice IDG in consultation with the patient's attending physician, if the patient has one.

- Medical social services by a qualified social worker under the direction of a physician.

- Counseling (including, but not limited to, bereavement, dietary, and spiritual counseling) with respect to care of the terminally ill individual and adjustment to death. The hospice must make bereavement services available to the family and other individuals identified in the bereavement plan of care up to 1 year following the death of the patient.

The hospice may contract for physician services as specified in the Conditions of Participation.

## 40.4.1 - Contracting for Core Services
**(Rev. 141, Issued: 03-02-11, Effective: 01-01-11: Implementation: 03-23-11)**

A hospice may use contracted staff, if necessary, to supplement hospice employees in order to meet the needs of patients under extraordinary or other non-routine circumstances.

Arrangements made by a hospice to furnish items or services must be such that receipt of payment by the hospice for the services relieves the beneficiary of liability or any other persons to pay for the services. Whether the services and items are furnished by the hospice itself or by another organization under arrangements made by the hospice, both must agree not to charge the patient for covered services and items and must agree to return money incorrectly collected.

A hospice that has a written agreement with another agency, individual, or organization to furnish any services under arrangement must retain administrative and financial management, and oversight of staff and services for all arranged services, to ensure the provision of quality care. Arranged services must be supported by written agreements that require that all services be--

(1) Authorized by the hospice;

(2) Furnished in a safe and effective manner by qualified personnel; and

(3) Delivered in accordance with the patient's plan of care.

## 40.4.1.1 - Contracting for Highly Specialized Nursing Services
**(Rev. 141, Issued: 03-02-11, Effective: 01-01-11: Implementation: 03-23-11)**

A hospice may contract for the services of a registered nurse if the services are highly specialized, provided non-routinely, and so infrequently that the provision of such services directly would be impracticable and prohibitively expensive. Highly specialized services are determined by the nature of the service and the nursing skill level required to be proficient in the service. For example, a hospice may need to contract with a pediatric nurse if it cares for pediatric patients infrequently and if employing a pediatric nurse would be impracticable and expensive. Continuous care is not a highly specialized service, because while time intensive, it does not require highly specialized nursing skills.

## 40.4.2 - Waiver for Certain Core Staffing Requirements
**(Rev. 141, Issued: 03-02-11, Effective: 01-01-11: Implementation: 03-23-11)**

Hospices are prohibited from contracting with other hospices and non-hospice agencies on a routine basis for the provision of the core services of nursing, medical social services and counseling to hospice patients. A hospice may, however, enter into arrangements with another hospice program or other entity for the provision of these core services in extraordinary, exigent, or other non-routine circumstances. An extraordinary circumstance generally would be a short-term temporary event that was unanticipated. Examples of such circumstances might include unanticipated periods of high patient loads, caused by an unexpectedly large number of patients requiring continuous care

simultaneously, temporary staffing shortages due to illness, receiving patients evacuated from a disaster such as a hurricane or a wildfire, or temporary travel of a patient outside the hospice's service area. The hospice that contracts for services must maintain professional management responsibility for all services provided under arrangement or contract at all times and in all settings. Regulations at 42CFR418.100(e) discuss the professional management responsibilities of the hospice for services provided under arrangement.

Hospices must maintain evidence of the extraordinary circumstances that required them to contract for the core services and comply with the following:

> (a) The hospice must ensure that contracted staff is providing care that is consistent with the hospice philosophy and the patient's plan of care and is actively participating in the coordination of all aspects of the patient's hospice care.

Hospices may not routinely contract for a specific level of care (e.g., continuous care) or for specific hours of care (e.g., evenings and week-ends).

## 40.4.2.1 - Waiver for Certain Core Nursing Services
**(Rev. 141, Issued: 03-02-11, Effective: 01-01-11: Implementation: 03-23-11)**

The Conditions of Participation allow CMS to waive the requirement that a hospice provide nursing services directly, if the hospice is located in a non-urbanized area. The location of a hospice that operates in several areas is considered to be the location of its central office. The hospice must provide evidence to CMS that it has made a good faith effort to hire a sufficient number of nurses to provide services. CMS may waive the requirement that nursing services be furnished by employees based on the following criteria:

- The location of the hospice's central office is in a non-urbanized area as determined by the Bureau of the Census.

- There is evidence that the hospice was operational on or before January 1, 1983, including the following:

  - Proof that the organization was established to provide hospice services on or before January 1, 1983;

  - Evidence that hospice-type services were furnished to patients on or before January 1, 1983; and

  - Evidence that hospice care was a discrete activity rather than an aspect of another type of provider's patient care program on or before January 1, 1983.

- By virtue of the following evidence that a hospice made a good faith effort to hire nurses:

    - Copies of advertisements in local newspapers that demonstrate recruitment efforts;

    - Job descriptions for nurse employees;

    - Evidence that salary and benefits are competitive for the area; and

    - Any other recruiting activities (e.g., recruiting efforts at health fairs and contacts with appropriate personnel at other providers in the area).

A waiver remains in effect for a 1-year period. A waiver may be extended for two additional 1-year periods. Prior to each additional year, the hospice must request the extension and certify that the employment market for appropriate personnel has not changed significantly since the initial waiver was granted if this is the case. No additional evidence is required with this certification.

Waiver requests and any extensions with supporting documentation must be sent to the regional office for review. Regional offices have the authority to review, and approve, or deny the waiver application.

## 40.5 - Non-core Services
**(Rev. 141, Issued: 03-02-11, Effective: 01-01-11: Implementation: 03-23-11)**

In addition to the hospice core services (physician services, nursing services, medical social services, and counseling), the following services must be provided by the hospice, either directly or under arrangements, to meet the needs of the patient and family:

- Physical and occupational therapy and speech-language pathology services.

- Hospice aide services. A hospice aide employed by a hospice, either directly or under contract, must meet the qualifications required by §1891(a)(3) of the Act and implemented at 42CFR418.76.

- Homemaker services.

- Volunteers.

- Medical supplies (including drugs and biologicals on a 24-hour basis) and the use of medical appliances related to the terminal diagnosis and related conditions.

- Short-term inpatient care (including respite care and interventions necessary for pain control and acute and chronic symptom management) in a Medicare/Medicaid participating facility.

Section 1861(dd)(5) of the Act allows CMS to permit certain waivers of the requirements that the hospice make physical therapy, occupational therapy, speech language pathology services, and dietary counseling available (as needed) on a 24-hour basis. CMS is also allowed to waive the requirement that hospices provide dietary counseling directly. These waivers are available only to an agency or organization that is located in an area which is not an urbanized area (as defined by the Bureau of Census) and that can demonstrate to CMS that it has been unable, despite diligent efforts, to recruit appropriate personnel.

## 50 - Limitation on Liability of Beneficiaries for Certain Hospice Coverage Denials
**(Rev. 1, 10-01-03)**
**PM-A-97-11**

Section 1879 of the Act provides protections from liability for charges for certain denied claims to beneficiaries who, acting in good faith, receive inpatient or outpatient services from Medicare Part A providers, or items or services from Medicare Part B suppliers which accept assignment. Likewise, providers and suppliers may also be protected from liability under §1879 of the Act when it is determined that they did not know and could not reasonably have been expected to know that Medicare would deny payment. When the beneficiary is held not liable and the provider also is held to be not liable, payment may be made for a denied claim under §1879, as if the service were covered.

Section 1879(g) of the Act extends limitation on liability protection to a beneficiary enrolled in a hospice when there is a denial of claims due to a determination that the individual is not terminally ill, effective for services furnished on or after August 5, 1997.

When a denial of payment for hospice services is based upon a determination that the beneficiary is not terminally ill, the contractor will apply the usual procedures of the limitation on liability provision.

See the Medicare Claims Processing Manual, Chapter 30, "Limitation on Liability."

## 60 - Provision of Hospice Services to Medicare/Veteran's Eligible Beneficiaries
**(Rev. 1, 10-01-03)**
**CCP/DCPC Comments - Tom Saltz, Carol Blackford, Terrie Deutsch**

Medicare beneficiaries that are dually eligible veterans, and reside at home in their community may elect the Medicare Hospice Benefit and have hospice services paid for under the Medicare Hospice Benefit. See §1853(c) and 1814(d) of the Act.

If a duly eligible veteran, who had been receiving Medicare hospice services in his/her home, is admitted to a VA owned and operated inpatient facility, the beneficiary must

revoke the Medicare hospice benefit. Medicare is not allowed to pay for those services for which another federal entity is primary payer (§1853(c) and 1814(d)).

Dually eligible veterans may elect to receive Medicare hospice services while residing in community nursing homes and state homes and have those services paid for under the Medicare hospice benefit. (This is similar to paying for hospice care if a beneficiary lives in a nursing facility. See §20.3.)

## 70 – Hospice Contracts with An Entity for Services not Considered Hospice Services
**(Rev. 1, 10-01-03)**
**A-02-102**

The law governing the provision of Medicare hospice services is found at §1861(dd) of the Act. This law specifies the services covered as hospice care and the conditions a hospice program must meet in order to participate in the Medicare program. One of the conditions a hospice program must meet is that it be "primarily engaged" in providing hospice care and services to terminally ill individuals. The law further clarifies that "terminally ill individuals" are individuals having a "medical prognosis that their life expectancy is six months or less if the illness runs its normal course." Although the law does not explicitly define its expectations for "primarily engaged," CMS has interpreted it to mean exactly what it says, that a hospice provider must be primarily engaged in providing hospice care and services (§1861(dd)(2)(A)(i)). "Primarily" does not mean "exclusively." This requirement does not preclude provision of non-hospice services to terminally ill individuals who are not hospice patients or services to individuals, who are not terminally ill, so long as the primary activity of the hospice is the provision of hospice services to terminally ill individuals.

The CMS recognizes that there may be circumstances in which another health care entity may wish to "purchase" some of the highly specialized staff time or services of a hospice to better meet the needs of its specific patient population. In these cases, the services are not "hospice" services in terms of Medicare payment but become part of the service package of the provider under whose care the patient is. Examples of such circumstances are provided below.

**EXAMPLE 1:**

A dually eligible Medicare/Medicaid beneficiary enrolled in the Program of All-Inclusive Care for the Elderly (PACE) program for approximately 2 years has been diagnosed with a life limiting terminal illness with a prognosis of six months or less. In the course of routine assessments, the PACE provider recognizes that the beneficiary would benefit from the specialized services of a pain management specialist or a grief counselor. The PACE provider would then enter into a contractual arrangement with a Medicare certified hospice to purchase these specialized services. The hospice provider would bill the PACE provider for the services, and the PACE provider would in turn pay the hospice provider directly. Neither provider type would be allowed to bill Medicare separately for

the contracted services (which in this example are PACE services and included in the PACE provider's capitated rate). In this example, the PACE provider would maintain a medical record on the patient and the hospice provider would submit any documentation related to the care of the PACE patient to the PACE provider.

**EXAMPLE 2:**

A Medicare beneficiary is receiving skilled services from a Medicare certified home health agency (HHA). The beneficiary has been diagnosed with a life limiting terminal illness, but chooses to continue curative treatments, thereby rendering him ineligible for the Medicare hospice benefit. The beneficiary is experiencing a period of intractable pain, and the HHA wishes to purchase specialized pain control services from the hospice provider. The HHA would then enter into a contractual arrangement with a Medicare certified hospice to purchase specialized nursing services. The hospice would bill the HHA and the HHA would pay the hospice provider directly. Neither provider type would be allowed to bill Medicare separately for the contracted services (which, in this example, are home health services and therefore included in the HHA's episode payment). In this example, the HHA would maintain a medical record on the patient, and the hospice submits any documentation related to the pain management to the HHA.

**EXAMPLE 3:**

A Medicare beneficiary (non-dual eligible) resides in a skilled nursing facility (SNF) and has a diagnosis of Alzheimer's disease. The beneficiary's disease process has progressed to a stage in which he/she can no longer ingest food or fluids. The beneficiary's family has been approached by the SNF regarding the placement of a feeding tube and has been told, "their loved one may not live much longer." The family is struggling with this concept and has requested assistance from the SNF regarding hospice care and grief counseling. The SNF has provided information about the Medicare hospice benefit to the family, but the patient's legal representative has made a decision not to elect hospice care at this time. The SNF does not have a trained grief counselor or full-time social worker on staff, but has a business relationship with a local hospice and has requested the services of a pastoral or grief counselor. The SNF and hospice enter into a contractual arrangement for the provision of grief counseling to this beneficiary's family by a pastoral care counselor. The hospice provider would bill the SNF, and the SNF would pay the hospice provider directly. Neither provider type would be allowed to bill Medicare Part A or B separately for the pastoral care services (which in this example are included in the Medicare's Resource Utilization Group or RUG payments to the SNF). The SNF maintains the medical record on this patient and the hospice provider would submit any documentation related to the pastoral care services provided to the SNF.

In all of the examples provided above, the billing and payment for the services are between each of the providers. Medicare must not be billed separately for any of the contracted services referred to in the examples provided above.

## 70.1 - Instructions for the Contractual Arrangement
**(Rev. 1, 10-01-03)**

A contractual agreement between both parties must be on file and available for review by the state survey agency responsible for conducting surveys on behalf of CMS to assess compliance with the relevant conditions of participation for the provider contracting for the hospice services. Where a PACE organization contracts with a hospice organization, the contract, which is reviewed by CMS, must meet the requirements specified in 42 CFR 460.70. The agreement must specify each of the services to be provided, the credentials required for any of the professionals providing the services, the billing method and payment amounts, and any required documentation.

## 80 - Hospice – Pre-Election Evaluation and Counseling Services
**(Rev. 28, Issued: 12-03-04, Effective: 01-01-05, Implementation: 01-03-05)**

Effective January 1, 2005, section 512 of the MMA amends section 1812(a)(1)(5) of the Act which, provides for a one-time payment to be made to a hospice for evaluation and counseling services furnished by a physician who is either the medical director of or employee of a hospice agency. In order to be eligible to receive this service, a beneficiary must:

- be determined to have a terminal illness (which is defined as having a prognosis of 6 months or less if the disease or illness runs its normal course;

- not have made a hospice election, and

- not previously received the pre-election hospice services

- Services under this benefit are comprised of:

- evaluating the individual's need for pain and symptom management;

- counseling the individual regarding hospice and other care options, and may include;

- advising the individual regarding advanced care planning.

The services that comprise this benefit are currently available through other Medicare benefits. For example, evaluation and counseling are often provided by an individual's physician as well as by other sources such as discharge planners, case managers, social workers and nonphysician providers. Therefore, this service may not be reasonable and necessary for all individuals. To the extent that beneficiaries have already received Medicare-covered evaluation and counseling with respect to end-of-life care, the hospice pre-election benefit would seem duplicative. However, if a beneficiary or the beneficiary's physician deem it necessary to seek the expertise of a hospice medical

director or physician employee, this benefit is available to assure that a beneficiary's end-of-life options for care and pain management are addressed.

Since the decision to utilize this benefit is determined by the beneficiary or the beneficiary's physician, the evaluation and counseling service may not be initiated by the hospice, that is, the entity receiving payment for the service. Payments by hospice agencies to physicians or others in a position to refer patients for services furnished under this provision may implicate the Federal anti-kickback statute.

If the beneficiary's physician is also the medical director or physician employed by a hospice or possesses expertise in the provision of palliative or hospice care, that physician already possesses the expertise necessary to furnish end-of-life services and will have received payment for these services through the use of evaluation and management codes.

For example:

A thoracic surgeon has diagnosed a patient hospitalized in an acute care facility, with end-stage lung cancer with a prognosis of 6 months or less, if the disease runs its normal course. The patient has been informed of this diagnosis. The physician, with the patient's concurrence, requests a consult by the hospital's palliative care team. The team meets with the patient, discusses options, evaluates the patient's pain and symptoms, and makes recommendations including hospice care. Utilization of the evaluation and consultation benefit would be duplicative.

A patient with terminal cervical cancer has been receiving aggressive curative care as an outpatient, which has not been successful. The patient's physician, nurse and social worker have discussed the possibility of hospice. The patient decides to seek information from a hospice. Utilization of the evaluation and consultation benefit would be appropriate.

Hospice A receives referrals from various physicians and facilities that the patients are certified as having a terminal illness and wish to elect the hospice benefit. Hospice A utilizes the evaluation and consultation benefit for every patient as a preliminary evaluation, prior to the actual election of the benefit. Utilization of the evaluation and consultation benefit would not be appropriate.

Nursing home B contacts Hospice C providing them with a list of patients that can be certified as having a terminal illness. The medical director of Hospice C makes "rounds" on these patients, many of whom are unable to communicate and whose symptoms are being managed well. Utilization of the evaluation and consultation benefit would not be appropriate.

A patient is being treated by a physician for end-stage COPD. The patient is experiencing distressing symptoms, but has not been able to make any definitive decision as to advanced directive decisions. The patient's physician feels that the expertise of the

medical director in Hospice D would be able to provide recommendations as to symptom management and advance directive decisions. The medical director provides the evaluation and consultation services. The patient does not elect the hospice benefit, but is able to make determinations as to his wishes and the physician has recommendations to assist in his provision of care. Utilization of the evaluation and consultation benefit would be appropriate.

## 80.1 - Documentation
**(Rev. 28, Issued: 12-03-04, Effective: 01-01-05, Implementation: 01-03-05)**

If the beneficiary's physician initiates the request for the evaluation and counseling service, appropriate documentation guidelines should be followed, including the determination of the terminal diagnosis. Since this provision is not a prerequisite of or part of the hospice benefit, certification of the terminal diagnosis is not required. The request or referral should be in writing, and the hospice medical director or physician employee would be expected to provide a written note on the patient's medical chart as well as maintaining a written record of this service.

If the beneficiary initiates the request for the service, the hospice agency should maintain a written record of the service and communication with the beneficiary's physician, with the beneficiary's permission, would occur, to the extent necessary to ensure continuity of care.

## 80.2 - Payment
**(Rev. 141, Issued: 03-02-11, Effective: 01-01-11: Implementation: 03-23-11)**

Section 512(b) of the MMA amends section 1814(i) of the Act and establishes payment for this service. The statute specifies that the payment will be made to the hospice for services provided by the hospice medical director or physician employed by the hospice. The provision of these services may not be delegated to other hospice personnel (i.e., nurse practitioners, registered nurses, social workers, etc.) and may not be furnished by a physician under contract with the hospice. CMS intends to monitor data regarding the use of this benefit.

Since the evaluation and counseling provision is not a service within the hospice benefit, payment for these services is not included in the hospice payment cap.

Payment to the hospice agency for the provision of this evaluation and counseling service is made using HCPCS code G0337. The national payment amounts for this service for FY 2005 was $54.57. Future changes in the rate will be identified in the Physician Fee Schedules. See Pub 100-04, Medicare Claims Processing Manual, chapter 11, section 10.1, for claims processing instructions.

## 90 – Caps and Limitations on Hospice Payments
*(Rev. 156, Issued: 06-01-12, Effective: 04-14-11 for the 2011 Cap Year and Prior Cap Years; October 1, 2011 for the 2012 Cap Year and Subsequent Cap Years; Implementation Date: 07-02-12)*

*The statute requires that hospice payments be limited by an inpatient cap and by an aggregate cap. Medicare contractors make the cap calculations annually, after the end of the aggregate cap year, which runs from November 1st to October 31st. Contractors send each provider a cap determination letter, which serves as a notice of program reimbursement under 42 CFR §405.1803(a)(3), showing the results of those calculations. Any amounts in excess of either cap are considered to be overpayments, and must be repaid to Medicare. Contractors compute the inpatient cap and the aggregate cap in order to determine whether a provider has exceeded the allowable hospice cap amount. The contractor shall issue a demand for the overpayment from hospices that exceeded the allowable hospice cap amount.*

## 90.1 – Limitation on Payments for Inpatient Care
*(Rev. 156, Issued: 06-01-12, Effective: 04-14-11 for the 2011 Cap Year and Prior Cap Years; October 1, 2011 for the 2012 Cap Year and Subsequent Cap Years; Implementation Date: 07-02-12)*

*Payments to a hospice for inpatient care are subject to a limitation on the number of days of inpatient care furnished to Medicare patients. During the 12-month period beginning November 1 of each year and ending October 31, the aggregate number of inpatient days for general inpatient care and inpatient respite care may not exceed 20 percent of the aggregate number of days of hospice care provided to all Medicare beneficiaries in that hospice during that same period. This limitation is applied once each year, at the end of the hospices' "cap period" (November 1 - October 31). The inpatient cap is calculated by the contractor as follows:*

1. *The maximum allowable number of inpatient days is calculated by multiplying the total number of days of Medicare hospice care by 0.20.*

2. *If the total number of days of inpatient care furnished to Medicare hospice patients is less than or equal to the maximum, no adjustment is necessary.*

3. *If the total number of days of inpatient care exceeds the maximum allowable number, the limitation is determined by:*

   - *Calculating the ratio of the maximum allowable inpatient care days to total inpatient care days reported on the Provider Statistical and Reimbursement Report (PS&R). The calculated ratio is multiplied by the total reimbursement for inpatient care (general inpatient and inpatient respite reimbursement) paid to the provider.*

- *Multiplying the excess inpatient care days by the routine home care (RHC) rate, wage adjusted for the location of the hospice.*

- *Adding together the amounts calculated in the two bullets above to derive the total allowable payments for inpatient care.*

- *Comparing the total allowable payments for inpatient care in bullet 3 above with actual payments made to the hospice for inpatient care during the "cap period" in order to determine the overpayments paid to the provider.*

*Any excess reimbursement must be refunded by the hospice.*

***EXAMPLE:*** *Assume that:*

*40,000 total hospice days x 0.20 = 8,000 = the maximum allowable inpatient care days.*

*10,000 inpatient care days were reported and paid to the hospice.*

*The ratio of maximum allowable days to the number of actual days equals 8,000 to 10,000 or 0.80.*

*Assume the total reimbursement for inpatient care revenue codes 0655 and 0656 for services provided between November 1st and October 31st is $4,000,000.*

*$4,000,000 x 0.80 = $3,200,000 = payments for allowable inpatient care days.*

*Excess inpatient days = (10,000 actual days) – (8,000 allowable days) = 2,000. Multiply the excess inpatient care days by the routine home care rate (wage adjusted for a hospice located in Redding, California, using the FY 2012 Wage Index value of 1.4631): 2,000 x $199.09 = $398,180 = allowable payments for the excess inpatient care days.*

*Add the allowable inpatient payments and the allowable payments for excess days to derive the inpatient cap: $3,200,000 + $398,180 = $3,598,180 = inpatient cap.*

*Compare $3,598,180 inpatient cap with $4,000,000 actually paid for inpatient revenue codes.*

*The hospice must refund $4,000,000 - $3,598,180 = $401,820*

## *90.2 – Aggregate Cap on Overall Reimbursement to Medicare-certified Hospices*

*(Rev. 156, Issued: 06-01-12, Effective: 04-14-11 for the 2011 Cap Year and Prior Cap Years; October 1, 2011 for the 2012 Cap Year and Subsequent Cap Years; Implementation Date: 07-02-12)*

*Overall aggregate Medicare payments made to a Medicare-certified hospice are subject to an aggregate cap, calculated by the contractor at the end of the hospice cap period. The cap year is from November 1st of each year to October 31st of the next year. The aggregate cap is calculated by multiplying a Medicare beneficiary count during the period by a statutory "cap amount." The Medicare beneficiary count is determined using either the proportional method or the streamlined method, as described in section 90.2.3 below. The hospice cap amount for the cap year ending October 31, 2011, is $24,527.69. This amount is adjusted annually to reflect the percentage increase or decrease in the medical care expenditure category of the Consumer Price Index (CPI) for all urban consumers. The computation of the cap amount is explained in section 90.2.6 below.*

*The total actual Medicare payments made for services furnished to Medicare beneficiaries during the cap year (November 1st to October 31st) are compared to the aggregate cap for this period. Any actual Medicare payments in excess of the aggregate cap must be refunded by the hospice.*

*All Medicare-certified hospices are subject to the aggregate cap calculation. When a beneficiary receives hospice care from more than one hospice, only the care provided by the Medicare-certified hospice(s) is considered when computing the aggregate cap.*

## 90.2.1 – Actual Medicare Payments Counted
*(Rev. 156, Issued: 06-01-12, Effective: 04-14-11 for the 2011 Cap Year and Prior Cap Years; October 1, 2011 for the 2012 Cap Year and Subsequent Cap Years; Implementation Date: 07-02-12)*

*"Total actual Medicare payments made for services furnished to Medicare beneficiaries during the cap year" refers to Medicare payments for services rendered beginning November 1 and ending October 31, regardless of when payment is actually made. All payments made to hospices on behalf of all Medicare hospice beneficiaries receiving services during the cap year are counted, regardless of which year(s) the beneficiary is counted in determining the cap, using the best data available at the time of the calculation. For example, payments made to a hospice for an individual initially electing hospice care on October 5, 2011 and dying on October 25, 2011, pertain to services rendered in the cap year beginning November 1, 2010, and ending October 31, 2011, and are counted as payments made during the 2011 cap year (November 1, 2010 - October 31, 2011), even though the beneficiary would be counted in the 2012 cap year if that hospice used the streamlined method (the period for counting beneficiaries using the streamlined method is September 28, 2011 to September 27, 2012).*

## 90.2.2 – New Hospices
*(Rev. 156, Issued: 06-01-12, Effective: 04-14-11 for the 2011 Cap Year and Prior Cap Years; October 1, 2011 for the 2012 Cap Year and Subsequent Cap Years; Implementation Date: 07-02-12)*

*The hospice aggregate cap is calculated in a different manner for new hospices entering the Medicare program if the hospice has not participated in the program for an entire cap year. In this situation, the initial cap calculations for newly certified hospices must cover a period of at least 12 months but less than 24 months. For example, the first cap period for a hospice entering the program on October 1, 2010, is from October 1, 2010 through October 31, 2011. Similarly, the first cap period for hospice providers entering the program after November 1, 2009, but before November 1, 2010, ends October 31, 2011.*

*Contractors shall use the proportional method when calculating the aggregate cap for all hospices which are Medicare-certified on or after October 1, 2011.*

## 90.2.3 – Counting Beneficiaries for Calculation
*(Rev. 156, Issued: 06-01-12, Effective: 04-14-11 for the 2011 Cap Year and Prior Cap Years; October 1, 2011 for the 2012 Cap Year and Subsequent Cap Years; Implementation Date: 07-02-12)*

*From the inception of the benefit in 1983 until April 14, 2011, the original method for counting beneficiaries for use in the aggregate cap calculation remained unchanged. That method is described below:*

> *Each hospice's cap amount is calculated by the contractor multiplying the adjusted cap amount by the number of Medicare beneficiaries who elected to receive hospice care from that hospice during the cap period. For purposes of this calculation, the number of Medicare beneficiaries includes—*

> *(1) Those Medicare beneficiaries who have not previously been included in the calculation of any hospice cap and who have filed an election to receive hospice care from the hospice during the period beginning on September 28 (34 days before the beginning of the cap period) and ending on September 27 (35 days before the end of the cap period).*

> *(2) In the case in which a beneficiary has elected to receive care from more than one hospice, each hospice includes in its number of Medicare beneficiaries only that fraction which represents the portion of a patient's total stay in all hospices that was spent in that hospice.*

*The following descriptions of CMS policies outlining procedures for counting beneficiaries used in the hospice cap calculation were described in CMS Ruling 1355-R and in the FY 2012 Hospice Wage Index Final Rule. The policies differ by timeframe, so*

*note carefully the timeframe and cap years mentioned. The two methods for counting beneficiaries are the streamlined method and the proportional method, and are explained below.*

**A. Hospice Appeals for Review of an Overpayment Determination (Ruling CMS-1355-R):**

*Effective April 14, 2011, a CMS Ruling entitled "Medicare Program; Hospice Appeals for Review of an Overpayment Determination" (CMS-1355-R), and also published in the **Federal Register** as CMS-1355-NR (76 FR 26731, May 9, 2011, found at http://www.gpo.gov/fdsys/pkg/FR-2011-05-09/pdf/2011-10694.pdf#page=1), was issued related to the aggregate cap calculation for hospices. This ruling provided for application of a proportional method to hospices that have challenged the original method of counting beneficiaries (shown at the beginning of section 90.2.3) for the aggregate cap calculation. Specifically, the Ruling provides that, for any hospice which has a timely-filed administrative appeal of the method used to determine the number of Medicare beneficiaries used in the aggregate cap calculation for a cap year ending on or before October 31, 2011, the Medicare contractors shall recalculate that year's cap determination using the proportional method. The proportional method is described in section 90.2.3.C below.*

**B. Cap year ending October 31, 2011 (the 2011 cap year) and all prior cap years:**

*Ruling CMS-1355-R applies only to the 2011 cap year and any prior cap year(s) for which a hospice received an overpayment determination and filed a timely qualifying appeal. For any hospice that received relief through Ruling CMS-1355-R in the form of a recalculation of one or more of its cap determinations, or for any hospice that receives relief from a court after challenging the validity of the cap regulation, the hospice's cap determination for any subsequent cap year is also calculated using a proportional method, as opposed to the original method described at the beginning of this section. The proportional method is defined below in section 90.2.3.C.*

*Additionally, there are hospices that have not filed an appeal of an overpayment determination challenging the validity of the original method for counting beneficiaries and which are waiting for CMS to make a cap determination for cap years ending on or before October 31, 2011. Any such hospice provider, as of October 1, 2011, may elect to have its final cap determination for such cap year(s), and all subsequent cap years, calculated using the proportional method.*

*Finally, those hospices which would like to continue to have the original method (hereafter called the streamlined method) used to determine the number of beneficiaries in a given cap year would not need to take any action, and would have their cap calculated using the streamlined method for cap years ending on or before October 31, 2011. The streamlined method is defined in section 90.2.3.C below.*

*C. Cap year ending October 31, 2012 (the 2012 cap year) and subsequent cap years:*

*For cap years ending on or after October 31, 2012, and all subsequent cap years, the hospice aggregate cap is calculated using the proportional method, except that eligible hospices can make a one-time election up to 60 days after receiving their 2012 cap determination to have their aggregate cap calculated using the streamlined method, as described later in this section. Contractors shall provide hospices with details on how to make that one-time election.*

<u>*Proportional Method:*</u> *Under the proportional method, for each hospice, the contractor shall include in its number of Medicare beneficiaries only that fraction which represents the portion of a patient's total days of care in all hospices and all years that was spent in that hospice in that cap year (November 1st to October 31st), using the best data available at the time of the calculation (subject to revision at a later time based on updated data). The whole and fractional shares of Medicare beneficiaries' time in a given cap year are then summed to compute the total number of Medicare beneficiaries served by that hospice in that cap year.*

*When a hospice's cap is calculated using the proportional method, and a beneficiary included in that calculation survives into another cap year, the contractor may need to make adjustments to prior cap determinations. Reopening is allowed for up to 3 years from the date of the cap determination notice, except in the case of fraud, where reopening is unlimited. A revised cap determination letter issued as a result of a reopening may itself be reopened, subject to the 3 year limitation on reopening.*

<u>*Streamlined Method:*</u> *Eligible hospices can exercise a one-time election to have its cap determination for cap years 2012 and beyond calculated using the streamlined method. The option to elect the continued use of the streamlined method for cap years 2012 and beyond is available only to hospices that have had their cap determinations calculated using the streamlined method for all cap years prior to cap year 2012.*

- *When a beneficiary receives care from only one hospice: The hospice includes in its number of Medicare beneficiaries those Medicare beneficiaries who have not previously been included in the calculation of any hospice cap, and who have filed an election to receive hospice care during the period beginning on September 28 (34 days before the beginning of the cap year) and ending on September 27 (35 days before the end of the cap year), using the best data available at the time of the calculation.*

  *Once a beneficiary has been included in the calculation of a hospice cap, he or she may not be included in the cap for that hospice again, even if the number of covered days in a subsequent cap year exceeds that of the period where the beneficiary was included (this could occur when the beneficiary has breaks between periods of election).*

- ***When a beneficiary receives care from more than one Medicare-certified hospice during a cap year or years:*** *Each Medicare-certified hospice includes in its number of Medicare beneficiaries only that fraction which represents the portion of a patient's total days of care in all Medicare-certified hospices and all years that was spent in that hospice in that cap year (November 1st to October 31st), using the best data available at the time of the calculation. Cap determinations are subject to reopening/adjustment to account for updated data. The streamlined method cap calculation for a Medicare beneficiary who has been in more than one Medicare-certified hospice is identical to the proportional method.*

### D. Beneficiary Counting Examples

*The following examples are for illustrative purposes only. As the examples indicate, if a hospice transitions from the streamlined method to the proportional method during the 2012 cap year, the transition might result in particular beneficiaries being counted a total of less or more than 1.0. As the examples illustrate, if the proportional method is applied for a given year, then every beneficiary who receives services in that year is counted based on the number of days of care furnished to the beneficiary in that year, relative to the total days of care for the beneficiary for all years.*

***Example 1.*** *Jane Smith, a Medicare beneficiary, initially elected hospice care from Hospice A beginning on June 1, 2011. Her condition improved, and she was discharged from Hospice A on August 15, 2011, as she was no longer terminally ill. However, in January 2012 Ms. Smith's condition worsened; she re-elected hospice at Hospice A on January 15, 2012, and subsequently died on February 26, 2012.*

*Streamlined Method: Hospice A would count Ms. Smith as 1 in its 2011 cap year, but would not count Ms. Smith again in its 2012 cap year. Medicare payments for hospice care provided would be counted in the cap year in which those services were provided, regardless of when payments were actually made, using the best data available at the time of the calculation.*

*Proportional Method: Ms. Smith would be counted as follows:*

| | | | |
|---|---|---|---|
| *2011 cap year (June 1st – August 15th):* | *76 days* | *= 76/119 =* | *0.64* |
| *2012 cap year (Jan 15th – Feb 26th):* | *43 days* | *= 43/119 =* | *0.36* |
| *Total days:* | *119 days* | *=* | *1.00* |

*The contractor uses the best data available at the time the cap is calculated to determine the proportional allocation of Ms. Smith's time. Because the contractor calculates the cap after allowing time for claims and adjustments to flow through the claims processing system, and assuming Hospice A files its claims without delay, by the time the 2011 cap is calculated the contractor would have information about Ms. Smith's complete hospice stay. Therefore, the contractor is able to correctly count Ms. Smith's stay for the 2011*

*and 2012 cap determinations, without having to make prior year adjustments to her proportional shares.*

*Had Ms. Smith lived until August 25, 2012, the contractor would consider the information it has at the time it makes the cap calculation when determining proportional shares. For example, if the contractor calculated the 2011 cap on June 30, 2012, using claims for dates of service through April 30, 2012, Ms. Smith's total stay would have been 183 days, and the 2011 proportional share would be 76 / 183 = 0.42. When calculating the 2012 cap determination, the contractor would be able to re-open the 2011 cap determination and correct the proportional allocation made in the previous cap year, to reflect a final allocation of 76/300 = 0.25 for the 2011 cap determination and 224/300 = 0.75 in the 2012 cap determination.*

***Transitioning from the Streamlined Method to the Proportional Method:*** *There are advantages and disadvantages for hospices transitioning from the streamlined method to the proportional method. When a transition to the proportional method occurs for the 2012 cap year, contractors shall not re-open the cap determination for prior cap years to pro-rate beneficiaries calculated under the streamlined method, who are included in beneficiary count for the 2012 cap year, unless those beneficiaries were in more than one hospice. Contractors shall consider all days of hospice care for these beneficiaries, including those in the previous cap year(s), when computing the proportional share of a beneficiary headcount using the proportional method. Therefore, some beneficiaries that were previously counted as 1 may be counted as more than 1 as a result of the transition.*

*When a hospice that elects to continue to have the streamlined method used for its cap calculation in 2012, later elects to change to the proportional method for the 2013 cap year or a later cap year, contractors can reopen cap determinations for the 2012 and later cap years. Reopening is allowed for up to 3 years from the date of the applicable cap determination, except in the case of fraud, where reopening is unlimited.*

*Additionally, when a transition to the proportional method is made, the timeframe for counting beneficiaries changes from September 28th – September 27th to November 1st – October 31st. As a result, there is a 34 day period from September 28th to October 31st, 2011 in the transition year where beneficiaries who elect hospice and die within that period are not counted in the total number of beneficiaries for either the 2011 or the 2012 cap year. However, the payments associated with those beneficiaries are counted in the 2011 cap year.*

*When a hospice transitions from the streamlined method to the proportional method, the beneficiaries' days of care from September 28 – October 31, 2011 (34 days) would not be included in the numerator for the beneficiary count calculation. However, that 34-day period would be included in the denominator because the proportional method includes in the denominator all days of hospice care provided to a beneficiary in order to prorate the beneficiary correctly. As such, any beneficiary that elected hospice care during the 34-day period would be counted as less than 1, since the numerator only includes days of service in the new cap year, but the denominator includes all days of care, including the*

*days in the 34-day transition period. The counting of these beneficiaries as less than 1 could be offset (in whole or in part) by other beneficiaries that will be carried over from years prior to the 2012 cap year that would be counted as more than 1 (one) beneficiary.*

***Example 2.*** *Hospice A's cap was calculated using the streamlined method for the 2011 cap year, but Hospice A changed to the proportional method for the 2012 cap year. Ms. Jones is a beneficiary who elected Hospice A on September 1, 2011, and who died November 15, 2011. Ms. Jones was counted as 1 in the 2011 cap determination, using the streamlined method. When computing the 2012 cap determination using the proportional method, the contractor does not re-open the 2011 cap determination to adjust Ms. Jones' count. Ms. Jones was in hospice care for a total of 76 days. In the 2012 cap year calculation using the proportional method, the contractor would count Ms. Jones as 15 / 76 = 0.20. In this case, Ms. Jones was counted as 1.20 beneficiaries.*

***Example 3.*** *Jason Smith, a Medicare beneficiary, initially elected hospice care from Hospice A in June 2012. He received hospice care for 30 days, but revoked the benefit to try a new treatment. The treatment put his disease into remission until 2016. Mr. Smith elected hospice at Hospice B in January 2016, and died 30 days later. The cap determination letter for the 2012 cap year was issued on December 29, 2013, and December 1, 2017 for the 2016 cap year. Mr. Smith received a total of 60 days of hospice care, with 30 days in the 2012 cap year and 30 days in the 2016 cap year. The contractor counted Mr. Smith in Hospice A's 2012 cap determination as 1. That 2012 cap determination is subject to reopening limitations because the 3 year reopening timeframe from the date of the cap determination letter has passed. The contractor for Hospice B counted Mr. Smith as 0.50, because Hospice B provided 30 days of care out of a total of 60 days of care. In this case, Mr. Smith was counted as 1.5 beneficiaries.*

*Had Mr. Smith re-elected the hospice benefit for 30 days in 2014 instead of 2016, and then died, then the contractor would reopen Hospice A's 2012 cap determination and re-compute the cap after reducing the total beneficiary count by 0.5, to account for the adjustment to Mr. Smith's time. Hospice B's contractor would also count Mr. Smith as 0.5 in its 2014 cap calculation. Between the 2 hospices and the different years, Mr. Smith is counted as 1 in total.*

***Example 4.*** *Mark Williams, a Medicare beneficiary, initially elected hospice care from Hospice A in June 2012. He received hospice care for 30 days, but revoked the benefit to try a new treatment, which put his disease into remission until 2014. Mr. Williams again elected hospice at Hospice A in January 2014, and died 30 days later. Hospice A has its contractor use the streamlined method. The contractor counted Mr. Williams in Hospice A's 2012 cap determination as 1. When computing the 2014 cap, the contractor would count Mr. Williams as 0, because the streamlined method requires that a beneficiary who receives care from a single hospice be counted in the initial year of election only.*

***Example 5.*** *Marla Jackson, a Medicare beneficiary, initially elects hospice care from Hospice A on September 2, 2011. Ms. Jackson stays in Hospice A until October 1, 2011, (30 days) at which time she changes her election and transfers to Hospice B. Ms.*

*Jackson stays in Hospice B for 70 days until her death on December 9, 2011. Each hospice can count the day of transfer in its total days of care. The contractor determines that the total length of hospice stay for Ms. Jackson is 100 days (30 days in Hospice A and 70 days in Hospice B).*

*Since Ms. Jackson was in more than one hospice, it doesn't matter which calculation method Hospice A or B uses; the calculation is identical and is proportional. The timeframe for counting beneficiaries using the proportional method follows that of the cap year: November 1st to October 31st. Therefore, Ms. Jackson's hospice stay not only occurred in 2 hospices, but also in 2 cap years.*

*Since Ms. Jackson was in Hospice A for 30 days in the 2011 cap year only, Hospice A counts 0.3 of a Medicare beneficiary for her in its hospice cap calculation (30 days/100 days). Hospice B counts 0.7 of a Medicare beneficiary in its cap calculation (70 days/100 days), but Ms. Jackson's stay in Hospice B must also be allocated to the appropriate cap year:*

| | *Hospice A* | *Hospice B* |
|---|---|---|
| *Total stay: 9/2/2011 – 12/9/2011* | *9/2/2011 – 10/1/2011* | *10/1/2011 – 12/9/2011* |
| *Total days: 100* | *30 days* | *70 days* |
| | | |
| *2011 Cap year (11/1/2010 – 10/31/2011)* | *30/100= 0.30* | *31/100= 0.31* |
| *2012 Cap year (11/1/2011 – 10/31/2012)* | *----* | *39/100= 0.39* |
| ***Total*** | ***0.30*** | ***0.70*** |

*If Hospice A was not Medicare certified, then the contractor would only consider Ms. Jackson's time in Hospice B.*

***Example 6.*** *Hospice A decided that it would like its contractor to calculate its cap using the proportional method beginning with the 2012 cap year. Hospice A admitted Susan Brown on October 1, 2011, and she passed away on October 20, 2011. In computing Hospice A's cap for the 2011 cap year, the contractor uses the streamlined method, which counts beneficiaries for the aggregate cap based on the date of initial election. Since Ms. Brown initially elected the Medicare hospice benefit on October 1st, she would not be included in Hospice A's beneficiary count for 2011, but the payments associated with her would be included in the total payments for the 2011 cap calculation. When the contractor calculates the 2012 cap using the proportional method, beneficiaries are counted based on the cap year timeframe (November 1, 2011 to October 31, 2012). As such, Ms. Brown is not included in the 2012 beneficiary count.*

*In the 2012 cap year, the transition from the streamlined method to the proportional method, beneficiaries who initially elect hospice and pass away during the 34 day period between September 28th and October 31st 2011, would not be included in either the count of beneficiaries for the prior year's streamlined cap calculation or in the approaching year's proportional cap calculation. However, the Medicare payments to the hospice*

*associated with those beneficiaries are included in the total actual payments used in the 2011 cap calculation.*

*Had Ms. Brown lived until November 15, 2011, she would have been included in Hospice A's cap calculation for the 2012 cap year. Her total hospice stay would then have been 46 days, with 15 of those days occurring during the 2012 cap year. Ms. Brown would be counted in the 2012 cap determination as 15/46=0.33.*

### 90.2.4 – Changing Aggregate Cap Calculation Methods
*(Rev. 156, Issued: 06-01-12, Effective: 04-14-11 for the 2011 Cap Year and Prior Cap Years; October 1, 2011 for the 2012 Cap Year and Subsequent Cap Years; Implementation Date: 07-02-12)*

*Hospices are not allowed to switch back and forth between cap calculation methods, as doing so would greatly complicate the cap determination calculation, would be difficult to administer, and could lead to inappropriate switching by hospices seeking merely to maximize Medicare payments. Additionally, in the year of a change in the calculation method or when a previous cap determination cannot be re-opened, there is a potential for over-counting some beneficiaries. Allowing hospices to switch back and forth between methods would perpetuate the risk of over-counting beneficiaries. Therefore:*

    *1) Those hospices that have their cap determination calculated using the proportional method for any cap year prior to the 2012 cap year will continue to have their cap calculated using the proportional method for the 2012 cap year and all subsequent cap years; and,*

    *2) All other hospices would have their cap determinations for the 2012 cap year and all subsequent cap years calculated using the proportional method unless they make a one-time election to have their cap determinations for cap year 2012 and beyond calculated using the streamlined method. Contractors do not reopen cap determinations for the 2011 cap year and prior cap years as a result of a hospice transition from the streamlined to the proportional method for the 2012 cap year. **NOTE**: this does not apply to hospices that appealed their cap determination.*

    *3) A hospice would be able to elect the streamlined method no later than 60 days following the receipt of its 2012 cap determination.*

    *4) Hospices which elected to have their cap determination calculated using the streamlined method may later elect to have their cap determinations calculated using the proportional method by either:*

        *a. electing to change to the proportional method (if the election is made prior to receipt of the cap determination associated with the cap year where the change is desired); or*

        *b. appealing a cap determination calculated using the streamlined method to*

*determine the number of Medicare beneficiaries.*

*5) If a hospice elected the streamlined method, and changed to the proportional method for a subsequent cap year, the hospice's aggregate cap determination for that cap year (i.e., the cap year of the change) and all subsequent cap years would be calculated using the proportional method. Past cap year determinations for the 2012 cap year and later cap years are subject to reopening; existing re-opening rules allow reopening for up to 3 years from the date of the cap determination, except in cases of fraud, where reopening is unlimited. A revised cap determination letter issued as a result of reopening may itself be reopened, subject to the 3 year limitation on reopening.*

## 90.2.5 – Other Issues
**(Rev. 156, Issued: 06-01-12, Effective: 04-14-11 for the 2011 Cap Year and Prior Cap Years; October 1, 2011 for the 2012 Cap Year and Subsequent Cap Years; Implementation Date: 07-02-12)**

*The computation and application of the aggregate cap is made by the contractor after the cap year ends. The updated PS&R system enables each hospice's contractor to correctly determine proportional allocations. For all cap years through the 2011 cap year, hospices are responsible for reporting the number of Medicare beneficiaries electing hospice care during the period to the contractor. This must be done within 30 days after the end of the cap period. For the 2012 cap year and beyond, hospices no longer need to report the number of Medicare beneficiaries to be counted in the aggregate cap calculation due to the updated PS&R system.*

*Hospices can obtain instructions regarding the cap determination method election process from their contractors. Regardless of which method is used, the contractor shall continue to demand any additional overpayment amounts due to CMS at the time of the hospice cap determination. Cap determinations are subject to the existing CMS reopening regulations, which allow reopening for up to 3 years from the date of the cap determination letter, except in cases of fraud, where reopening is not limited.*

## 90.2.6 – Updates to the Cap Amount
**(Rev. 156, Issued: 06-01-12, Effective: 04-14-11 for the 2011 Cap Year and Prior Cap Years; October 1, 2011 for the 2012 Cap Year and Subsequent Cap Years; Implementation Date: 07-02-12)**

*The original cap amount of $6,500 per year is increased or decreased for accounting years that end after October 1, 1984, by the same percentage as the percentage of increase or decrease in the medical care expenditure category of the consumer price index for all urban consumers (CPI-U, United States city average), published by the Bureau of Labor Statistics, from March 1984 to the fifth month of the accounting year. The hospice cap is calculated on the basis of a cap year beginning November 1 and ending the following October 31.*

*For example, for the cap amount for the cap year ending October 31, 2011, calculate using the March 2011 CPI-U in the medical care expenditures category of 397.726 and divide by the March 1984 CPI-U in the medical care expenditures category of 105.4 to yield an index of 3.773491 (rounded). The new hospice cap amount is the product of $6,500 (base year cap) multiplied by 3.773491. Therefore, the cap amount for the period ending October 31, 2011, is $24,527.69.*

*In those situations where a hospice begins participation in Medicare at any time other than the beginning of a cap year (November 1st), and hence has an initial cap calculation for a period in excess of 12 months, a weighted average cap amount is used. The following example illustrates how this is accomplished.*

### EXAMPLE

*10/01/10 - Hospice A is Medicare certified.*

*10/01/10 to 10/31/11 - First cap period (13 months) for hospice A.*

*Statutory cap amount for first Medicare cap year (11/01/09 - 10/31/10) = $23,874.98*

*Statutory cap amount for second Medicare cap year (11/01/10 - 10/31/11) = $24,527.69*

*Weighted average cap amount calculation for hospice A:*

*One month (10/01/10 - 10/31/10) at $23,874.98 = $23,874.98*

*12 months (11/01/10 - 10/31/11) at $24,527.69 = $294,332.28*

*13 month period $318,207.26 divided by 13 = $24,477.48 (rounded)*

*In this example, $24,477.48 is the weighted average cap amount used in the initial cap calculation for Hospice A for the period October 1, 2010, through October 31, 2011.*

***NOTE:*** *If Hospice A had been certified in mid-month, a weighted average cap amount based on the number of days falling within each cap period is used.*

### 90.3 – Administrative Appeals
*(Rev. 156, Issued: 06-01-12, Effective: 04-14-11 for the 2011 Cap Year and Prior Cap Years; October 1, 2011 for the 2012 Cap Year and Subsequent Cap Years; Implementation Date: 07-02-12)*

*The applicable contractor shall issue a letter to notify hospice providers of the results of the contractor's cap calculations and to serve as the provider's determination of program reimbursement. If there is a cap overpayment, there shall be an accompanying demand for repayment. As indicated in 42 CFR 418.311, a hospice that believes that its*

payments have not been properly determined may request a review from the applicable contractor or the Provider Reimbursement Review Board (PRRB). Each determination of program reimbursement shall include language describing the provider's appeal rights.

The above described letter, serving as the provider's determination of program reimbursement, shall include the following language:

"This notice is the contractor's final determination for purposes of appeal rights. If you disagree with this determination, you may file an appeal, in accordance with 42 CFR 418.311 and 42 CFR, part 405, subpart R. The appeal should be filed with either the applicable contractor (FI, RHHI, or A/B MAC) or the Provider Reimbursement Review Board (PRRB), depending on the amount in controversy. Appeal requests must be in writing and be filed within 180 days from the date of this determination."

# Transmittals Issued for this Chapter

| Rev # | Issue Date | Subject | Impl Date | CR# |
|---|---|---|---|---|
| R156BP | 06/01/2012 | Updates to Caps and Limitations on Hospice Payments | 07/02/2012 | 7838 |
| R141BP | 03/02/2011 | New Hospice Certification Requirements and Revised Conditions of Participation (CoPs) | 03/23/2011 | 7337 |
| R121BP | 02/05/2010 | Medicare Systems Edits Refinements Related to Hospice Services | 07/06/2010 | 6778 |
| R28BP | 12/03/2004 | Hospice Pre-Election Evaluation and Counseling Services | 01/03/2005 | 3585 |
| R22BP | 10/24/2004 | Nurse Practitioners As Attending Physicians in the Medicare Hospice Benefit | 06/28/2004 | 3226 |
| R15BP | 06/15/2004 | Nurse Practitioners As Attending Physicians in the Medicare Hospice Benefit | N/A | 3226 |
| R1BP | 10/01/2003 | Introduction to the Benefit Policy Manual | N/A | N/A |

Back to top of Chapter