

DEPARTMENT OF HEALTH AND HUMAN SERVICES

# OFFICE OF INSPECTOR GENERAL

WASHINGTON, DC 20201



**MAY 0 3 2013**

**TO:**    Marilyn Tavenner
Acting Administrator
Centers for Medicare & Medicaid Services

/S/

**FROM:**    Stuart Wright
Deputy Inspector General
    for Evaluation and Inspections

**SUBJECT:**    Memorandum Report: *Medicare Hospice: Use of General Inpatient Care*, OEI-02-10-00490

This memorandum report describes the use of hospice general inpatient care in 2011. It is part of ongoing work by the Office of Inspector General (OIG) on the Medicare hospice benefit. A companion report will look at the appropriateness of hospice general inpatient care provided to beneficiaries.

## SUMMARY

Hospice general inpatient care (GIP) is for pain control or symptom management provided in an inpatient facility that cannot be managed in other settings. The care is intended to be short-term and is the second most expensive level of hospice care. GIP may be provided in one of three settings: a Medicare-certified hospice inpatient unit, a hospital, or a skilled nursing facility (SNF).

Centers for Medicare & Medicaid Services (CMS) staff have expressed concerns about possible misuse of GIP, such as care being billed for but not provided, long lengths of stay, and beneficiaries receiving care unnecessarily. In addition, the Federal government recently reached a $2.7 million settlement with a hospice for allegedly billing Medicare for GIP when beneficiaries actually received routine home care, which has a lower reimbursement rate.[1]

We found that Medicare paid $1.1 billion for GIP in 2011, most of which was provided in hospice inpatient units, as opposed to hospitals or SNFs. Twenty-three percent of

---

[1] U.S. Department of Justice, "Hospice Home Care to Pay $2,700,000 Settlement in Medicare Fraud Case," December 9, 2011. Accessed at http://www.justice.gov/usao/are/news/2011/December/Hospice_quitam_settle_120911.html on April 22, 2013.

Medicare hospice beneficiaries received GIP during the year. One-third of beneficiaries' GIP stays exceeded 5 days, with 11 percent lasting 10 days or more. The hospices that used inpatient units provided GIP to more of their beneficiaries and for longer periods of time than hospices that used other settings. We also found that 953 hospices, or 27 percent of Medicare hospices, did not provide any GIP to Medicare beneficiaries in 2011 and that 429 of these hospices did not provide any level of hospice care other than routine home care.

These results raise several questions about GIP. Long lengths of stay and the use of GIP in inpatient units need further review to ensure that hospices are using GIP as intended and providing the appropriate level of care. OIG is committed to looking into these issues further and will conduct a medical record review that will assess the appropriateness of GIP provided in different settings. CMS should also focus on these issues as it considers options for hospice payment reform and for developing hospice quality measures. In particular, CMS should focus on hospices that do not provide GIP and ensure that these hospices are providing beneficiaries access to needed levels of care at the end of their lives. One option is for CMS to adopt a quality measure regarding hospices' ability to provide all hospice services.

## BACKGROUND

The goals of hospice care are to help terminally ill beneficiaries continue life with minimal disruption and to support beneficiaries' families and other caregivers throughout the process. The care may be provided to individuals and their families in various settings, including a hospice inpatient unit, the home, or other places of residence, such as a SNF or other nursing facility. In 2011, Medicare paid $13.7 billion for hospice care for 1.2 million beneficiaries.

To be eligible for Medicare hospice care, a beneficiary must be entitled to Part A of Medicare and be certified as having a terminal illness with a life expectancy of 6 months or less if the disease runs its normal course.[2] Upon a beneficiary's election of hospice care, the hospice agency assumes the responsibility for medical care related to the beneficiary's terminal illness and related conditions. This care is palliative, rather than curative. It includes, among other things, nursing care, medical social services, hospice aide services (sometimes referred to as home health aide services), medical supplies (including drugs and biologicals), and physician services. The beneficiary waives all rights to Medicare payment for services related to the curative treatment of the terminal condition or related conditions but retains rights to Medicare payment for services to treat conditions unrelated to the terminal illness.[3] Beneficiaries may revoke their election of hospice care and return to standard Medicare coverage at any time.[4]

---

[2] Social Security Act, §§ 1814(a)(7)(A) and 1861(dd)(3)(A), 42 U.S.C. §§ 1395f(a)(7)(A) and 1395x(dd)(3)(A); 42 CFR §§ 418.20 and 418.22. Certification is based on the physician's or medical director's clinical judgment regarding the normal course of the individual's illness.

[3] Social Security Act, §§ 1812(d)(2)(A) and 1861(dd)(1), 42 U.S.C. §§ 1395d(d)(2)(A) and 1395x(dd)(1); 42 CFR § 418.24(d).

[4] Social Security Act, § 1812(d)(2)(B), 42 U.S.C. § 1395d(d)(2)(B); 42 CFR § 418.28.

Beneficiaries are entitled to receive hospice care for two 90-day periods, followed by an unlimited number of 60-day periods.[5] The periods need not be consecutive. At the start of each period of care, an attending physician must certify that the beneficiary is terminally ill and has a life expectancy of 6 months or less. For care to be covered under Part A, hospices must be certified by Medicare.[6] In 2011, there were 3,585 Medicare hospices. Of these, 2,071 were for-profit, 1,237 were nonprofit, and 185 were government owned.[7]

The Medicare hospice benefit is currently undergoing some changes. Per the Patient Protection and Affordable Care Act (ACA), CMS must reform the hospice payment system.[8] Also, CMS must develop quality measures for hospices and hospices must report quality data. CMS is currently using two quality measures. The first relates to pain management and the second relates to how hospices track patient care. Beginning in 2014, hospices must report these measures or face reduced Medicare payments.[9]

**Hospice General Inpatient Care**
The Medicare hospice benefit has four levels of care.[10] Each level has an all-inclusive daily rate that is paid through Part A. The rate is paid to the hospice for each day that a beneficiary is in hospice care, regardless of the number of services furnished. The rates are adjusted based on the beneficiary's geographic location.

GIP is the second most expensive level of hospice care. As with all covered hospice services, hospices are required to provide GIP if the beneficiary needs it.[11] GIP is for pain control or symptom management that cannot be managed in other settings, such as the beneficiary's home.[12] GIP is intended to be short-term and may be provided in one of three settings: a Medicare-certified hospice inpatient unit, a hospital, or SNF.[13] A Medicare-certified hospice inpatient unit can be freestanding or in space shared with another health care facility. Medicare-certified hospices with inpatient units must comply with a number of Federal regulations, ranging from staffing to the dispensing of drugs.[14]

The other three levels of care are routine home care, continuous home care, and inpatient respite care. Routine home care is the most common. Medicare reimburses the hospice at this rate for each day that the beneficiary is under the care of the hospice and is not receiving one of the other levels of care. Continuous home care is allowed only during

---

[5] Social Security Act, § 1812(a)(4), 42 U.S.C. § 1395d(a)(4). Prior to 1990, Medicare provided hospice coverage for a maximum of 210 days.

[6] Social Security Act, §§ 1814(a) and 1866, 42 U.S.C. §§ 1395f(a) and 1395cc; 42 CFR § 418.116(a).

[7] We did not have information on ownership status for 92 hospices.

[8] Patient Protection and Affordable Care Act (ACA), P.L. 111-148 § 3132.

[9] ACA, P.L. 111-148 § 3004; 76 Fed. Reg. 47302, 47325–26 (Aug. 4, 2011).

[10] 42 CFR § 418.302.

[11] Social Security Act, § 1861(dd)(2)(A)(i), 42 U.S.C. § 1395x(dd)(2)(A)(i).

[12] 42 CFR § 418.302(b)(4).

[13] 42 CFR § 418.108(a) and (b). For GIP, Medicare regulations do not specify what is meant by "short term."

[14] 42 CFR § 418.110.

brief periods of crisis in which a beneficiary requires continuous care to achieve palliation or management of acute medical symptoms. Inpatient respite care is short-term inpatient care provided to the beneficiary when necessary to relieve the beneficiary's caregiver(s). It may not be provided consecutively for more than 5 days at a time.[15] See Table 1 for the unadjusted payment rates for each level of care in fiscal year (FY) 2011.

**Table 1: Unadjusted Daily Medicare Hospice Payment Rates by Level of Care, FY 2011**

| Level of Care | Unadjusted FY 2011 Rate |
|---|---|
| Routine Home Care | $146.63 |
| Continuous Home Care | $855.79 |
| General Inpatient Care | $652.27 |
| Inpatient Respite Care | $151.67 |

Source: CMS, "Update to Hospice Payment Rates, Hospice Cap, Hospice Wage Index, and the Hospice Pricer for FY 2011," Change Request 7077, July 23, 2010.

Inpatient care is subject to an annual cap. Medicare limits the total number of days of inpatient care (the sum of GIP and inpatient respite care days) for which a hospice may be reimbursed. The cap is set at 20 percent of the hospice's total patient care days.[16]

**Related Work**

This report is part of OIG's continuing work related to Medicare hospice care. Another study involving a medical record review of general inpatient claims from 2012 will follow this memorandum report. In 2011, OIG issued a report that found that hospices with a high percentage of their Medicare beneficiaries residing in nursing facilities received more Medicare payments per beneficiary and served beneficiaries who spent more time in hospice care.[17] Another report determined that Medicare paid an average of $960 per week for hospice care for each beneficiary in a nursing facility.[18] This care most commonly included nursing, home health aide, and medical social services. Hospices provided an average of 4.2 visits per week for these 3 services combined.

OIG also has conducted several studies identifying inappropriate Medicare payments in hospice. OIG found that 82 percent of hospice claims for beneficiaries in nursing facilities did not meet Medicare coverage requirements.[19] In addition, OIG identified a number of cases in which the use of inpatient respite care for beneficiaries in nursing facilities may have been inappropriate.[20] OIG also found instances in which Medicare

---

[15] 42 CFR § 418.302(e)(5).

[16] Social Security Act, § 1861(dd)(2)(A)(iii), 42 U.S.C. § 1395x(dd)(2)(A)(iii); 42 CFR § 418.302(f). Excess inpatient care days are reimbursed at the routine home care rate.

[17] OIG, *Medicare Hospices That Focus on Nursing Facility Residents*, OEI-02-10-00070, July 2011.

[18] OIG, *Medicare Hospice Care: Services Provided to Beneficiaries Residing in Nursing Facilities*, OEI-02-06-00223, September 2009. Payment for physician services was not included in the analysis.

[19] OIG, *Medicare Hospice Care for Beneficiaries in Nursing Facilities: Compliance With Medicare Coverage Requirements*, OEI-02-06-00221, September 2009.

[20] OIG, *Hospice Beneficiaries' Use of Respite Care*, OEI-02-06-00222, March 2008.

paid physicians for services related to a beneficiary's terminal illness under Part B, while also paying for physicians' services for the terminal illness under Part A.[21]

In addition, OIG is conducting a study that focuses on discharges from acute care hospitals to hospice care.[22] It will address how a hospital transfer payment policy for early discharges to hospice care would financially affect the Medicare Part A program and hospitals.

## METHODOLOGY

We based this memorandum report on an analysis of Medicare Part A hospice claims. To conduct this analysis, we extracted all Medicare Part A hospice claims from CMS's National Claims History file that included service dates for hospice care in 2011 and 2010. Part A hospice claims typically cover a 1-month period but could be for shorter periods of time. The level of hospice care, such as GIP, was indicated by a code on the claim.

We analyzed the claims data to identify the hospice beneficiaries who received GIP during 2011, the number of days that each beneficiary received this care, and the setting in which the care was provided. We also determined from the claims data the terminal illness of each beneficiary. For beneficiaries receiving care at the beginning of 2011, we used hospice claims from 2010 to determine the level of care they received when they started hospice care.

In addition, we identified all of the Medicare-certified hospices that provided hospice care in 2011. For each hospice, we determined the number of Medicare hospice beneficiaries it served, the number of hospice beneficiaries for whom it provided GIP, the settings in which it provided GIP, the number of beneficiaries for whom it provided other levels of hospice care, and the reimbursements it received for GIP and for all hospice care. We determined each hospice's profit status by using Certification and Survey Provider Enhanced Reports (CASPER). If CASPER did not show a classification of for-profit, nonprofit, or government owned for a hospice, we used information available in the Healthcare Cost Report Information System to determine the hospice's status.

We grouped hospices according to the number of Medicare beneficiaries each hospice served during the year. We considered a hospice to be large if it provided care to more than 320 Medicare beneficiaries in 2011. We considered a hospice to be small if it provided care to 90 or fewer beneficiaries.[23]

---

[21] OIG, *Questionable Billing for Physician Services for Hospice Beneficiaries*, OEI-02-06-00224, September 2010.
[22] OIG, *Medicare Could Save Millions by Implementing a Hospital Transfer Payment Policy for Early Discharges to Hospice Care*, A-01-12-00507, (forthcoming).
[23] Large hospices were those in the top 30th percentile, whereas small hospices were in the bottom 30th percentile.

For the purposes of this memorandum, we use the term "GIP stay" to refer to the continuous days in which a beneficiary received GIP from the same hospice in the same setting. To determine the continuous days a beneficiary received care, we combined claims for GIP when they were for the same beneficiary in the same setting, from the same hospice, and the start date of a subsequent claim was the same day or the next day as the ending date of the previous claim.

**Standards**
This study was conducted in accordance with the *Quality Standards for Inspection and Evaluation* issued by the Council of the Inspectors General on Integrity and Efficiency.

**Limitations**
We based this memorandum report on an analysis of Medicare hospice claims. We did not conduct a medical record review and did not determine whether services provided were medically necessary.

## RESULTS

### Medicare Paid More Than $1 Billion for Hospice General Inpatient Care in 2011, Most of Which Was Provided in Hospices' Inpatient Units, as Opposed to Hospitals or SNFs

Medicare paid $1.1 billion for GIP in 2011. This is 8 percent of the total $13.7 billion that Medicare spent for all hospice care during the year.

Most GIP was provided in hospice inpatient units. Fifty-eight percent of GIP stays were in hospice inpatient units, compared to 33 percent in hospitals and 8 percent in SNFs.[24] In addition, GIP stays in hospice inpatient units accounted for more than two-thirds of the total amount Medicare spent on GIP during the year. In 2011, Medicare paid $738 million for GIP provided in hospice inpatient units, $280 million for GIP provided in hospitals, and $86 million for this care in SNFs. These amounts accounted for 67 percent, 25 percent, and 8 percent of all GIP spending, respectively. See Figure 1.

**Figure 1: Percentages of GIP Stays and Medicare Spending on GIP by Setting, Calendar Year 2011**



Source: OIG analysis of CMS data, 2012.

Twenty-three percent of Medicare hospice beneficiaries received GIP in 2011. Seventy-one percent of these beneficiaries received GIP at the start of their time in hospice care. The most common terminal illnesses of beneficiaries who received GIP were cancer, circulatory disease, respiratory disease, ill-defined conditions, and mental disorders. These terminal illnesses were also the most common in the general hospice population.

---

[24] Because of rounding, these figures do not add to 100 percent.

**One-Third of GIP Stays Lasted Longer Than 5 Days**

Thirty-three percent of GIP stays in 2011 were longer than 5 days, with some lasting much longer than 5 days. More specifically, 11 percent of all GIP stays were 10 days or more. Two percent of all GIP stays continued for over 3 weeks. See Figure 2. Medicare policy does not specify a limit on the number of days GIP is allowed, although it is intended to be short-term. The other level of hospice care intended to be short-term, inpatient respite care, is limited to 5 consecutive days. Inpatient respite care is used to relieve the beneficiary's caregiver(s).

**Figure 2: Percentage of GIP Stays Lasting More Than 5, 10, or 21 Days, Calendar Year 2011**



Source: OIG analysis of CMS data, 2012.

GIP stays were much less likely to begin on Sunday or Saturday than on a weekday. Eight percent of all GIP stays started on Sundays and 11 percent started on Saturdays, whereas at least 16 percent of GIP stays started on each of the other days of the week. Because GIP is meant for pain control or symptom management that cannot be managed in other settings, we would expect that the percentages of GIP starts during weekend days and those during weekdays to be similar.[25] In each of the three settings, the lowest percentage of GIP stays started on Sundays. The difference between Sunday and other days was greatest in SNFs, where 5 percent of GIP stays started on Sundays and 19 percent started on Fridays. See Appendix A.

Unlike the starts of GIP stays, the ends of GIP stays were generally steady throughout the week. Fourteen percent of GIP stays ended on Sundays and 13 percent on Saturdays. Thirteen to 16 percent of GIP stays ended on each of the other days of the week.

---

[25] Hospices must make physician and nursing services available (as needed) on a 24-hour basis. Social Security Act, § 1861(dd)(2)(A)(i), 42 U.S.C. § 1395x(dd)(2)(A)(i).

**Hospices That Used Inpatient Units Provided GIP to More of Their Beneficiaries and for Longer Periods of Time Than Hospices That Used Other Settings**

Twenty-three percent of all Medicare hospices (809 hospices) provided GIP in inpatient units. Sixty percent of all Medicare hospices (2,163 hospices) provided GIP in hospitals, and 27 percent (978 hospices) provided GIP in SNFs.[26]

The 23 percent of hospices that used inpatient units were more likely than other hospices to provide GIP to their beneficiaries. Hospices that used inpatient units provided GIP to 35 percent of their beneficiaries. In contrast, hospices that did not use inpatient units and provided GIP in hospitals or SNFs did so for 12 percent of their beneficiaries. Hospices that used inpatient units were also more dependent on GIP dollars. GIP represented 13 percent of the total Medicare dollars of hospices that used hospice inpatient units. In contrast, GIP represented 4 percent of the total Medicare dollars of hospices that did not use inpatient units and provided GIP in hospitals or SNFs.

GIP stays in inpatient units were typically longer than GIP stays in other settings. On average, GIP stays in inpatient units were 50 percent longer than GIP stays in hospitals and 29 percent longer than GIP stays in SNFs. The average GIP length of stay in an inpatient unit lasted 6.1 days, whereas the average GIP length of stay in a hospital was 4.1 days and the average in a SNF was 4.8 days. See Figure 3. GIP stays in inpatient units were much more likely than GIP stays in other settings to exceed 5 days. Forty percent of all GIP stays in an inpatient unit exceeded 5 days, compared to 22 percent in hospitals and 27 percent in SNFs.

**Figure 3: Average Length of GIP Stays by Setting, Calendar Year 2011**



Source: OIG analysis of CMS data, 2012.

Hospices that provided GIP in inpatient units were more likely to be large than were other hospices that provided GIP. We considered a hospice to be large if it provided

---

[26] Some hospices provided GIP in more than one setting.

hospice care to more than 320 Medicare beneficiaries in 2011. Sixty-two percent of hospices that used inpatient units were large, compared to 29 percent of other hospices. Hospices that provided GIP in inpatient units served an average of 774 Medicare beneficiaries in 2011. Other hospices that provided GIP served an average of 292 Medicare beneficiaries.

**More Than One Quarter of Hospices Did Not Provide Any General Inpatient Care in 2011**

A total of 953 hospices did not provide GIP in 2011. This represents 27 percent of the 3,585 Medicare hospices in 2011. These 953 hospices served 92,803 Medicare hospice beneficiaries, but did not provide GIP to any of them during the year. As with all covered hospice services, hospices are required to provide GIP if the beneficiary needs it. In general, the beneficiaries served by hospices that did not provide GIP had the same terminal illnesses as beneficiaries served by hospices that provided GIP.[27]

Hospices that did not provide GIP often did not provide other levels of hospice care to beneficiaries. Sixty-eight percent of hospices that did not provide GIP also did not provide continuous care, which is a level of hospice care that manages acute medical symptoms while the beneficiary remains at home. Sixty-two percent of hospices that did not provide GIP did not provide inpatient respite care, which is short-term inpatient care provided to the beneficiary when necessary to relieve the beneficiary's caregiver(s). Like GIP, continuous care and inpatient respite care are covered by Medicare and must be provided if needed. In total, 45 percent of hospices that did not provide GIP also did not provide continuous care or inpatient respite care during the year. These 429 hospices provided only routine hospice care to all their beneficiaries throughout 2011.

The hospices that did not provide GIP were more likely than other hospices to be for-profit. In 2011, 69 percent of the hospices that did not provide GIP were for-profit, as opposed to 54 percent of hospices that provided GIP.

In addition, hospices that did not provide GIP were more likely than other hospices to be small. We considered a hospice to be small if it provided hospice care to 90 or fewer Medicare beneficiaries in 2011. Sixty-three percent of hospices that did not provide GIP were small while 18 percent of hospices that provided GIP were small.

---

[27] There were small differences in two terminal illnesses. Twenty-four percent of beneficiaries from hospices that did not provide GIP had cancer, compared to 28 percent of beneficiaries from hospices that provided GIP. Eight percent of beneficiaries from hospices that did not provide GIP had Alzheimer's disease, compared to 5 percent from the other hospices. See Appendix A.

**CONCLUSION**

GIP is an important level of care for hospice beneficiaries.  We found that Medicare paid $1.1 billion for GIP in 2011, most of which was provided in hospice inpatient units, as opposed to hospitals or SNFs.  Twenty-three percent of Medicare hospice beneficiaries received GIP during the year.  One-third of beneficiaries' GIP stays exceeded 5 days, with 11 percent lasting 10 days or more.  The hospices that used inpatient units provided GIP to more of their beneficiaries and for longer periods of time than hospices that used other settings.  We also found that 953 hospices, or 27 percent of Medicare hospices, did not provide any GIP to Medicare beneficiaries in 2011 and that 429 of these hospices did not provide any level of hospice care other than routine home care.

These results raise several questions about GIP.  Long lengths of stay and the use of GIP in inpatient units need further review to ensure that hospices are using GIP as intended and providing the appropriate level of care.  OIG is committed to looking into these issues further and will conduct a medical record review that will assess the appropriateness of GIP provided in different settings.  CMS should also focus on these issues as it considers options for hospice payment reform and for developing hospice quality measures.  In particular, CMS should focus on hospices that do not provide GIP and ensure that these hospices are providing beneficiaries access to needed levels of care at the end of their lives.  One option is for CMS to adopt a quality measure regarding hospices' ability to provide all hospice services.

This report is being issued directly in final form because it contains no recommendations. We anticipate making recommendations regarding the use of GIP in a separate report after we have completed our medical record review.  If you have comments or questions about this report, please provide them within 60 days.  Please refer to report number OEI-02-10-00490 in all correspondence.

**APPENDIX A**

**Figure A-1: Percentage of Hospice General Inpatient Care (GIP) Stays That Started on Each Day of the Week by Setting, Calendar Year 2011**



Source: Office of Inspector General analysis of Centers for Medicare & Medicaid Services data, 2012.

## APPENDIX B

**Figure B-1: Beneficiary Diagnoses in Hospices That Provided Hospice General Inpatient Care (GIP) and in Hospices That Provided No GIP, Calendar Year 2011**



Source: Office of Inspector General analysis of Centers for Medicare & Medicaid Services data, 2012.