IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>         Plaintiff,<br><br> v.<br><br>VITAS HOSPICE SERVICES, L.L.C., *et al.,*<br><br>         Defendants. | Case No. 13-0449-CV-W-BCW |

**PLAINTIFF UNITED STATES OF AMERICA'S SECOND AMENDED NOTICE OF DEPOSITION OF DEFENDANTS VITAS HOSPICE SERVICES L.L.C AND VITAS HEALTHCARE CORPORATION PURSUANT TO FED. R. CIV. P. 30(b)(6)**

  PLEASE TAKE NOTICE that, pursuant to Fed. R. Civ. P. 30(b)(6), Plaintiff the United States of America will take the deposition(s) upon oral examination, to be recorded by stenographic means and videotape, at the offices of Vitas and Chemed, or at another location mutually convenient to the parties, of Vitas Hospice Services L.L.C., and Vitas Healthcare Corporation (collectively "Vitas"). Vitas is requested to designate the person or persons most knowledgeable and prepared to testify on behalf of Vitas concerning the subject matters identified below. The depositions will commence at 9:00 a.m. on November 4, 2015 at the offices of the Dinsmore Law Firm, 255 E. Fifth Street, Suite 1900, Cincinnati, Ohio. Each deposition will be adjourned until completed.

1

Case 4:13-cv-00449-BCW   Document 234   Filed 10/30/15   Page 1 of 15

## DEFINITIONS AND INSTRUCTIONS

A. "CMS" means the Centers for Medicare and Medicaid Services, United States Department of Health and Human Services, and any employees, agents, or contractors acting on CMS' behalf.

B. "Crisis care," also known as "continuous home care," means that the patient receives hospice care consisting predominantly of licensed nursing care on a continuous basis at home, and is only furnished during brief periods of crisis and only as necessary to maintain the terminally ill patient at home. *See* 42 C.F.R. §§ 418.204(a); 418.302(b)(2).

C. "Employee" or "Employees" mean any person including, but not limited to, any independent contractor or agent, all past and present directors, officers, representatives, accountants, advisors, and consultants who acted or purported to act on behalf of Vitas or who have performed any service for, or been remunerated by, Vitas or under its name, directly or indirectly, whether on a full-time, part-time, piece-work, commission, or other basis, and whether paid or unpaid.

D. "Level of care" means the categories of covered hospice care set forth in 42 C.F.R. § 418.302: routine home care, continuous home care (or crisis care), inpatient respite care, and general inpatient care.

E. "Marketing" and "Promotion" are terms that are intended to be read expansively, including, but not limited to, any activity communicating the value of Vitas' hospice services to individuals, including, but not limited to, potential or actual Medicare beneficiaries, their healthcare providers, and their families. This would include, but not be limited to, promotional activities, marketing planning, marketing research, sales activities (such as structuring of the marketing/sales divisions, sales training and

compensation plans, and employee training and evaluations), public relations activities, and in-service training (such as training staff at hospitals, nursing homes, skilled nursing facilities, assisted-living facilities, or other health care institutions).

F. "Medicare hospice cap" means the hospice aggregate cap set by CMS each year that is used to determine, in the aggregate, the maximum amount that a hospice will be reimbursed for Medicare hospice services. *See* 42 C.F.R. § 418.309.

G. "Terminally ill" means that a person "has a medical prognosis that his or her life expectancy is 6 months or less if the illness runs its normal course" as set forth in 42 C.F.R. § 418.3.

H. The relevant time period for the subject matters for examination is since July 24, 2002.

I. The words "and" and "or" are to be read interchangeably.

## SUBJECT MATTERS FOR EXAMINATION

1. With respect to Vitas' numerical or financial goals or targets for patient census, conversion rates, levels of care, length of stay, admissions, budget, revenue, or profitability:

    a. How Vitas determined those goals or targets;

    b. When those goals or targets were determined;

    c. Who was involved in determining those goals or targets;

    d. The purpose for those goals or targets;

    e. Vitas' corporate, regional, and local strategies, plans, policies, and practices to meet those goals or targets;

    f. Meetings, discussions, and communications, whether verbal or written, about those goals or targets;

3

g. To whom those goals or targets were communicated, whether verbally or in writing;

h. The manner and frequency in which those goals or targets were communicated; and

i. The purposes for communicating those goals or targets.

2. With respect to compensation, bonuses, benefits, commissions, gifts, prizes, trips, premiums, dividends, stock options, remuneration, or employee promotion opportunities offered to Vitas employees based, in whole or part, on goals or targets for patient census, conversion rates, levels of care, length of stay, admissions, budget, revenue, or profitability:

    a. The employee eligibility requirements; and

    b. The total annual value of such compensation, bonuses, benefits, commissions, gifts, prizes, trips, premiums, dividends, stock options, remuneration, or employee promotion opportunities.

3. Regarding Vitas employment actions that were based, in whole or in part, on goals or targets for patient census, conversion rates, levels of care, length of stay, admissions, budget, revenue, or profitability, including, but not limited to, promotions, disciplinary actions, corrective action plans, adverse actions, or terminations:

    a. The type of action;

    b. The identity of the employee; and

    c. The details related to the action including, but not limited to, the reason or reasons for the action.

4. The policies, procedures, methods, or processes used by Vitas in connection with its admission and discharge of Vitas hospice patients, including, but not limited to, any changes in the policies, procedures, methods, or processes, and the reasons or rationales for those changes.

5. The policies, procedures, methods, or processes used by Vitas in connection with an order or request to start or discontinue continuous home care for Vitas hospice patients, including, but not limited to, any changes in the methods, procedures, policies, or processes, and the reasons or rationales for those changes.

6. The policies, procedures, methods, or processes used by Vitas in obtaining written certifications or recertifications of terminal illness pursuant to 42 C.F.R. § 418.22 for Medicare beneficiaries who were current or prospective Vitas hospice patients, including, but not limited to, any changes in the methods, procedures, policies, or processes, and the reason or reasons or rationales for those changes.

7. The policies, procedures, methods, or processes used by Vitas in ascertaining whether Medicare beneficiaries who were current or prospective Vitas hospice patients were eligible for the Medicare hospice benefit, including, but not limited to, any changes in the methods, procedures, or processes, and the reasons or rationales for those changes.

8. The policies, procedures, methods, or processes used by Vitas to determine whether Medicare beneficiaries who were current or prospective Vitas hospice patients were eligible for continuous home care under the Medicare hospice benefit, including, but not limited to, any changes in the methods, procedures, policies, or processes, and the reason or reasons for those changes.

9. The instructions, directions, guidance, guidelines, encouragement, criteria, standards, research, or training used by Vitas, or its employees, to determine whether current or prospective Vitas hospice patients were eligible for the Medicare hospice benefit, including, but not limited to, any changes in the instructions, directions, guidelines, guidance, encouragement, criteria, standards, research, or training.

10. The instructions, directions, guidance, guidelines, encouragement, criteria, standards, research, or training used by Vitas or its employees, to determine whether current or prospective Vitas hospice patients were eligible for continuous care under the Medicare hospice benefit, including, but not limited to, any changes in the instructions, directions, guidelines, guidance, encouragement, criteria, standards, research, or training.

11. The policies, procedures, methods, or processes used by Vitas to reduce or eliminate the risk of exceeding the Medicare hospice cap, including, but not limited to, any changes in the methods, procedures, or processes, and the reasons or rationales for those changes.

12. The policies, procedures, methods, or processes used by Vitas to create Management Operating Reports, or any other reports tracking company results and outcomes, including, but not limited to, the fields contained in the reports, the distribution and maintenance of the reports, and how Vitas uses and has used those reports to monitor business results.

13. Any internal and external audits or reviews of Vitas' hospice operations, including, but not limited to, audits conducted by the Chemed Audit Team/Group, Corridor Group, or Wells Consulting.

14. Any meetings, discussions, or communications, whether verbal or in writing, about potential corrective actions or other changes in Vitas' practices, methods, procedures, processes, or policies in response to internal and external audits or reviews of Vitas' hospice operations.

15. Any corrective actions or other changes in practices, methods, procedures, processes, or policies made by Vitas in response to internal and external audits or reviews of Vitas' hospice operations, including, but not limited to, audits conducted by the Chemed Audit Team/Group, Corridor Group, or Wells Consulting.

16. Any corrective actions or other changes in practices, methods, procedures, processes, or policies made by Vitas in response to reports or complaints from Vitas' current or former employees, patients, or physicians, caregivers, families of patients, or other individuals or entities relating to Medicare hospice requirements, including, but not limited to, the eligibility of patients for the Medicare hospice benefit.

17. Guidance, education, or training received by Vitas from CMS concerning the Medicare hospice benefit.

18. Corrective action or other changes in practices, methods, procedures, processes, or policies concerning the Medicare hospice benefit made by Vitas as a result of guidance, education, or training received by Vitas from CMS.

19. Communications, whether verbal or written received by Vitas from CMS regarding reviews by CMS of Vitas' claims under the Medicare hospice benefit, including, but not limited to, probe edits, "Additional Documentation Requests" (ADR), "Teaching and Instruction for Providers" (TIP) letters, and Focused Medical Reviews (FMR).

20. Corrective action or other changes in practices, methods, procedures, processes, or policies made by Vitas as a result of reviews or audits conducted by CMS of Vitas' claims under the Medicare hospice benefit, including, but not limited to, probe edits, ADRs, TIP letters, and FMRs.

21. Corrective action or other changes in practices, methods, procedures, processes, or policies made by Vitas as a result of communications received by Vitas from CMS regarding the lengths of stay of Medicare beneficiaries receiving hospice services from Vitas, including, but not limited to, "Non-Cancer Length of Stay" (NCLOS) letters.

22. Policies, procedures, methods, or processes Vitas had in place to ascertain whether Vitas needed to make a repayment or reimbursement, or return an overpayment, to CMS relating to the Medicare hospice benefit.

23. Meetings, discussions, or communications, whether verbal or written, about actual or potential repayments, reimbursements, or return of overpayments to CMS relating to the Medicare hospice benefit.

24. The instructions, directions, guidance, guidelines, encouragement, criteria, standards, research, training, or sales or marketing aids or collaterals provided by Vitas to its employees regarding the promotion or marketing of Vitas' hospice services, including, but not limited to, the targets and audience for Vitas' promotion and marketing.

25. The instructions, directions, guidance, guidelines, encouragement, criteria, standards, research, training, or sales or marketing aids or collaterals provided by Vitas to its employees regarding the promotion or marketing of Vitas' continuous care services,

including, but not limited to, the targets and audience for Vitas' promotion and marketing.

26. The instructions, directions, guidance, guidelines, encouragement, criteria, standards, research, training, or sales or marketing aids or collaterals provided by Vitas to its employees regarding referrals of patients to Vitas' hospice operations, including, but not limited to, the patients or types of patients to be targeted for referral.

27. With respect to Vitas' marketing collaterals:

    a. A description of those collaterals;

    b. How those marketing collaterals were developed;

    c. Who was involved in developing those marketing collaterals;

    d. How those marketing collaterals have been and are used;

    e. Who used those marketing collaterals;

    f. When those marketing collaterals were developed;

    g. How those marketing collaterals changed over time;

    h. Vitas' purpose for using those marketing collaterals; and

    i. Meetings, discussions, or communications about those marketing collaterals.

28. Policies, procedures, methods, or processes, policies related to marketing strategy, plans, activities, timing, and purpose for re-examination of "not taken under care" (NTUC) patients including, but not limited to, any changes in the methods, procedures, policies, or processes.

29. With respect to Vitas' sales competitions for its sales or marketing personnel including, but not limited to, "Go for the Gold," "Beast of the East," "Top Dog," and year-end and quarter-end pushes:

a. A description of those competitions;

b. How those competitions were developed;

c. Who was involved in developing those competitions;

d. Who took part in those competitions;

e. When those competitions took place;

f. Vitas' purpose for those competitions; and

g. Meetings, discussions, or communications about those competitions.

30. With respect to the role of Vitas' nurses and other clinical staff in promoting or marketing Vitas' hospice services:

a. A description of that role;

b. Who determines that role;

c. Whether that role has changed over time and, if so, how; and

d. Vitas' efforts to encourage its nurses and other clinical staff to work with its sales or marketing staff regarding the promotion or marketing of Vitas' hospice services.

31. How Vitas uses its continuous care services to distinguish itself from competitors, promote or market its other services, or attract referrals of potential hospice patients.

32. Vitas' methods, procedures, processes, policies and criteria for the recruitment, hiring, retention, and evaluation of Medical Directors for its hospice operations.

33. Vitas' methods, procedures, processes, and criteria for the recruitment, hiring, retention, and evaluation of physicians for its hospice operations.

34. Instructions, directions, guidance, guidelines, encouragement, criteria, standards, research, training, continuing medical education, or in-service activities provided by

or funded by Vitas to physicians employed or otherwise used by Vitas as Medical Directors in its hospice operations, including, but not limited to, training or instructions regarding the role of Medical Directors to determine whether Medicare beneficiaries who were current or prospective Vitas hospice patients were eligible for the Medicare hospice benefit.

35. Instructions, directions, guidance, guidelines, encouragement, criteria, standards, research, training, continuing medical education, or in-service activities provided by or funded by Vitas to physicians employed or used by Vitas who were not Medical Directors in its hospice operations, including, but not limited to, training or instructions regarding the role of the physician to determine whether Medicare beneficiaries who were current or prospective Vitas hospice patients were eligible for the Medicare hospice benefit.

36. The significance of the Medicare program to the financial condition of Vitas' hospice operations including, but not limited to, the percentage of revenue derived from the receipt of Medicare payments, the sources of non-Medicare revenues, whether those revenue sources have changed over time and, if so, how.

37. The amount of revenue that Vitas derives from providing continuous care services to hospice patients, the amount and types of expenses that Vitas incurs by providing continuous care services to hospice patients, the profitability of Vitas' provision of continuous care services to hospice patients, and how Vitas' provision of continuous care services to hospice patients affects its overall profitability.

38. The key factors affecting Vitas' revenue and profitability, and the roles that patient census, conversion rates, levels of care, length of stay, and admissions play in Vitas' revenues and profitability.

39. The management, operational, and organizational structure of Vitas' hospice operations, including, but not limited to, the number and types of employees responsible for marketing and promotion, clinical services for Vitas hospice patients, management of continuous care services, compliance issues regarding Vitas' hospice operations, and the submission of claims under the Medicare hospice benefit.

40. Vitas' awareness, tracking, or monitoring of nationwide or regional trends in hospice marketing, operations, or profitability; and Vitas' awareness, tracking, or monitoring of how Vitas' use of the four hospice levels of care compares to other hospices' use of those levels of care.

41. Any reports to Chemed regarding nationwide or regional trends in hospice marketing, operations, or profitability, including, but not limited to, how Vitas' use of the four hospice levels of care compares to other hospices' use of those levels of care.

42. The measures taken by Vitas to preserve, search for, identify, collect, and produce documents in connection with any government subpoena and document request served upon Vitas from 2005 to the present.

43. The limitations (including, but not limited to, date or geographic limitations) utilized in connection with Vitas' document preservation, search, collection, and production efforts.

44. The location, custodian, and medium of storage for any documents or categories of documents that Vitas did not search or are withholding, and the basis for not searching and/or withholding such documents.

45. How and where Vitas has preserved emails, electronically stored information, hard copy documents, and other sources utilized to store any information relevant to the claims and defenses of the parties to this litigation.

46. Vitas' email, electronically stored information and data backup, archive and/or restoration policies, practices, procedures, and schedules (including media and software used, frequency, medium of storage and storage locations).

47. Vitas' policies, procedures, practices, and actions regarding document and electronically stored information preservation when notified about the above-captioned litigation or the reasonable possibility of this litigation.

48. Profitability of Vitas.

49. The use of any computer-based program to track and record visits, appointments, calls, or other communications, whether verbal or written, with healthcare professionals, including, but not limited to, Salesforce.com.

50. Change in the Vitas census by year.

51. Vitas' extended prognosis discharges by year.

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General

TAMMY DICKINSON
United States Attorney

By: */s/ Lucinda S. Woolery*
LUCINDA S. WOOLERY

13

THOMAS M. LARSON
Assistant United States Attorneys

LINDSEY BERAN
Special Assistant United States Attorney

Charles E. Whittaker, Courthouse
400 E. 9th Street
Kansas City, MO 64106
Telephone: 816-426-3122
Facsimile: 816-426-3165
Cindi.Woolery@usdoj.gov
Tom.Larson@usdoj.gov

MICHAEL D. GRANSTON
RENÉE BROOKER
CAROLYN B. TAPIE
JENELLE M. BEAVERS
WILLIAM E. OLSON
NATALIE A. PRIDDY
SHANA T. MINTZ
ALEXANDER T. POGOZELSKI

Attorneys, Civil Division
United States Department of Justice
P.O. Box 261, Ben Franklin Station
Washington, D.C. 20044
Telephone: 202-616-2964

ATTORNEYS FOR THE UNITED STATES

## CERTIFICATE OF SERVICE

I hereby certify that on October 30, 2015, I served the foregoing by E-mail on all counsel of record.

                                                           /s/ Lucinda S. Woolery